## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

WILLIAM ANTHONY, PBA MARTIAL ARTS, INC., KATIE BAKER, WILLIAM BAKER, S&RW LEGACY, LLC, MORGAN BARTH, ECM HOLDINGS, LLC, CALE BEARDEN, AIMEE BEARDEN, BEARDEN PMA ONE, LLC, BEARDEN PMA TWO, LLC, BEARDEN INVESTMENT GROUP, INC., ED BENTLEY, BENTLEY & SON, INC., DAVID BLACKWELL, EMMA BLACKWELL, BLACKWELL FITNESS, INC., CLAY BRIAN, MEGAN BRIAN, RAINBOWS AND BUTTERFLIES, INC., MEREDITH BROWN, MATTHEW BROWN, MMBROWN ENTERPRISES, LLC, PRAVIN CHOUGULE, MARTIAL ARTS OF STEELE CREEK LLC, ASHLEY COSTOLNICK, JON COSTOLNICK, JAC CONSULTING GROUP, LLC, KARLY DOBLE, ANTHONY DOBLE, F5 PARTNERS, LLC, JOSEPH FEICHT, ROBIN FEICHT, JRFEICHT, INC., DAN FRAHM, DARCI FRAHM, DDF VENTURES, LLC, DDF VENTURES 2, LLC, DDF VENTURES 3, LLC, BONNIE FRASER, TYCHE FORTUNA, LLC, MATTHEW GLASS, PMA DEVELOPMENT NJ, LLC, BRIAN GRIFFITH, TOURAJ TABATABAI, ANCIENT OCEAN, LLC, KELLI HERMAN, WILLIAM JOHNSON, HERMAN JOHNSON, LLC, SCOTT HOLLAND, JENNIFER HOLLAND, OFF THE RAIL INVESTMENTS, LLC, SAN MARCO MARTIAL ARTS, LLC, DANIEL HOLLINGSWORTH, CHRYSTAL HOLLINGSWORTH, DCHOLLINGSWORTH ENTERPRISES, INC., KICKEN CHICKEN, LLC, DALE HOUSE, FORTIS ANIMUS BROKEN ARROW, LLC, LISA MARIE IVEY, MARTIAL ARTS MOGULS CORPORATION, RENNIE KAUSHAL,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 3:22-cv-00416
JURY DEMAND

MATTHEW KAUSHAL, MELROSE )
FRANCHISE PARTNERS, LLC, PMA )
OLATHE STATION, LLC, PMA LEE'S )
SUMMIT, LLC, ELIZABETH )
KETTLEWELL, MYSTRENGTHKC, LLC, )
JASON KEY, ALLISON KEY, KEY )
INGREDIENTS, INC., VERONICA )
KORMOS, NICHOLAS KORMOS, )
NKORMOS INC., JACOB KULHANEK, )
CANDACE KULHANEK, LAKESHORE )
PMA, LLC, OKEMOS PMA, LLC, MEGAN )
LARSON, MOREA STUDIO ALPHA, LLC, )
MOREA HOLDINGS, LLC, ERIS LASKU, )
PMA OF UPTOWN INC., PMA OF SAN )
ANTONIO, LLC, MORRIS LIFSCHUTZ, )
MOSAH VENTURES, INC., PATRICK )
LOBB, ART VANDALAY KARATE, INC., )
MICAH LOGAN, RYAN LOGAN, )
PREMIER ARTS LLC, KOWSILLIYA )
LOOMIS, GLENN LOOMIS, RAINY DAY )
VENTURES, LLC, JASON MCMAHON, )
THERESA SELIGMAN, CADENCIA )
ENTERPRISES, LLC, SEAN MCNALLY, )
BOSTON BLACK BELT CORP., MAGGIE )
MOORHOUSE, JAMIE MOORHOUSE, )
SAN DIEGO MARTIAL ARTS LLC, )
VRAJESH PATEL, SHEFALI PATEL, S&A )
MARTIAL ARTS, PETER PENDERGAST, )
EVERYTHING PENDY, LLC, ERIC )
PETROSEVICH, STACEY PETROSEVICH, )
SEQIL, INC., JOSHUA RAGLAND, )
KIMBERLY RAGLAND, EIGHTY ONE )
THIRTEEN, LLC, JOSEPH RHOTON, )
JENNIFER RHOTON, RHOGENICS, INC., )
MICHELLE RICHWINE, DAN )
RICHWINE, BRIAN BAUMGARTNER, )
MDB MARTIAL ARTS, INC., RICHARD )
SCOTT RUBANT, ERIKA ESTES RUBANT, )
MAKING A DIFFERENCE IN LIVES, LLC, )
PETER SILBERMAN, MICHELLE )
SILBERMAN, MCSILBERMAN CORP, )
LLC, SCOTT STEELE, REBECCA )
STEELE, COBRA STEELE, INC., SHANE )
TAYLOR, BCV INC., BRENT THIBEAUX, )
MELISSA THIBEAUX, BMT )
ENTERPRISES, INC., MERIN THOLATH, )

JOSEPH THOLATH, MERJO VENTURES INC., BILLIE TORRENT, JASON TORRENT, COMPOUND ENTERPRISES, INC., JULIAN TROTMAN, JT FRANCHISE TRUMBULL, LLC, SRIDHAR VADLAMUDI, SWAPNA SURAPANENI, 4SV MARTIAL ARTS-FAIRVIEW, LLC, CHERYL WALTERS, BENJAMIN WALTERS, LEELYNE, LLC, BRIAN WATERMAN, JANELLE WATERMAN, H20 STUDIOS, INC., KERRI WATTS, JAMES WATTS, CMW LEGACY, LLC, JASON YEN, ANQI WANG, AND NORA, LLC,

                 Plaintiffs,

    vs.

BARRY VAN OVER, MYLES BAKER, BRENT SEEBOHM, PREMIER FRANCHISING GROUP, LLC D/B/A PREMIER MARTIAL ARTS, FRANCHISE FASTLANE, LLC, UNLEASHED BRANDS, LLC, AND KIMBERLEY DALY,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## FIRST AMENDED COMPLAINT

Plaintiffs, who represent fifty-four (54) franchisees of Defendant Premier Franchising Group, LLC d/b/a Premier Martial Arts ("PMA"), file their First Amended Complaint against Defendants Barry Van Over ("Van Over"), Myles Baker ("Baker"), Brent Seebohm ("Seebohm"), PMA, Franchise Fastlane, LLC ("FFL"), Unleashed Brands, LLC ("Unleashed"), and Kimberley Daly ("Daly") for, among other things, fraudulent inducement and violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1962(c) and (d). For their causes of action, Plaintiffs state as follows:

3

## Introduction

1.      Defendants have engaged in an ongoing, multi-year, nationwide scheme to defraud hundreds of people into investing substantial amounts of money to buy and attempt to operate martial arts studios as PMA franchises. The depth of the fraudulent scheme is still being uncovered but the devastation is already well-known: retirement savings obliterated, franchisees suffering from staggering debt, and a host of hard-working individuals and families on the brink of financial ruin.

2.      The scheme that has been uncovered thus far is wide-ranging and, sadly, involves a number of different individuals and companies working together to defraud franchisees across the country. But, in short, the story discovered thus far is this: PMA and its founder, Van Over, had previously licensed their martial-arts-studio business model for a number of years. In or around 2018, Van Over first attempted to "franchise" the model. It did not work or, else, Van Over did not sell as many franchises as he apparently wanted.

3.      Sometime thereafter, Van Over hired Seebohm and FFL to change the pitch. The new pitch: fundamentally misstate material facts about the model in order to trick as many people as possible into signing up and paying hundreds of thousands of dollars in franchise fees, royalties, and other costs and expenses.

4.      Accordingly, over the next several years, PMA, Van Over, Seebohm, Baker (Vice President at PMA), and others, including—importantly—Daly, self-proclaimed as "One of America's Top Franchise Consultants," told a new story based on false statements in their efforts to sell-sell-sell as many franchises as possible. As noted, the many, many false statements are still being determined but the primary ones, which were uniformly communicated to prospective franchisees, including all of the Plaintiffs, are detailed below.

4

5.     The first is that the PMA franchise could be run "semi-absentee"—that is, the story that was told—over and over again—was that, as a franchise owner, the owner would only need to devote, as Seebohm put it, "10 hours a week or so" to operating the franchise. This particular false statement was important for boosting sales of the franchise and opening up the scheme to a whole new class of potential franchisees: those who were looking for an investment to supplement their full-time day jobs or, else, their retirement.

6.     Indeed, Defendants knew full well (as it was communicated to them countless times) that the new prospective franchisees were planning to keep full-time jobs and/or operate this investment on the side and truly be "semi-absentee" owners. That flexibility was, indeed, what led many to even consider PMA in the first place.

7.     The problem was that the notion that an owner could operate this studio "semi-absentee" was simply not true. It could not be done. It had never been done. As one legacy PMA licensee owner recently noted: "It's never been done in our industry in 75 years." As this same licensee owner also recently admitted:

**"It was unethical to sell it…as such."**

8.     In short, Defendants knew it had not been done and could not be done, so they instructed legacy licensee owners who they used to pitch the franchise to new prospective franchisees to simply lie. Seebohm, in particular, would repeatedly tell legacy owners to falsely represent the number of hours that they spent working in their studios for the sole purpose of tricking new potential franchisees into believing that the semi-absentee model was workable, when it was not.

9.     Instead, the truth is that a PMA studio cannot be run "semi-absentee." Instead, 40-60 hours of work per week is required by an owner just to keep the studio functional—not

profitable, because the overwhelming majority of the franchisees are not profitable at all—but just functional.

10. That fact leads to one of the other primary false statements: the profitability of the model. That is, PMA fundamentally misrepresented the profitability of the studios in a host of different material ways. For one, prospective franchisees were told that all legacy owners, *i.e.* the licensees, had "become" franchisees, which was not true. Instead, upon information and belief, there were 150-200 legacy owners, and PMA cut out a substantial number of them and then asked only the most profitable ones to "become" franchisees (even though the operations of these licensees-turned-franchisees was still fundamentally different than that of the new franchisees[1]). Despite this fact, PMA represented that all legacy owners had become franchisees, which was false.

11. In addition, the financial data Defendants presented to prospective franchisees was fabricated. As but one example (and many others are detailed below), Seebohm told prospective franchisees that they would achieve profit margins in excess of 40%, and this profit margin was purportedly achieved on the 4-day-per-week semi-absentee schedule, based on an average generation of approximately $35,000-$40,000 in revenue each month. These numbers were simply not real.

12. Likewise, Van Over and Baker claimed, again and again, that the financial figures were based on studios with square footage space as low as 1,200 feet (the overwhelming number of new franchisees operate in spaces of 1,400 square feet or higher) that operated 4 days per week

---

[1] The differences in the models are numerous: besides being owned and operated, full-time, by martial artists, the legacy studios are also typically in much larger square footage with multiple teaching areas and larger staffs and in much lower-rent commercial centers (ones that PMA would never approve for the new franchisees). In addition, these legacy owners have different contracts with PMA and operate under completely different business models as they relate to PMA.

6

as semi-absentees. Additionally, both discussed the "unheard of" margins of 40%+ (even though those margins were fabricated). Van Over would even frequently remark that this was an extensively tested system with a built-in safety net because of the high margins, but, in fact, upon information and belief, PMA attempted to create corporate-owned studios based on the new franchisee model and they were not profitable.

13.     In the end, none of these statements were true. Simply put, this level of profitability simply did not exist and was not achievable for the PMA franchisee model period—let alone a semi-absentee model.

14.     The Franchise Disclosure Documents (the "FDDs") that PMA has produced over the years are riddled with similar falsehoods. As but two examples (of many), the "financials" that are presented come from a cherry-picked selection of licensee owners, who operate under a completely different business model. Relatedly, the costs represented are intentionally and fraudulently understated for the new franchisee model.

15.     Yet another false statement was the number of necessary employees, which was presented as 1.5 employees. This, likewise, was not true, and Defendants knew it was not true, but Defendants presented the idea that a studio only needed one full-time and one part-time employee to operate profitably, because it was a way to artificially keep projected expenses down and maintain the ruse that the studios could be operated semi-absentee at the type of high profit margins claimed by Defendants.[2]

---

[2] As yet one more example of the blatant nature of these false statements, every previous school that Defendant Baker has tried to run was, upon information and belief, not successful financially and the current school owned by his wife, Kristina Baker, is not turning a profit while using five employees.

7

16.     Another false statement presented to Plaintiffs (and also included in the Franchise Agreements) is that PMA had systems in place to run a profitable business. It did not. The examples here are, likewise, numerous and run the gamut of all aspects of the operation: PMA promised to help franchisees hire instructors and said they had a network of potential instructors, but they did not help and they did not have any such functioning network; relatedly, PMA repeatedly said that, in emergency situations, due to injury, sickness, or otherwise, it had a traveling CIT (certified instructor team) that would ensure that franchisees could stay operational. This was, likewise, simply not true. In addition, PMA required that franchisees use its vendors, such as real-estate agents for site selection and general contractors for the build-out, but those vendors were uniformly incompetent and caused substantial delays, additional expense, and cost overruns. PMA required franchisees to use proprietary software, including Studio Pro, which Van Over owned, and it was shoddy, time-consuming, and inefficient. PMA promised "success coaches," but these individuals were typically in their twenties with no business experience (or, else, simply individuals from other unsuccessful schools), and they did not help the studios operate profitably. PMA's wildly overpriced marketing system, likewise, did not work, and, oftentimes, PMA would not let franchisees use other marketing systems that PMA had not approved (and for which PMA did not receive kickbacks) even if those other systems were far more effective. That is, in short, even if PMA had not systematically made false statements for the sole purpose of fraudulently inducing individuals into buying franchises—which they undoubtedly did—the entire business model did not work because PMA had none of the systems in place that they promised.

17.     One would think all of this could not get any worse, but it did.

18.     At some point, PMA started pressuring prospective franchisees to buy multiple "territories." In fact, for a number of Plaintiffs, these additional territories were presented as

"required"—that is, Defendants told a number of franchisees that they had to buy at least two territories and that they could simply use cash flow from the first to fund the second. But, because Defendants knew that the studios were money-losing endeavors that would never reach the profit margins fraudulently promised, there would be no cash flow from the first studio at all, so that it would not be viable to open a second (let alone, a third or fourth) location. In short, requiring franchisees to buy multiple territories, when PMA knew these territories would never be opened because the business model did not work, was just a way for PMA to force more money out of the franchisees (and, in the process, fundamentally violate the Federal Trade Commission ("FTC")'s Franchise Rule) so that, in essence, the "franchisee fee" was far more than $50,000 and, in fact, could reach as high as $298,500 depending on the number of territories purchased.

19.     And, finally, what appears to be one of the last—and, frankly, most shocking to the conscience—parts of the scheme is what you might expect from fraudsters: <u>they needed to cover their tracks</u>.

20.     So, using every ruse they could think of, Defendants, including, importantly, Unleashed, told existing franchisees that they must sign new documents—what they typically called addenda or amendments to existing contracts—and they must do so for various made-up reasons.

21.     For example, one tactic—perpetrated by Seebohm, among others—was that, during the "on-boarding" training, there was a specific step in the process in which Seebohm instructed the individual franchisees, who had already signed up for a franchise, to reach out to PMA to "transfer" the Franchise Agreement from their personal names to a business entity that they had created to operate the business. Indeed, certain Plaintiffs were told by Seebohm that they did not need to create an entity before signing the Franchise Agreement and that, after they signed the

9

Franchise Agreement, PMA would work with each franchisee to transfer the agreement over to a new entity once created.

22.     Embedded in these "transfer" documents, however, was Defendants' effort to attempt to get away scot-free with their fraud: "releases" in which the provision purports to say that the franchisee was releasing PMA from wrongdoing.

23.     That is, PMA fraudulently induced franchisees to enter into Franchise Agreements and then, once they had the money, they attempted to fraudulently induce the same franchisees into releasing claims against PMA for fraudulently inducing them into entering into the Franchise Agreements in the first place. It is shocking.

24.     When Unleashed purchased PMA in 2021,[3] it attempted to do the same thing—again. Thus, franchisees were presented with yet new documents that they were allegedly required to sign—for example, a document purportedly relating to the resizing of a territory—that, again, purported to have the franchisee release claims against PMA and/or Unleashed.

25.      Obviously, these "releases" release nothing for a host of different reasons, including that they are procured by fraud, violate the duty of good faith and fair dealing implicit in contracts under Tennessee law, and lack consideration, but, nevertheless, they reflect the cynical and sad efforts by Defendants to defraud their franchisees at every turn.

26.     In the end, as detailed in this First Amended Complaint, Plaintiffs have suffered dramatic, devastating losses as a result of Defendants' widespread fraud, bad faith, and incompetence. As Van Over says in one of his advertising videos, owning a PMA franchise will

---

[3] It is important to note that, after Unleashed purchased PMA in December 2021, the fraudulent scheme detailed herein did not change. The same false statements were still made and the same bogus model was pitched. Indeed, it appears that this scheme is ongoing to this day.

be "life-changing" for the owners. Indeed, that is one thing Van Over has said that has turned out to be true.

**Parties, Jurisdiction & Venue**

27.    Plaintiff William Anthony is a resident of the State of Florida, and Plaintiff PBA Martial Arts, Inc. is incorporated under the laws of the State of Florida with its principal place of business at 15710 Catalpa Cove Dr., Fort Myers, Florida 33908 (collectively "Anthony").

28.    Plaintiffs Katie and William Baker are residents of the State of Colorado, and Plaintiff S&RW Legacy LLC is a limited liability company organized under the laws of the State of Colorado with its principal place of business at 1704 Vista Point Drive, Severance, Colorado 80550 (collectively the "Bakers").

29.    Plaintiff Morgan Barth is a resident of the State of Tennessee, and Plaintiff ECM Holdings LLC is a limited liability company organized under the laws of the State of Tennessee with its principal place of business in Tennessee (collectively "Barth").

30.    Plaintiffs Cale and Aimee Bearden are residents of the State of Texas. Plaintiff Bearden Investment Group Inc. is incorporated under the laws of the State of Texas with its principal place of business at 4620 Parkview Lane, Fort Worth, Texas 76137. Plaintiffs Bearden PMA One LLC and Bearden PMA Two LLC are both limited liability companies organized under the laws of the State of Texas with their principal place of business in Texas. These Plaintiffs are collectively referred to herein as the "Beardens."

31.    Plaintiff Ed Bentley is a resident of the State of Michigan, and Plaintiff Bentley & Son, Inc. is incorporated under the laws of the State of Michigan with its principal place of business at 2196 Pandora Dr. Sterling Heights, Michigan 48310 (collectively "Bentley").

32. Plaintiffs David and Emma Blackwell are residents of the State of Colorado, and Blackwell Fitness Inc. is incorporated under the laws of the State of Colorado with its principal place of business at 16675 Downing Street, Thornton, Colorado 80602 (collectively the "Blackwells").

33. Plaintiffs Clay and Megan Brian are residents of the State of Florida, and Plaintiff Rainbows and Butterflies, Inc. is incorporated under the laws of the State of Florida with its principal place of business at 6043 Pine Valley Drive, Orlando, Florida 32819 (collectively the "Brians").

34. Plaintiffs Meredith and Matt Brown are residents of the State of Texas, and Plaintiff MMBrown Enterprises, LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business in Texas (collectively the "Browns").

35. Plaintiff Pravin Chougule is a resident of the State of South Carolina, and Plaintiff Martial Arts of Steele Creek LLC is a limited liability corporation organized under the laws of the State of North Carolina, with a principal address of 261 Helton Ln., Fort Mill, South Carolina 29708 (collectively "Chougule").

36. Plaintiffs Ashley and Jon Costolnick are residents of the State of Georgia, and Plaintiff JAC Consulting Group LLC is a limited liability company organized under the laws of the State of Georgia with its principal place of business at 16500 Quayside Drive, Alpharetta, Georgia 30004 (collectively the "Costolnicks").

37. Plaintiffs Karly and Anthony Doble are residents of the State of Washington, and Plaintiff F5 Partners, LLC is incorporated under the laws of the State of Washington with its principal place of business in Puyallup, Washington (collectively the "Dobles").

12

38.     Plaintiffs Joseph and Robin Feicht are residents of the State of Ohio, and Plaintiff JRFeicht Inc. is incorporated under the laws of the State of Ohio with its principal place of business at 7562 County Road 121, Fredericktown, Ohio 43019 (collectively the "Feichts").

39.     Plaintiffs Darci and Dan Frahm are residents of the State of North Carolina, and Plaintiffs DDF Ventures, LLC, DDF Ventures 2, LLC, and DDF Ventures 3, LLC are limited liability companies organized under the laws of the State of North Carolina with their principal place of business at 19935 River Falls Drive, Davidson, North Carolina 28036 (collectively, the "Frahms").

40.     Plaintiff Bonnie Fraser is a resident of the State of Nevada, and Plaintiff Tyche Fortuna LLC is a limited liability company organized under the laws of the State of Nevada with its principal place of business at 103 Emerald Dunes Circle, Henderson, Nevada 89052 (collectively "Fraser").

41.     Plaintiff Matthew Glass is a resident of the State of Florida, and Plaintiff PMA Development NJ, LLC is a limited liability company organized under the laws of the State of New Jersey with its principal place of business in New Jersey (collectively "Glass").

42.     Plaintiff Brian Griffith and Plaintiff Touraj Tabatabai are business partners and both are residents of the State of California. Plaintiff Ancient Ocean LLC is a limited liability company organized under the laws of the State of California with its principal place of business in California (collectively, "Griffith and Tabatabai").

43.     Plaintiff Kelli Herman and Plaintiff William C. Johnson are married and are residents of the State of Michigan. Plaintiff Herman Johnson LLC is a limited liability company organized under the laws of the State of Michigan with its principal place of business at 15410 North Haggerty Rd Northville, Michigan 48170.

13

44.     Plaintiffs Scott and Jennifer Holland are residents of St. Johns, Florida, and Plaintiffs Off the Rail Investments, LLC and San Marco Martial Arts, LLC are limited liability companies organized under the laws of the State of Florida (collectively the "Hollands").

45.     Plaintiffs Dan and Chrystal Hollingsworth are residents of the State of Texas. Plaintiff DCHollingsworth Enterprises, Inc. is incorporated under the laws of the State of Texas with its principal place of business in Texas. Plaintiff Kicken Chicken, LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business at 11550 Louetta Road, Houston, Texas 77070. These Plaintiffs are collectively referred to herein as the "Hollingsworths."

46.     Plaintiff Dale House is a resident of the State of Oklahoma, and Plaintiff Fortis Animus Broken Arrow LLC is a limited liability company organized under the laws of the State of Oklahoma with its principal place of business at 18193 N 113 East Avenue, Collinsville, Oklahoma 74021 (collectively "House").

47.     Plaintiff Lisa Marie Ivey is a resident of the State of California, and Plaintiff Martial Arts Moguls Corporation is a corporation organized under the laws of California with a principal address of 13343 Friar St., Van Nuys, California 91401 (collectively "Ivey").

48.     Plaintiffs Matthew and Rennie Kaushal are residents of the State of Kansas. Plaintiffs Melrose Franchise Partners, LLC, PMA Olathe Station, LLC, and PMA Lee's Summit, LLC are limited liability companies organized under the laws of the State of Kansas with a principal address of 8020 W 113th Street, Overland Park, Kansas 66210 (collectively, the "Kaushals").

14

49.     Plaintiffs Jason and Allison Key are residents of the State of North Carolina, and Plaintiff Key Ingredients Inc. is incorporated under the laws of the State of North Carolina with its principal place of business in Charlotte, North Carolina (collectively the "Keys").

50.     Plaintiff Elizabeth Kettlewell is a resident of the State of Kansas, and Plaintiff MyStrengthKC, LLC is a limited liability company organized under the laws of the State of Kansas with its principal place of business at 4122 Prairie Ln, Prairie Village, Kansas 66208 (collectively, "Kettlewell").

51.     Plaintiffs Veronica and Nicholas Kormos are residents of the State of Ohio, and Plaintiff NKormos Inc. is incorporated under the laws of the State of Ohio with its principal place of business in Ohio (collectively "Kormos").

52.     Plaintiffs Jacob and Candace Kulhanek are residents of the State of Michigan; Okemos PMA, LLC is a limited liability company organized under the laws of the State of Michigan with its principal place of business at 4750 Central Park Drive, Suite E, Okemos, Michigan 48864; and Plaintiff Lakeshore PMA, LLC is a limited liability company organized under the laws of the State of Michigan with its principal place of business at 3350 House Street NE, Rockford, Michigan 49341 (collectively the "Kulhaneks").

53.     Plaintiff Megan Larson is a resident of the State of Washington, Plaintiff Morea Studio Alpha, LLC is a limited liability company organized under the laws of the State of Washington with its principal place of business at 14240 SE 176th Street, Renton, Washington 98058, and Plaintiff Morea Holdings, LLC is a limited liability company organized under the laws of the State of Washington with its principal place of business at 4447 137th Avenue SE, Bellevue, Washington 98006 (collectively "Larson").

54.     Plaintiff Eris Lasku is a resident of the State of Texas. Plaintiff PMA of Uptown, Inc. is incorporated under the laws of the State of Texas with its principal place of business at 17026 Bulverde Road, San Antonio, Texas 78247. Plaintiff PMA of San Antonio LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business at 17026 Bulverde Road, Suite 110, San Antonio, Texas 78247. These Plaintiffs are collectively referred to herein as "Lasku."

55.     Plaintiff Morris Lifschutz is a resident of the State of California, and Plaintiff Mosah Ventures Inc. is incorporated under the laws of the State of California with its principal place of business at 13726 Canyon Loop Trail, San Diego, California 92130 (collectively "Lifschutz").

56.     Plaintiff Patrick Lobb is a resident of the State of Missouri, and Plaintiff Art Vandalay Karate, Inc. is incorporated under the laws of the State of Missouri with its principal place of business at 16517 Nation Road, Kearney, Missouri 64060 (collectively "Lobb").

57.     Plaintiffs Ryan and Micah Logan are residents of the State of California, and Plaintiff Premier Arts LLC is a limited liability company organized under the laws of the State of California, with a principal address of 636 San Julio Rd, Solana Beach, California 92075. (collectively, the "Logans").

58.     Plaintiffs Glenn and Kowsilliya Loomis are residents of the State of California, and Plaintiff Rainy Day Ventures, LLC is a limited liability company organized under the State of California with a principal address of 26333 Horsetail Street, Murrieta, California 92562 (collectively, the "Loomises").

59.     Plaintiffs Jason McMahon and Theresa Seligman are residents of the State of New Mexico, and Plaintiff Cadencia Enterprises LLC is a limited liability company organized under

the laws of the State of New Mexico with its principal place of business at 310 Del Aker Rd NW, Los Ranchos, New Mexico 87107 (collectively "McMahon and Seligman").

60.    Plaintiff Sean McNally is a resident of the State of Massachusetts, and Plaintiff Boston Black Belt Corp. is incorporated under the laws of the State of Massachusetts with its principal place of business at 100 Cummings Center Suite 246-D, Beverly, Massachusetts 01915 (collectively "McNally").

61.    Plaintiffs Jamie and Maggie Moorhouse are residents of the State of California, and Plaintiff San Diego Martial Arts LLC is a limited liability company organized under the laws of the State of California, with a principal address of 3050 Rue Dorleans, Unit 329 San Diego, California 92110 (collectively, the "Moorhouses").

62.    Plaintiffs Vrajesh and Shefali Patel are residents of the State of New Jersey, and Plaintiff S&A Martial Arts LLC is a limited liability company organized under the laws of the State of New Jersey with its principal place of business at 3130 NJ-10, Denville, New Jersey 07834 (collectively the "Patels").

63.    Plaintiff Peter Pendergast is a resident of the Commonwealth of Pennsylvania, and Plaintiff Everything Pendy, LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1112 Lehigh Avenue, Wyomissing, Pennsylvania 19610 (collectively "Pendergast").

64.    Plaintiffs Stacey and Eric Petrosevich are residents of the State of Florida, and Plaintiff SEQIL Inc. is incorporated under the laws of the State of Florida with its principal place of business in Florida (collectively the "Petrosevichs").

65.    Plaintiffs Joshua and Kimberly Ragland are residents of the State of Missouri, and Plaintiff Eighty One Thirteen, LLC is a limited liability company organized under the laws of the

17

State of Missouri with its principal place of business at 4810 Broad Oak Drive, Saint Louis, Missouri 63128 (collectively the "Raglands").

66.     Plaintiffs Joseph and Jennifer Rhoton are residents of the State of California, and Plaintiff Rhogenics, Inc. is incorporated under the laws of the State of Delaware with its principal place of business at 2314 College Drive, Costa Mesa, California 92626 (collectively the "Rhotons").

67.     Plaintiffs Michelle and Dan Richwine and Brian Baumgartner are residents of the State of Oregon, and Plaintiff MDB Martial Arts Inc. is incorporated under the laws of the State of Oregon with its principal place of business at 3084 NW River Trail Place, Bend, Oregon 97703.

68.     Plaintiffs Richard Scott Rubant and Erika Estes Rubant are residents of the State of Georgia, and Plaintiff Making a Difference in Lives, LLC is a limited liability company organized under the laws of the State of Georgia, with a principal address of 235 Foxley Way, Roswell, GA, 30075 (collectively the "Rubants").

69.     Plaintiffs Peter and Michelle Silberman are residents of the Commonwealth of Pennsylvania, and Plaintiff McSilberman Corp, LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 400 Cloverdale Drive, Wexford, Pennsylvania (collectively the "Silbermans").

70.     Plaintiffs Scott and Rebecca Steele are residents of the State of Kansas, and Plaintiff Cobra Steele Inc. is incorporated under the laws of the State of Missouri with its principal place of business in Kansas City, Missouri (collectively the "Steeles").

71.     Plaintiff Shane Taylor is a resident of the State of Nebraska, and Plaintiff BCV Inc. is incorporated under the laws of the State of Nebraska with its principal place of business in Omaha, Nebraska (collectively "Taylor").

18

72.     Plaintiffs Brent and Melissa Thibeaux are residents of the State of Texas, and Plaintiff BMT Enterprises, Inc. is incorporated under the laws of the State of Texas with its principal place of business at 13701 Genoves Drive, Little Elm, Texas 75068 (collectively the "Thibeauxes").

73.     Plaintiffs Joseph and Merin Tholath are residents of the State of California, and Plaintiff Merjo Ventures Inc. is a corporation organized under the laws of California with a principal address of 11745 Battenburg Way, Rancho Cordova, California 95742 (collectively the "Tholaths").

74.     Plaintiffs Billie and Jason Torrent are residents of the State of Wisconsin, and Plaintiff Compound Enterprises Inc. is incorporated under the laws of the State of Wisconsin with its principal place of business at 8252 Iverson Road, Wind Lake, Wisconsin 53185 (collectively the "Torrents").

75.     Plaintiff Julian Trotman is a resident of the State of Connecticut, and Plaintiff JT Franchise Trumbull, LLC is a limited liability company organized under the laws of the State of Connecticut with its principal place of business at 6540 Main Street, Suite E, Trumbull, Connecticut 06611 (collectively "Trotman").

76.     Plaintiff Sridhar Vadlamudi and Swapna Surapaneni are residents of the State of Texas, and Plaintiff 4SV Martial Arts-Fairview, LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business in Texas (collectively "Vadlamudi").

77.     Plaintiffs Cheryl and Benjamin Walters are residents of the State of Ohio, and Plaintiff Leelyne, LLC is a limited liability company organized under the laws of the State of Ohio

with its principal place of business at 5518 Irwin Simpson Rd., Mason, Ohio 45040 (collectively the "Walters").

78.     Plaintiffs Brian and Janelle Waterman are residents of the State of Colorado, and Plaintiff H20 Studios, Inc. is a corporation organized under the laws of the State of Colorado with its principal place of business at 3327 Alexander Way, Broomfield, Colorado 80023 (collectively the "Watermans").

79.     Plaintiffs Kerri Watts and James Watts are residents of the State of Texas, and Plaintiff CMW Legacy, LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business in Texas (collectively "Watts").

80.     Plaintiffs Jason Yen and Anqi Wang are residents of the State of Minnesota, and Plaintiff Nora, LLC is a limited liability company organized under the laws of the State of Minnesota with its principal place of business at 14105 Highway 13 South, Savage, Minnesota 55378 (collectively "Yen and Wang").

81.     Defendant Barry Van Over is a resident of Knoxville, Tennessee.

82.     Defendant Myles Baker is a resident of Knoxville, Tennessee. Baker is the Vice President of Operations and Training of PMA.

83.     Defendant Brent Seebohm is a resident of Nashville, Tennessee.

84.     Defendant Premier Franchising Group LLC d/b/a Premier Martial Arts is a limited liability company organized under the laws of the State of Tennessee with its principal place of business at 9202 South Northshore Drive, Suite 102, Knoxville, Tennessee 37922.

85.     Defendant Unleashed Brands, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 2350 Airport Freeway,

Suite 505, Bedford, Texas 76022. Unleashed directly and/or indirectly controls PMA, as Unleashed controls the ownership interest of PMA.

86.     Defendant Franchise Fastlane LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Omaha, Nebraska.

87.     Upon information and belief, Defendant Kimberley Daly is a resident of the State of New Hampshire.

88.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs bring claims under 18 U.S.C. § 1964(c) for Defendants' violations of 18 U.S.C. §§ 1962(c) and (d).

89.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants are found and/or transact their affairs in this judicial district.

## Facts

90.     As noted in the Introduction above, Defendants' scheme is wide-ranging, involving a host of different people and a bevy of fraudulent statements and fraudulent contracts. Plaintiffs have provided certain specific individual allegations below related to each individual Plaintiff and, otherwise, have endeavored to detail the outline of Defendants' fraudulent scheme as they understand it at this time.

## General Background

91.     Defendants publicly represent that they have "a proven business model that is simple to run and easy to scale" resulting in "a low-cost investment opportunity with enormous profit potential." According to the PMA website, Defendants have induced franchisees to open

over 200 PMA franchises in 40 States across the country and in multiple other countries, and they state that they are "growing quickly" and "excited to expand [their] reach." Defendants represent PMA franchises as providing a place for children to learn martial arts and a means for franchisees to improve the lives of these children while providing for themselves and their families.

92.     Defendants target individuals who want to make a positive impact on their communities and contribute to the well-being and development of children by making claims such as "[o]ur sole goal is for our students to develop self-discipline, high self-esteem, a positive outlook, a spirit of constant improvement, and an attitude that refuses to give up."

93.     Defendants' actual goal, however, is to enrich themselves at the expense of their franchisees, whom they subject to a calculated campaign of misrepresentations, omissions, half-truths, bad faith acts, general incompetence, and lies.

94.     Plaintiffs have become victims of this fraudulent scheme, investing, collectively, millions and millions of dollars and thousands and thousands of hours due to Defendants' misrepresentations, often spending their life savings and retirement funds to keep their franchises afloat.

95.     Defendants' actions have left many franchisees unable to continue operating, causing franchisees, including a number of Plaintiffs, to close their studios, while leaving others at the precipice of financial ruin.

96.     Van Over describes himself as "the President/CEO of Premier Martial Arts International[,] one of the largest and most successful martial arts chains in the United States."

97.     According to Defendants' website, "[Van Over's] insight into how to improve operations, win new customers, and develop curriculums proved enormously successful for hundreds of entrepreneurs." He claims that "[w]e learned very quickly that the success of Premier

22

Martial Arts was replicable in new markets across the country . . . We standardized the curriculums for our customers, implemented best practices for hiring and retaining the best instructors, and created the branding and support infrastructure necessary to win new customers and find success over the long term."

98.     As noted above, Van Over founded a PMA studio in 2004, and he licensed the concept to other martial arts instructors thereafter.

99.     Van Over ultimately licensed the PMA concept to licensees who were experienced in martial arts, worked in the business full-time, and had multiple full-time employees.

100.    In 2018, Van Over changed PMA from a license model to a franchise model.  (Van Over refers to the former licensees who purportedly became franchisees as "Legacy Owners.")

101.    At this time, Van Over began marketing the PMA franchise nationwide, organizing and coordinating multiple companies to effectuate his plan to defraud franchisees by misrepresenting key characteristics of the franchises.

102.    Initially, Van Over's franchising scheme had limited success, but then he partnered with Seebohm and FFL—and, upon information and belief—Daly to effectuate the scheme.

103.     According to his public profile, Seebohm began working at FFL in March 2019, right around the time that PMA began aggressively and fraudulently selling franchises.

104.    As noted above and below, Seebohm was a pivotal player in making a host of fraudulent misstatements to Plaintiffs.

105.    And Seebohm was apparently very good at his job, as PMA franchises sold extremely well (and the devastation Defendants have caused has now spread nationwide). Seebohm himself acknowledges as much on his LinkedIn page:

> [Seebohm] [r]ecently earned elite honors (#1 to top 5 nationwide) among all three
> top franchise networks' 400+ actively growing franchise concepts with the booming

PREMIER MARTIAL ARTS brand, developing all 210 new franchisees & 700+ total territories awarded in the first 32 months...for the #1 Franchise Sales Organization in North America.[4]

106.    Daly proved a capable saleswoman as well, as she would be the initial point of contact for many prospective franchisees in her role as a "franchise consultant." Daly contacted prospective franchisees, including a number of Plaintiffs, and encouraged them to become PMA franchisees by stating that the Semi-Absentee Model would generate consistent, high profit margins, not require the owner to work more than ten hours per week, and need only one full-time and one part-time employee.

107.    Daly has admitted her essential role in spreading PMA lies: She "interviewed" Van Over in January 2022, and Daly stated that PMA is the "number one company that Kim Daly has helped people say 'yes' to in 2020 and 2021 . . . and when I say 'number one,' I mean *a lot* of units and *a lot* of people."

108.    Van Over, in turn, acknowledged Daly's role, stating "Absolutely. We've done a lot of units with you, and you're one of the big reasons why [PMA] is number one in your broker network . . . it's consultants just like you who have really pushed our brand and believed in us."

109.    Upon information and belief, Daly receives a kickback and/or portion of the franchisee fee for aggressively pushing PMA, which she does not disclose to the prospective franchisee. Indeed, for one Plaintiff detailed below, Daly aggressively pushed PMA so hard that, after the Plaintiff signed up to purchase a PMA franchise, Daly asked that the Plaintiff post a positive review on a public forum of Daly's work. The Plaintiff refused and told her that Daly's business tactics were so aggressive and off-putting that she could not recommend Daly to anyone.

---

[4] Seebohm does not explain in his LinkedIn page profile how many of these franchisees have been profitable and/or how many of these additional 500+ territories have actually been developed.

110.    **Image 1** below shows the increasing growth rate of the number of PMA franchises from 2019 to 2022.

**Image 1**



111.    In early 2022, Defendants' scheme to sell as many franchises as possible no matter what was successful, as Unleashed acquired PMA and its associated business entities. As Van Over explained in a public interview, he personally made "a considerable sum" as part of the transaction.

112.    According to the PMA website, "[a]s a part of the Unleashed Brands family, our franchise will experience even more growth, have access to new opportunities, and will provide our franchise owners with better corporate support."

113.    According to the Unleashed website, "Premier Martial Arts is in rapid growth mode and has over 100 schools throughout the United States. With a business model that generates significant interest among both entrepreneurs and martial art studio owners, their martial arts franchise is poised for long-term success. Unleashed Brands is proud to count them as part of our portfolio."

25

114.    Defendants' scheme to defraud Plaintiffs includes a marketing campaign designed to induce Plaintiffs to become franchisees. This marketing campaign involved websites, videos, presentations, spreadsheets, calls, emails, "franchise consultants," and other communications in which Defendants make material misrepresentations about PMA.

115.    **Image 2** below shows a representative example of the communications that Defendants direct to potential franchisees, including Plaintiffs, on their website.

**Image 2**

116. When Defendants learn that an individual may be interested in becoming a franchisee, Defendants begin an aggressive sales campaign.

117. Defendants produced videos to show prospective franchisees, and Defendants require that prospective franchisees watch two of these videos prior to speaking with Seebohm about becoming a franchisee.

118. In the video titled "Premier Martial Arts Franchise Intro," among other misrepresentations, Defendants claim that "this brand is built for a non-martial-artist and a semi-absentee owner" and that the time commitment of being a semi-absentee owner "is really just 10 hours a week or so," which involves only "reviewing key financial metrics, checking in with the manager, participating on the Facebook owners page and ensuring there are no customer service issues" ("Semi-Absentee Model").

119. The video states that the Semi-Absentee Model is possible and effective because PMA has a "[f]ully-automated customer recruitment program," "[p]roven marketing and sales system," "[f]ully-integrated CRM software with billing, POS, management and marketing capabilities," "[r]egional owner and staff training events to support your growth in all areas," "PMA operations website with complete business systems, marketing, curriculum and member management training modules," "[t]wo weekly Q&A teleconferences, one for marketing and one for management," "[b]i-weekly management meetings," "[p]rivate Facebook networking group for owners and instructors," and "[o]ngoing[,] continuous[,] FREE consulting on demand."

120. Defendants also claim that, as part of the Semi-Absentee Model, "1 full time and 1 part time employee is all you need" and that "[a]ll support and marketing systems are in place." A screenshot of these statements being made in this video is shown in **Image 3** below.

27

**Image 3**



121.    Additionally, Defendants claim that PMA is "A Franchise Serious About Branding And Marketing," stating that "[o]ur expertise in branding allows us to help our franchisees market effectively in their communities."

122.    Defendants further state that "[i]n 2018, 100% of Premier Martial Arts owners agreed to convert from a license model to a franchise model[, s]howing the franchisees have full confidence in home office."

123.    In a second video, titled "Premier Martial Arts Franchise: Why Now is the Time to Invest," Van Over states that "we designed the systems, we designed the processes that owners and managers can implement easily to be profitable."  Baker states that "all of our staff goes through intense training. You are guaranteed to have a nice facility, a clean facility, [and] professional people teaching your children and adults." He also states that "I am personally most proud of our owners and them being able to provide for their family. We see owners taking vacations, leaving their business for an extended amount of time because they have a manager and systems in place that allows them to live their life in a way that they never thought they could."

28

124.    After prospective franchisees watch these videos, Seebohm arranges an initial call with them, in which he determines how to represent PMA in order to ensure that the prospective franchisees will agree to become franchisees.

125.    Following this initial call, Seebohm arranges a second call with prospective franchisees, which Defendants refer to as the "Economics Workbook" call.

126.    During this call, Seebohm represents the "financial performance and expectations of owning a PMA Studio" and presents financial information that purportedly shows the financial performance of PMA franchises operating the Semi-Absentee Model and estimates of the return on investment that prospective franchisees should expect from operating this model ("Unit Economics Presentation").

127.    He states that the Semi-Absentee Model franchises will "open the doors on day one in the black" and that they will cashflow from the first day of being open due to the systems Defendants designed.

128.    During the Unit Economics Presentation, Seebohm states that Semi-Absentee Model studios that are open four days per week have profit margins in excess of 40% and that studios that are open six days per week have profit margins of 50%. And, again, these profit margins were presented as occurring in spaces as low as 1,200 square feet, while new franchisees would be operating in spaces 1,400 square feet or higher.

129.    During this call, Seebohm relies upon the Unit Economics Presentation materials produced by Defendants that state that PMA studios "are designed to run off a staff of two people . . . Main instructor (full-time) and assistant 15-20 hours a week."  Defendants claim that "[w]e will help recruit and train all staff and instructors."

29

130. Following the Unit Economics Presentation, Seebohm arranges another call with prospective franchisees, in which he presents the FDD and "Owner Validation Calls," in which existing franchise "owners" state that the Semi-Absentee Model is effective, requiring no more than 10 hours of work per week, and one full-time and one part-time employee.

131. The calls with Seebohm lead to prospective franchisees being told to attend "Discovery Day," which takes place in Knoxville, Tennessee. For several months during the pandemic, Discovery Days took place via video calls.

132. At Discovery Day, Defendants arrange group presentations and meetings, as well as one-on-one meetings with prospective franchisees, in which Van Over, Baker, and Seebohm state that franchisees can successfully operate PMA franchises as semi-absentee owners, working just 10 hours per week with one full-time and one part-time employee. (As Van Over put it: "Everybody's looking at this as a semi-absentee investment.") These Defendants provide financials and claim that the financials are based on Semi-Absentee Model studios that are open four days per week and operated by semi-absentee franchisees. These Defendants repeat the representations about PMA described above, including that Defendants will provide staff, training, marketing, and other services to enable franchisees to operate the business without working more than 10 hours per week.

133. Following Discovery Day, Defendants "invite" prospective franchisees to become franchisees by signing a franchise agreement. Upon information and belief, few, if any, prospective franchisees have ever not been "invited" to become franchisees.

## Scheme to Defraud

134.     Each of the representations made by Defendants as described above were false, made with knowledge of this falsity, made with the intent to deceive, and designed to perpetuate Defendants' scheme to defraud franchisees, including Plaintiffs.

135.     As detailed, in part, above, Defendants' scheme to defraud included: (1) systematically subjecting prospective franchisees to false and misleading information about PMA and the Semi-Absentee Model; (2) using the martial arts experience of Van Over and the purported financial performance of the Legacy Owners to give prospective franchisees false impressions about the Semi-Absentee Model;[5] (3) developing a system to lure prospective franchisees using Daly, Seebohm, and FFL to amplify these misrepresentations; (4) tying franchisees into a series of commitments to purchase services, inventory, and equipment from companies that provided kickbacks to Defendants and were ultimately incompetent and ineffective; (5) subjecting prospective franchisees to "Discovery Days," where Van Over, Baker, and Seebohm reiterated their false narrative and promises in a multi-day, high pressure sales pitch; (6) falsely stating that certain prospective franchisees are "required" to purchase multiple territories and that the cash flow from the first territory will fund the second even though Defendants were well aware that the business model did not work and, in essence, the "required" territory purchase is just a way to increase the "franchise fee" from approximately $50,000 to up to multiple hundreds of thousands of dollars; (7) structuring the "on-boarding" process such that prospective franchisees are told that

---

[5] In reality, non-martial-artist owners have significant additional problems that martial-artist owners may not. For example, if a martial-artist owner has a problematic or absent instructor, that owner can theoretically fire the instructor and act as the instructor until a replacement can be found. A non-martial-artist owner cannot do the same. Thus, here, when Defendants had no functioning system in place to assist with hiring instructors, either in an emergency or on a full-time basis, non-martial-artist owners must either put up with a problematic instructor or plan to go without an instructor until one can be found (without Defendants' assistance).

31

they must assign and/or transfer their Franchise Agreement to a new business entity and, then, as part of that "assignment" attempt to hide general releases in these "transfer" documents; and (8) fraudulently misrepresenting the financials provided in the FDD by, among other things (and as detailed below) purposely omitting low-performing franchises from the calculations, stating that low-performing franchises had profit margins in excess of 40% (despite Van Over admitting in 2017 that martial arts studios would not have profit margins in excess of 20% to 25%), and presenting purported financials from Legacy Owners without disclosing that the financials were purportedly generated pursuant to an entirely different business model..

136.    Defendants represented and marketed the Semi-Absentee Model as an investment opportunity that would not require franchisees to devote substantial hours per week on the business, as Defendants represented that the systems that Defendants put in place would generate customers, recruit and train staff, and handle the other aspects of operating the business, such as marketing, pricing, and inventory.

137.    Defendants led prospective franchisees to believe that they would only need to "review[] key financial metrics, check[] in with the manager, participat[e] on the Facebook owners page and ensur[e] there are no customer service issues," and this scheme was calculated to target non-martial-artist individuals with jobs, careers, and other commitments by presenting the Semi-Absentee Model as a "turn-key" business that these individuals could own and successfully operate while maintaining these other obligations.

138.    The Semi-Absentee Model is a lie. The Semi-Absentee Model cannot operate as a semi-absentee business with an owner who spends 10 hours per week working on the business. These franchises require multiple full-time employees, and the franchisees must spend up to 60-

32

80 hours per week working on the business, and, even then, the studios typically still lose money or, else, the lucky few may break even.

139.    Defendants knew that operating the Semi-Absentee Model that they marketed was not possible.

140.    Prior to marketing the first Semi-Absentee Model franchises, Van Over, Baker, and Seebohm had no basis for their claims that the Semi-Absentee Model would be effective because the existing PMA studios had operated as licensees, and the licensees had martial arts experience, worked in the studios full-time, and had multiple full-time staff members—along with a host of other material differences in the business model.

141.    Initially, the Semi-Absentee Model that Defendants sold to prospective franchisees was entirely unproven, and Legacy Owners informed Defendants that the model would not work.

142.    For example, Defendant Baker opened a PMA franchise and admitted on video that he had to hire three full-time employees. He did not share this information with prospective franchisees, including Plaintiffs. Further, Defendants regularly obtained financial information from the newly-opened Semi-Absentee Model franchises, which showed that the model was failing and could not meet the financial results that Defendants promised. Nevertheless, they continued (and continue to this day) to sell this fantasy.

143.    Defendants designed the "Owner Validation Calls" to defraud prospective franchisees, including Plaintiffs, by showing prospective franchisees statements from existing owners who state that the Semi-Absentee Model is effective and that the franchises can successfully operate with one full-time and one part-time employee.

33

144.    Defendants used these calls to give Plaintiffs the false impression that the Semi-Absentee Model was effective and that Plaintiffs were hearing success stories from franchisees like themselves.

145.    Prior to recording the Owner Validation Calls, Van Over, Baker, and Seebohm instructed the existing owners to lie about the amount of work and time required to operate the franchises. At least one existing owner informed Defendants that he would no longer participate in the Owner Validation Calls because Defendants pressured him to make false statements about the Semi-Absentee Model.

146.    Another existing owner who Defendants used in these Owner Validation Calls admitted that he was working more than 40 hours per week in the franchise when he recorded the Owner Validation Call in which he stated that semi-absentee owners could operate the business with no more than 10 hours of work per week with one full-time and one part-time employee.

147.    Defendants used these misrepresentations about the amount of time that is required to operate the franchises to induce prospective franchisees to become franchisees by representing that prospective franchisees could continue to work full-time while operating the Semi-Absentee Model.

148.    Defendants encouraged—and, in some cases, required—prospective franchisees to purchase multiple territories at the same time, offering "discounted" franchise fees. Defendants misled prospective franchisees by stating that the financial success of the first franchise that the franchisee developed would enable the franchisee to have enough resources to open the following franchises.

149.    Defendants misrepresented the financial information provided to prospective franchisees. Defendants stated that the financial models provided to prospective franchisees as part

34

of the Unit Economics Presentation, at Discovery Day, and in the FDDs were based on the performance of franchisees operating according to the Semi-Absentee Model.

150.     This financial information was not based on the performance of franchisees operating according to the Semi-Absentee Model. This information was cherry-picked and/or otherwise fabricated. Defendants misrepresented that 100% of licensees agreed to become franchisees; Defendants only permitted the most successful licensees to "become" franchisees. Defendants then represented that certain cherry-picked financial data from these most successful licensees was representative of the Semi-Absentee Model, despite the fact that the licensees had not operated (and did not operate) the Semi-Absentee Model.

151.     According to one licensee whose data was included in this financial information as being representative of the Semi-Absentee Model, he informed Van Over that the franchise concept is unsustainable for owners who are not martial artists and that the Semi-Absentee Model is particularly unsustainable because operating the studio requires substantially more time than Defendants represent. This licensee stated that the financials provided to prospective franchisees were the "exact opposite" of what Van Over, Myles, and Seebohm represented because the financials did not provide an accurate representation of the Semi-Absentee Model.

152.     In addition, as noted above, Defendants failed to provide the support and systems that Defendants promised to provide, including by failing to provide (or even assist in providing) staff, training, customer generation services, competent vendors, and competent marketing. For example, the "fully-automated customer recruitment program" that Defendants promised did not work, Defendants failed to hold the promised "two weekly Q&A teleconferences," and Defendants failed to provide the promised "ongoing, continuous, FREE consulting on demand" or, else,

whatever "consulting" was provided was ineffective and/or grossly incompetent. Instead, Defendants ignored franchisees' repeated pleas for help and assistance.

153.     As one example, PMA claimed that Studio Pro would help "run the business." PMA charged $200 per month per location for the software, but it was an abject failure with little-to-no support for how to use the product from PMA and no basic software architecture for streamlining studio tasks.

154.     Indeed, as Defendant Baker recently admitted in reference to the services Defendants provide to franchisees: "We definitely have some tech deficiencies, to say the least."

155.     Defendants falsely represented that prospective franchisees would have access to a network of qualified instructors who would be able to teach the classes offered at the franchises and comprehensive training for instructors hired by franchisees, and, as such, Defendants emphasized that prospective franchisees did not need martial arts experience. Defendants then provided franchisees with a link to the website "instructorfinder.com," which provided no access to qualified instructors, and Defendants provided no additional help with hiring instructors.

156.     Defendants arranged for franchisees to use contractors selected by Defendants, typically presenting prospective franchisees with only one option for which contractor to use when building out the locations of the franchises. Defendants held franchisees to an unobtainable 6-month deadline for building out and opening the franchises, and Defendants knew that the contractor that Defendants arranged for franchisees to use could not or would not complete the build-out according to the deadline Defendants imposed upon franchisees.

157.     When franchisees predictably did not complete the build-out according to this deadline, upon information and belief, Defendants threatened to revoke the franchisees' ability to operate the franchise.

158.     Upon information and belief, Defendants held this "failure" over the heads of the franchisees, despite orchestrating this situation by requiring them to use contractors that Defendants knew could not or would not complete the build-out by Defendants' arbitrary deadline.

159.     Upon information and belief, in certain situations, Defendants stripped franchisees of the right to operate the franchise that the franchisees had worked to open, then sold the franchise territory to the next unsuspecting prospective franchisee—in effect recycling franchise territories to new prospective franchisees in a scheme to resell the same worthless territory over and over again.

160.     Defendants used this same tactic when franchisees who purchased multiple territories did not have the financial resources to develop their remaining territories within the time mandated by Defendants, as Defendants encouraged franchisees to commit to these deadlines for multiple territories and represented that the financial success of the first-developed franchise would enable franchisees to develop the following territories.

161.     Upon information and belief, Defendants used their knowledge of the inevitable failure of the Semi-Absentee Model to carry out their plan to recycle the territories, obtaining new franchise fees from prospective franchisees each time.

162.     Upon information and belief, Defendants represented that franchisees would be able to sell their franchises and undeveloped territories, despite knowing that franchisees had no success in doing so and that Defendants would force franchisees to abandon their franchises and territories so that Defendants could resell them to new prospective franchisees.

**Specific Allegations Related to Plaintiffs**

163.     Defendants directed the foregoing misrepresentations, omissions, and lies at each Plaintiff in order to effectuate their scheme and conspiracy to defraud and induce Plaintiffs to

37

become franchisees, and Plaintiffs would not have become franchisees but for this fraud. Defendants reused the same misrepresentations repeatedly, and each of the foregoing misrepresentations was made to each of the following Plaintiffs. The following allegations more specifically demonstrate the scope and breadth of Defendants' ongoing scheme:

### i.    The Anthonys

164.    The Anthonys purchased four territories in Florida in January 2021, and they opened their first franchise in April 2022. They have spent over $490,000 in opening and operating the franchise, in addition to entering into a multi-year commercial lease. The franchise has not been profitable because the Semi-Absentee Model promised by Defendants does not exist. The Anthonys must work in the franchise 40 or more hours per week, and the franchise cannot be operated with one full-time and one part-time employee.

165.    The Anthonys were introduced to Seebohm by a franchise consulting company in October 2020. The Anthonys informed this consulting company that they were seeking a semi-absentee franchise because Mr. Anthony intended to keep working in his full-time job, and Mrs. Anthony was retired and did not intend to work in the franchise. Based on the Anthonys' semi-absentee requirement, the consulting company recommended PMA.

166.    The Anthonys spoke with Seebohm by phone on October 15, 2020. During this call, the Anthonys told Seebohm that they wanted a semi-absentee franchise that would enable Mr. Anthony to keep working his full-time job and not require Mrs. Anthony to work in the franchise.

167.    Beginning in this call, and continuing throughout the entire sales process, Seebohm consistently told the Anthonys that the Semi-Absentee Model would not require the Anthonys to work in the franchise more than 10 hours per week and that it was a "semi-absentee opportunity." Seebohm told the Anthonys that he understood their requirement that the franchise be semi-

38

absentee because, according to Seebohm, he owned franchises and operated them on a semi-absentee basis while working a full-time job.

168. Following this initial call, Seebohm sent the Anthonys the videos discussed above and gave them the Unit Economics Presentation, using financials that did not represent the Semi-Absentee Model. Seebohm represented that the Anthonys would have profit margins in excess of 40% by operating the franchise four days per week, not working in the franchise more than 10 hours per week, and with one full-time and one part-time employee.

169. Seebohm told the Anthonys to attend Discovery Day.

170. On December 8 and 9, 2020, the Anthonys attended Discovery Day in Knoxville, Tennessee.

171. At Discovery Day, Seebohm, Van Over, and Baker repeated the misrepresentations about the Semi-Absentee Model discussed in the preceding paragraphs. Van Over told the Anthonys that the Semi-Absentee Model is a "business in a box" that the Anthonys could successfully operate without martial arts experience by working no more than 10 hours per week in the franchise because of the systems and support provided by Defendants.

172. None of these statements were true.

*ii.     The Bakers*

173. The Bakers became franchisees in January 2020, and they have spent over $638,000 opening and operating their franchise, in addition to entering into a multi-year commercial lease costing over $500,000.

174. The Bakers met Seebohm on November 29, 2019 in person at a coffee shop in Timnath, Colorado. At this meeting, Seebohm told the Bakers that the Semi-Absentee Model required no more than 10 hours of work per week, that the Bakers could successfully operate it

with one full-time and one part-time employee, and that the systems that Defendants had in place would ensure that the franchise would generate 40-50% profit margins as soon as the Bakers opened the franchise.

175.    At this meeting, Seebohm stated that the Semi-Absentee Model was "so great" that he planned to "buy several myself and transition away from Franchise FastLane."

176.    After this meeting, Seebohm emailed the Bakers on December 2, 2019, telling them to watch a recorded video of the Unit Economics Presentation. The Bakers watched the recorded video, in which Defendants represented that the financials shown in the presentation were representative of the Semi-Absentee Model, that the Bakers' franchise would generate 40-50% profit margins, and that the systems that Defendants had in place would guarantee these results and provide support to the Bakers.

177.    On December 3, 2019, the Bakers had a video call with Seebohm, in which the Bakers and Seebohm discussed the territory map, which showed available locations for the Bakers' franchise.

178.    After this call, Seebohm emailed the Bakers links to recorded calls of Van Over and other franchisees discussing the Semi-Absentee Model. In these calls, Van Over stated that the franchise could be successfully operated according to the Semi-Absentee Model, that an owner did not need martial arts experience to successfully operate the Semi-Absentee Model, and that the Semi-Absentee Model had profit margins in excess of 40%. The other franchisees on these calls validated these statements at the direction of Van Over, Baker, and Seebohm.

179.    On December 5, 2019, Seebohm emailed the Bakers to confirm that the Bakers had listened to the calls described in the preceding paragraph. He arranged a video call with the

40

Bakers, in which Seebohm inquired about the Bakers' finances. Seebohm informed the Bakers that they qualified to become franchisees, and he told the Bakers to attend Discovery Day.

180.     The Bakers attended Discovery Day on January 13 and 14, 2020 in Knoxville, Tennessee.

181.     At Discovery Day, Seebohm, Van Over, and Baker told the Bakers that the Semi-Absentee Model was proven and effective, that the Bakers' franchise would have profit margins in excess of 40%, and that the systems that Defendants put in place would provide all the support needed in order for the Bakers to be successful franchisees.

182.     These Defendants repeatedly stated that the Semi-Absentee Model did not require more than 10 hours per week of work, that it could be successfully operated with one full-time and one part-time employee, and that Defendants would help recruit and train employees for the Bakers. Van Over further stated that Defendants would provide a group health care plan for franchisees, which franchisees could use and offer to their employees.

183.     Likewise, on January 14, 2020, the Bakers were "invited" to become a franchisee at the end of Discovery Day. The Bakers then had a meeting with Van Over and Baker. Mr. Baker was concerned about not being a martial artist and asked again about instructors. Van Over said that staffing should be "the least of your concerns" and stated that PMA had contacts all over the country, including a traveling CIT (certified instructor team) "that has bags packed ready to go out to schools so you're never closed more than 72 hours."

184.     After the Bakers became franchisees, they learned that the Semi-Absentee Model does not work and that the financial information that Defendants provided to prospective franchisees was not representative of the Semi-Absentee Model. They must work substantially

more than 10 hours per week in the franchise. They cannot operate the franchise with one full-time and one part-time employee.

185.     Likewise, when the Bakers needed help with instructors, PMA could never assist. This occurred once when the Bakers' instructor's wife was about to have a baby in November 2021, and Van Over said he could not help. Later, on October 4, 2022, the Bakers' instructor quit. Van Over ultimately suggested to Ms. Baker that she walk into local gymnastics places and see if there was a young adult gymnast who would be willing to come teach classes for a couple of weeks.

186.     The Bakers' franchise has never reached the profit margins promised by Defendants. Rather, the Bakers' franchise barely broke even, and it did so in large part due to students prepaying for multi-year memberships and plans; however, the Bakers have been forced to close their franchise, which will entail returning these prepaid funds to the students.

187.     The Bakers' franchise has not been profitable because Defendants failed to provide the support, systems, and training that they promised, including, for example, by failing to provide bi-weekly management meetings, marketing and customer lead generation systems, consulting on demand, and two weekly Q&A teleconferences. When the Bakers inquired about the promised group health care plan, Van Over told the Bakers that such a plan did not exist and that the Bakers should contact an independent insurance broker.

*iii.     Barth*

188.     Barth purchased three territories in the Middle Tennessee area, and he has opened two franchises, while the third territory remains undeveloped. Despite following the systems and instructions that Defendants provided, he has never made a profit. Instead, his operating losses for 2022 have exceeded $80,000 to date with total losses, to date, including franchise fees,

42

construction costs, and operating losses totaling approximately $800,000. The Semi-Absentee Model has failed, requiring him to hire multiple full-time employees and spend significantly more than 10 hours per week working on the franchise.

189.     When Barth sought help from Van Over and PMA, these Defendants covered up the fact that their franchises across the country were failing and instead attempted to give Barth the impression that he was alone in being unsuccessful, *i.e.* that it was his fault.

190.     Barth began receiving Defendants' misrepresentations when Seebohm emailed him on September 27, 2019 and provided him with the two videos discussed above.

191.     In October 2019, Seebohm held calls with Barth wherein Seebohm made the representations discussed above and provided him with the false and misleading Owner Validation calls and Unit Economics Presentation.

192.     On November 5, 2019, Barth attended Discovery Day in Knoxville, Tennessee, at which Van Over, Baker, and Seebohm repeated the misrepresentations about, among other things, the Semi-Absentee Model, profit margin, and average monthly revenue.

193.     In addition, Van Over instructed Barth that he was required to use RPM Construction, LLC. Indeed, the president of RPM Construction, LLC led a presentation at Discovery Day touting the money-saving services they would provide. The problems with RPM Construction, LLC were legion:

- They told Barth he would be ready to open by August 2020. Construction was not complete until late December 2020.
- Due to this fact and PMA's instructions/"system," Barth started pre-sales in July 2020 and then lost dozens of members due to delays. Likewise, he had substantial increased cost due to staff being on payroll for months before they were needed.
- RPM Construction, LLC hired a contractor who was not licensed to work in Tennessee and later a stop-work order was issued from Davidson County.
- The contractor did not pay subs, and Barth had to directly pay subs in order to remove liens.
- Barth lost $85,207 in operating losses in 2020 before his school was even open.

43

194.    Despite the consistent losses from Day One for Barth, he was awarded a "Rising Star" award at the PMA Symposium in October 2021—presumably because Barth has been following the PMA "system."

195.    Likewise, Barth served as a franchisee validator on several phone calls arranged by Seebohm in late 2021 and early 2022. In these calls, Seebohm expressly asked Barth not to discuss the fact that he was not making a profit yet and to under-play how much he was working in the business.

196.    Barth has paid as much as $3,500 per month per school for PMA's "marketing" and the results have been uniformly terrible. Even trying to get basic PMA gear and required uniforms from the PMA-run merchandise platform has been problematic, as the materials are frequently out-of-stock.

197.    In the end, the entire PMA operation has simply been a bungled failure.

*iv.     The Beardens*

198.    The Beardens purchased six territories in May 2021, and they opened the first franchise in May 2022. They have lost over $145,000 opening and operating this franchise to date this year, in addition to incurring nearly $300,000 in loans to purchase and develop the franchise and signing leases that total over $950,000 over the terms.

199.    In April 2021, a franchise consultant, Giuseppe Grammatico, introduced the Beardens to the PMA franchise and arranged an introduction to Seebohm. Grammatico enticed the Beardens into pursuing PMA as a franchise due to their rapid growth and popularity.

200.    On May 10, 2021, the Beardens spoke with Seebohm, and he represented that the Semi-Absentee Model would be effective and provided the videos discussed above.

201. On May 13, 2021, Seebohm gave the Beardens the Unit Economic Presentation via zoom. In addition to the misrepresentations inherent in the Unit Economic Presentation, Seebohm represented that franchises that operated six days per week had profit margins in excess of 50%. Seebohm said the Semi-Absentee Model required only one full-time and one part-time employee. Seebohm encouraged the Beardens to purchase multiple territories by claiming that the initial franchise would generate enough immediate cash flow to pay for opening subsequent franchises.

202. On May 17, 2021, the Beardens met with Seebohm via zoom, and Seebohm presented the Owner Validation Calls.

203. On May 24, 25, and 26, 2021, the Beardens attended Discovery Day in Knoxville, Tennessee. At Discovery Day, Baker and Seebohm told the Beardens that the financials provided in the Unit Economics Presentation were based solely on franchises that were open four days per week in a 1200 sq. ft. space. At Discovery Day, Seebohm, Van Over, and Baker told the Beardens that the Semi-Absentee Model would not require Mr. Bearden to work more than 10 hours per week in the franchise or hire more than one full-time and one part-time employee.

204. On May 25, 2021, at a bowling alley in downtown Knoxville, Van Over told the Beardens multiple times that the Semi-Absentee Model was "extensively tested" and had a "built-in safety net" due to the high margins.

205. At Discovery Day, Van Over told the Beardens to purchase multiple territories, stating that the profits from the first franchise would provide funding to open the following franchises. In reliance upon Defendants' misrepresentations, the Beardens became franchisees on May 31, 2021.

45

*v.* *Bentley*

206.     On August 6, 2019, Bentley received an email from Debbie Kurland at FFL to kick off the "discovery" process regarding PMA. Ms. Kurland also sent the Unit Economics Presentation for review prior to Bentley's call with Seebohm.

207.     On August 9, 2019, Bentley participated in the Unit Economics call with Seebohm, during which Seebohm told Bentley for the first time (of many) that PMA would assist with staff recruitment; that PMA had a well-established, "proven" semi-absentee model that would only require 10 hours of work per week; that PMA franchisees regularly achieved 47.9% net profit based on a 4-day work week; and that only 1.5 employees were needed. Finally, Seebohm reiterated that, as a PMA franchisee, Bentley would have frequent Q&A and management meetings with PMA management to assist in making his franchise a profitable business. Most importantly, Seebohm told Bentley that Bentley did not need any martial arts experience to be successful and that all he needed to do during his 10 hours per week was to review key financial metrics, check in with his manager, participate on the Facebook owners page, and handle any customer service issues.

208.     On August 9, 2019, Bentley received the PMA FDD from Amie Hawk at FFL.[6]

209.     On August 13, 2019, Bentley received purported territory options from Seebohm.

210.     Between August 15, 2019 and September 9, 2019, Bentley attended multiple conference calls with Van Over, Baker, and Seebohm and several "Legacy Owners" where the

---

[6] The 2019 FDD is, of course, riddled with false statements. The biggest is that the financials provided in Item 19 are purportedly from the same business model being pitched to the new franchisees. If the numbers are actually real, which, upon information and belief, they are not, the model is not the same at all, as "Legacy Owners" who transitioned to franchisees do not operate the same business model being sold to new franchisees. As but one (of many) material misrepresentations, the expenses in the 2019 FDD are woefully understated, which wildly skews the numbers.

46

"proven" semi-absentee model, net profit margin, 1.5 employees, and other statements referenced above were reiterated.

211. On September 10-11, 2019, Bentley attended his "Discovery Day" in Knoxville. Again, the above-mentioned false statements were made multiple times during group meetings, private meetings, and casual conversations. Van Over and Baker also heavily pushed the idea that Bentley should buy at least five territories. They stated that the 47.9% net profit would allow the first studio to finance the opening of the second studio and so on. The message was loud and clear and reiterated, again and again, that with PMA's years of experience, proven model, systems, and support, Bentley would absolutely be successful. Bentley was even told during one of the discussions with Van Over and Baker that no one had failed yet and that every franchisee was performing well.

212. Relying on these many false statements, Bentley signed the Franchise Agreement on September 9, 2019 and purchased three territories. Now, he has spent approximately $550,000 on franchise fees (including the additional territory fees), the build-out of the one studio that he has opened, and the money he has lost in the operation of the school itself. Likewise, like the many other plaintiffs here, he is signed on to a five-year lease with a personal guaranty.

213. In short, Bentley has two full-time employees, plus himself—all of whom currently work a 5-day per week schedule—and he has never come close to breaking even in a single month <u>ever</u>. Instead, he loses on average between $10k-$12k per month ever since he opened for pre-sales in November of 2020. Despite the fact that he follows the models and uses the PMA "system," he has found no success whatsoever.

47

*vi.*     *The Blackwells*

214.    The Blackwells purchased three territories in Colorado in May 2020, and they opened their first franchise in July 2021. The Blackwells have spent over $400,000 opening and operating this franchise, and the franchise has operated at a loss every month since opening (with the exception of two months). The Blackwells also entered into a multi-year commercial lease to open the franchise.

215.    The Blackwells were contacted by FFL on March 30, 2020 to set up a zoom meeting to discuss the Semi-Absentee Model with Seebohm.

216.    The Blackwells informed Seebohm that Mr. Blackwell had recently been laid off, needed to support his family, and therefore could not wait months or years in order to break even on the franchise. Seebohm assured the Blackwells that the Semi-Absentee Model would be profitable immediately.

217.    The Blackwells asked Seebohm whether other franchisees had been unsuccessful, how profitable the franchise would be, and how long the franchise would take to open. Seebohm told the Blackwells that no franchisee had ever failed, closed a franchise, or been unprofitable, that the franchise would achieve at least the level of profitability shown in the Unit Economics Presentation, and that the franchise would be opened within five months.

218.    Seebohm arranged for the Blackwells to attend Discovery Day in Knoxville, Tennessee from May 11 to 13, 2020.

219.    At Discovery Day, Van Over, Baker, and Seebohm falsely told the Blackwells that the franchise operating costs would be no more than $12,000 to $15,000 per month and that no franchise operating the Semi-Absentee Model had revenue less than $30,000 per month in any

48

month. The Blackwells' franchise costs more than $20,000 per month to operate, and the Blackwells have had revenue near $30,000 only two months since opening.

220. At Discovery Day, these Defendants falsely told the Blackwells that Defendants had a database for finding and hiring permanent instructors. Likewise, they said they would provide instructors to teach the classes at the Blackwells' franchise if the Blackwells got in a bind and needed a fill-in. They also said a "seasoned coach," Gabby Good, would help open the Blackwells' franchise. Van Over and Baker told the Blackwells that virtually no franchisees failed, but those that did fail failed because they did not follow the Defendants' Semi-Absentee Model.

221. Defendants failed to provide instructors to the Blackwells, the database that Defendants promised did not have instructors who could teach lessons at the Blackwells' franchise, and Ms. Good quit working with Defendants prior to helping the Blackwells open their franchise.

222. At Discovery Day, Van Over, Baker, and Seebohm stated that the Semi-Absentee Model would not require the Blackwells to work in the franchise for more than 10 hours per week and that only one part-time and one full-time employee would be necessary. Shortly after the Blackwells agreed to become franchisees, Van Over and Baker stated that the Blackwells needed to work in the franchise full-time and that no one had ever stated that the Semi-Absentee Model was semi-absentee.

223. At Discovery Day, these Defendants told the Blackwells that Defendants would provide marketing, assuring the Blackwells that they had a "marketing expert" to manage advertising on all social media platforms for franchisees, including the Blackwells. Defendants failed to provide such a "marketing expert," and the Blackwells were forced to spend thousands of dollars hiring a marketing firm.

49

224.   At Discovery Day, these Defendants represented that the Blackwells and Defendants would be "in this together," with these Defendants providing the Blackwells any help that the Blackwells needed in order to make the franchise successful. After the Blackwells became franchisees, these Defendants did not provide this assistance, and instead, Van Over publicly blamed the Blackwells for encountering difficulties in a video shared with all franchisees.

225.   At Discovery Day, Defendants also specifically stated that they were looking for owners with business experience but not martial arts experience, and they emphasized that not having martial arts background was not an issue because they would come alongside and coach the franchisees every step of the way.

226.   At Discovery Day, Van Over and Baker assured the Blackwells that Defendants would help select a territory for the Blackwells' franchise in a place that would guarantee the franchise's success and that they would not locate another franchise near the Blackwells' franchise. Defendants did not provide this assistance, and Defendants later located a number of franchise territories near the Blackwells'. During a later telephone call, the Blackwells asked Baker whether the location of the Blackwells' franchise was appropriate, and Baker assured the Blackwells that the location was a "recipe for success." It was not, as the area has demographics that are inadequate to support the franchise.

227.   Indeed, the Blackwells inquired about placing a studio in a nearby city (Brighton) but were told that it was not a viable territory and, therefore, was not possible. Then, of course, only months afterwards, Defendants created a territory there and sold it to another franchisee.

228.   Defendants arranged for the Blackwells' instructor to meet with a "coach" provided by Defendants. During calls with this "coach," the "coach" was not knowledgeable about basic questions, which caused much frustration, and berated the Blackwells' instructor, causing the

instructor to ultimately quit. The Blackwells were forced to spend weeks and thousands of dollars to locate and train a new instructor.

229.     Defendants required the Blackwells to contract with RPM Construction LLC for the build-out. RPM Construction LLC assured the Blackwells that it would produce three "555" bids for the Blackwells, guaranteeing that the bidders would have 5-star reviews, be in business at least 5 years, and have $5,000,000 in revenue. RPM Construction LLC did not produce such bids, and instead, it submitted three fake bids on behalf of companies who did not know about the project.

230.     RPM Construction LLC failed to complete the build-out in a timely or professional manner, using subcontractors who performed work while intoxicated and damaged the Blackwells' premises. RPM Construction LLC's actions delayed the opening of the Blackwells' franchise by multiple months, costing the Blackwells' time and lost revenue.

*vii.     The Brians*

231.     The Brians purchased five territories in Florida in August 2020, and they opened their first franchise in August 2021. The Brians' franchise has been profitable only one month since opening. The Brians have spent over $500,000 opening and operating the franchise, in addition to entering into a ten-year commercial lease with hundreds of thousands of dollars in payments remaining due, and Mr. Brian must work in the franchise over 40 hours per week. The Brians have drained their retirement accounts and pulled equity from their home to try to make the Semi-Absentee Model work, but the franchise continues to lose money every month.

232.     On June 4, 2020, a franchise consultant introduced the Brians to Mr. Brianto Larry Carnell, VP of Business Development at Benetrends, a financing company that teaches prospective

51

franchisees how to fund their franchises through 401k rollovers. The Brians obtained approval to finance a franchise in this manner.

233.    After the Brians secured funding, Chelsey Boyce, a representative of FFL, contacted Mr. Brian on June 10, 2020 and asked Mr. Brian to watch the two introductory videos about PMA described above.

234.    After Mr. Brian watched these videos, Seebohm called Mr. Brian on June 17, 2020. During this call, Seebohm told Mr. Brian that the Semi-Absentee Model was proven and effective, that Mr. Brian would achieve the profit margins advertised by PMA, and that he would not have to work more than 10 hours per week on the franchise.

235.    On June 19, 2020, another representative of FFL, Amie Hawk, sent Mr. Brian a request for permission to send the FDD to Mr. Brian. On June 22, 2020, she emailed Mr. Brian the FDD, which, as detailed herein, contained misrepresentations regarding the financial performance of the Semi-Absentee Model.

236.    On June 23, 2020, Chelsey Boyce began sending Mr. Brian invites for PMA "Leadership" and "Validation" conference calls. During these calls, Van Over, Baker, and existing owners told the Brians that the Semi-Absentee Model would not require the Brians to work in the franchise more than 10 hours per week and that the Brians would be successful by following the Semi-Absentee Model because the systems put in place by Van Over, Baker, and PMA were tested and proven.

237.    On June 29, 2020, the Brians met Baker and another representative of PMA, Reed Pressley, at a PMA studio in Sanford, Florida. The Brians spoke with Baker and raised concerns about the viability of the Semi-Absentee Model, and Baker assured the Brians that the Semi-Absentee Mode was proven and effective and that the Brians would achieve the advertised

52

financial success by following PMA's systems. Mr. Brian raised concerns about whether PMA could handle the rapid increase in new franchisees, and Baker assured him that PMA could do so.

238. The next day, Mr. Brian emailed Seebohm to inform Seebohm that the Brians would purchase five territories.

239. The Brians attended Discovery Day in Knoxville, Tennessee on July 29 and 30, 2020. At Discovery Day, Van Over and Baker told the Brians that they would have profit margins in excess of 40% by operating the franchise no more than 10 hours per week. They further stated that PMA's systems and support would ensure the Brians' success.

240. After becoming franchisees, the Brians discovered that the Semi-Absentee Model does not work. Despite following the systems and processes imposed by PMA, the Brian continue to lose money on their franchise each month.

241. The systems and support promised by Van Over, Baker, and PMA were not effective. For example, the "Success Coaches" provided by PMA were uniformly inept and unable to provide assistance to the Brians. Further, the CRM software that the Brians were required to use was ineffective and provided thousands of fake leads to the Brians.

242. The Brians attended a convention hosted by PMA. At this convention, Mr. Brian asked Baker to introduce Mr. Brian to franchisees who successfully operated the Semi-Absentee Model by working no more than 10 hours per week. Baker could not think of any franchisee doing so.

### viii.    The Browns

243. The Browns purchased two territories in Texas and two territories in Louisiana in late 2021. The Browns have begun opening their first franchise in Texas, but have not yet had a grand opening. The Browns have already spent more than $450,000 in purchasing and opening the

53

franchise—far exceeding the costs that Defendants stated that the Browns would incur, in addition to entering into a ten-year commercial lease with hundreds of thousands of dollars in payments remaining due. The Browns have been forced to make the franchise their full-time jobs for over a year, with the Browns regularly working over 80 hours per week in the franchise, in addition to hiring multiple full-time employees.

244.    Daly introduced the Browns to Seebohm on September 29, 2021, following a call with Daly, during which Daly told the Browns that the Semi-Absentee Model was effective and proven and would enable the Browns to have profit margins in excess of 40% by working no more than 10 hours per week.

245.    During a video call with Seebohm on October 2, 2021, Seebohm told the Browns that the Semi-Absentee Model required a low initial investment, provided a good quality of life, and could be successfully operated with one full-time and one part-time employee. Seebohm told the Browns that the Semi-Absentee Model required a "minimal time investment" and that, as a result, the Browns could "run other businesses at the same time."

246.    That day, after the video call, Seebohm emailed the Browns, stating that "Premier Martial Arts is a proven, scalable, and profitable brand." Seebohm attached a document to this email that stated that "one full-time and one part-time employee is all you need" and that "[a]ll support and marketing systems are in place."

247.    On October 7, 2021, Seebohm gave the Browns the Unit Economics Presentation during a video call. During this call, Seebohm told the Browns that following the Semi-Absentee Model would result in the Browns achieving profit margins in the "40-45% range." He stated that the Browns should expect a profit of at least $89,000 per franchise location. During this call,

54

Seebohm showed the Browns documents prepared by Defendants that misrepresented the costs and profits associated with the Semi-Absentee Model.

248.    Following this call, Seebohm sent the Browns an email on October 12, 2021, in which Seebohm included Owner Validation Calls, during which existing owners misrepresented the time commitment required to operate the Semi-Absentee Model.

249.    That same day, during a call, Seebohm told the Browns that they "must purchase 2 territories, but 3 is the sweet spot."

250.    The Browns attended Discovery Day in Knoxville, Tennessee on November 11, 2021.

251.    At Discovery Day, Seebohm, Van Over, and Baker repeated the misrepresentations detailed above. Van Over told the Browns that the Semi-Absentee Model was proven to enable the Browns to operate the franchise, achieve profit margins in excess of 40%, and not work in the franchise more than 10 hours per week.

252.    At Discovery Day, the Browns asked Van Over whether they would be required to use Defendants' "preferred vendors." Van Over stated that the Browns did not have to do so, telling the Browns "using these vendors is recommended but not required."

253.    The Browns became franchisees shortly after Discovery Day.

254.    After the Browns became franchisees, Defendants informed the Browns that the Browns were required to use the "preferred vendors" in an email on April 22, 2022.

255.    Using the preferred vendors would have delayed the Browns in opening the franchise and cost the Browns more money than Defendants represented because the vendors selected by Defendants provide substandard services at inflated prices.

55

256.    To avoid using the preferred vendors, the Browns called a representative of Unleashed, Kristin Taylor, on April 26, 2022. Ms. Taylor told the Browns that they could use the architect and contractor that the Browns had selected, but Unleashed failed to confirm this in writing.

257.    After becoming franchisees, the Browns learned that the financials provided in the Unit Economics Presentation and FDD do not accurately represent the Semi-Absentee Model. The Browns have incurred substantially higher costs than the costs that Defendants represented that the Browns would incur.

*ix.    Chougule*

258.    Chougule purchased two territories in South Carolina in 2021 and opened his first franchise in October 2022. Chougule has spent over $300,000 in opening and operating his franchise, in addition to entering into a ten-yar commercial lease with hundreds of thousands of dollars in payments remaining due, and the franchise continues to lose over $6,000 per month.

259.    During phone and video conversations and at Discovery Day in Knoxville, Tennessee, Seebohm, Van Over, and Baker told Chougule that the Semi-Absentee Model was proven and effective, that PMA would provide the systems and support to ensure Chougule's success, and that the Semi-Absentee Model would generate profit margins in excess of 40%.

260.    Seebohm and Van Over told Chougule that the franchise would not require that he work on the franchise more than 10 hours per week and that Chougule, who is not a martial artist, would be successful because PMA would assist with hiring and training staff and that many qualified martial artists would be available to work in Chougule's franchise. Van Over stated that "corporate," referring to PMA, had a "pipeline" of qualified candidates to work in Chougule's franchise.

56

261.    Seebohm, Van Over, and Baker also told Chougule that he could successfully operate the Semi-Absentee Model with one full-time and one part-time employee.

262.    Van Over assured Chougule that PMA had "proven systems in place" that would ensure Chougule's success, including, for example, instructions on how to successfully operate the Semi-Absentee Model, training, and other information.

263.    Seebohm sent Chougule the FDD, assuring Chougule that the financials in the FDD were representative of the Semi-Absentee Model and that Chougule would have profit margins in excess of 40% each month. Van Over and Baker further relied on this FDD at Discovery Day, representing that the financials were reliable and accurate, and that they proved that Chougule would be successful, as no franchisee had ever failed.

264.    Van Over further assured Chougule that he did not need martial arts experience and that PMA would provide Chougule with "Success Coaches" who would ensure that Chougule achieved the advertised levels of profitability and success.

265.    During Discovery Day, Van Over informed Chougule that Chougule would have to buy two territories.

266.    After becoming a franchise, Chougule discovered that Van Over, Baker, and Seebohm systematically misrepresented the Semi-Absentee Model. For example, Chougule has not reached the advertised levels of profitability, and he has been unable to plan to open his second franchise because his first franchise continues to lose money every month.

267.    Further, PMA has offered no assistance with hiring instructors, and Chougule has learned that there is no "pipeline" of qualified instructors.

268.     The costs Chougule incurred in opening and operating his franchise far exceed the costs represented in the FDD. For instance, Chougule's construction costs were more than double the amounts represented in the FDD.

269.     As for the proven system Van Over promised to provide, it does not exist. There is no system to guide Chougule to success and profitability. The information that PMA provides is scattered around a few, disorganized websites and is duplicative, contradictory, out-of-date, and borderline incomprehensible.

270.     Chougule also learned that the "Success Coaches" do not have the martial arts or business experience necessary to provide even a modicum of assistance. Rather, they repeat canned responses cooked up by PMA that provide no solutions or help.

271.     Chougule has been forced to spend innumerable hours working on the franchise – far more than 10 hours per week – causing Chougule to be away from his family and fall behind on other obligations since becoming a franchisee.

272.     Chougule has discovered that Seebohm and Van Over induced prospective franchisees like himself by making false promises of the impact they could have on their communities by helping children and calculated misrepresentations about the profitability and feasibility of the Semi-Absentee Model, substantiated by a hand-picked group of legacy owners instructed to paint a false picture of reality.

*x.     The Costolnicks*

273.     The Costolnicks purchased two territories in Georgia and opened their first franchise in April 2022. The Costolnicks have spent over $414,000 opening and operating the franchise, in addition to signing a lease that totals over $242,000 over its five-year term. The

58

franchise has lost over $90,000 to date this year, and the Costolnicks must work more than 40 hours per week on the franchise and employ multiple full-time employees.

274.    Seebohm began making misrepresentations about the Semi-Absentee Model to the Costolnicks in April 2021. Prior to the Costolnicks' first call with Seebohm on April 5, 2021, he instructed them to watch the videos described above. During this call, he confirmed that the Semi-Absentee Model would require no more than 10 hours of work per week and only one full-time and one part-time employee.

275.    Seebohm gave the Costolnicks the Unit Economics Presentation on April 15, 2021. During this call, Seebohm again emphasized that the Semi-Absentee Model required only one full-time and one part-time employee. Seebohm encouraged the Costolnicks to purchase multiple territories by claiming that the initial franchise would generate enough immediate cashflow to pay for opening subsequent franchises.

276.    At the end of this call, Seebohm told the Costolnicks to join weekly calls to hear from existing franchisees about their experiences. The existing franchisees later admitted to the Costolnicks that Van Over, Myles, and Seebohm instructed them to lie about the time required to operate the franchises on these calls in order to induce the Costolnicks to become franchisees.

277.    On April 26, 2021, Defendants told the Costolnicks to attend Discovery Day in Knoxville, Tennessee. Seebohm checked in with the Costolnicks on April 28, 2021 to ensure that the Costolnicks would attend Discovery Day.

278.    On May 24, 25, and 26, 2021, the Costolnicks attended Discovery Day in Knoxville, Tennessee. The Costolnicks were subjected to the same misrepresentations directed at the Beardens, as described above. Seebohm stated that the Semi-Absentee Model "was such an

easy business model to run semi-absentee" and that "the margins are too good to pass up." Seebohm told the Costolnicks that Seebohm intended to become a franchisee.

279.    On June 7, 2021, the Costolnicks became franchisees.

<i>xi.    The Dobles</i>

280.    The Dobles purchased four territories in Washington in September 2021, and the Dobles have not yet opened a franchise. The Dobles have spent over $202,000 in purchasing the territories and preparing to open their first franchise, in addition to spending hundreds of hours working to open the franchise.

281.    Seebohm began misrepresenting the Semi-Absentee Model to the Dobles in a call on July 5, 2021, during which Seebohm told the Dobles that the Semi-Absentee Model is proven and effective and would generate profit margins in excess of 40% without requiring the Dobles to work in the franchise more than 10 hours per week.

282.    The next day, Seebohm gave the Dobles the Unit Economics Presentation, during which he misrepresented financial data, stating that the financial data was representative of the Semi-Absentee Model. The financial data Seebohm showed to the Dobles and relied upon during this call was not representative of the Semi-Absentee Model.

283.    The Dobles attended Discovery Day in Knoxville, Tennessee from August 31 to September 1, 2021. At Discovery Day, Seebohm, Baker, and Van Over subjected the Dobles to the same misrepresentations that they directed to other Plaintiffs at Discovery Days, including that the Semi-Absentee Model was proven, effective, and had the benefit of support systems put in place by Defendants that would guarantee the success of the Dobles' franchise.

284. After becoming franchisees, the Dobles discovered that the costs represented by Defendants were inaccurate and that opening and operating the franchises would cost substantially more than Defendants represented.

285. The Dobles asked Seebohm whether they could use the money that they set aside for their future franchises to open their first franchise due to these higher costs. He suggested foregoing their fourth franchise, instead opening only three franchises.

286. On November 5, 2021, Seebohm stated "we haven't ever had a 'back-pedal' on [a] territory request such as this before." He stated Defendants "anticipate that they could cap your total territories at 2 or 3 for good." These false statements were designed to pressure the Dobles into remaining franchisees. Seebohm told the Dobles that "we'll ask Barry [Van Over] & his counsel to take it from here . . . Hope we can resolve/handle by next Friday."

287. The Dobles contacted Van Over on June 3, 2022, informing Van Over that the costs to open their first franchise were more than double the highest costs that Defendants stated the Dobles would incur. They informed Van Over that, due to the misrepresentations made by Defendants, the Dobles did not have sufficient funds to open all four franchises.

288. On June 7, 2022, Van Over told the Dobles that "PMA corporate does not buy back territories." He stated that it is "extremely difficult" to sell territories and that the Dobles "have until 9/9/22 to sell any of your territories, as this is the date your development agreement expires and your territories revert back to corporate for resale."

*xii.* *The Feichts*

289. The Feichts purchased two territories in Ohio, and they opened their first franchise on October 4, 2021. The Feichts have been unable to open the second franchise because they had

to use the funds that they set aside for the second franchise in order to keep operating the first franchise, which has lost over $108,000 this year to date.

290.    A franchise broker introduced the Feichts to Seebohm. The Feichts spoke to Seebohm on May 29, 2021. During this call, Seebohm began telling the Feichts the same lies about the Semi-Absentee Model, including that the Semi-Absentee Model did not require more than 10 hours of work per week.

291.    On June 8, 2021, Seebohm sent a follow-up email to the Feichts, which included links to watch recorded Owner Validation Calls. Seebohm also stated that "[a]fter meeting with CEO Barry and VP Myles recently in Knoxville . . . we wanted to get you a timely and more thorough look 'behind the curtain' of PMA's robust and seamless systems for semi-absentee new owners. The resources, training and modules are so comprehensive that sometimes our owners/validators can't best describe the breadth on our concise phone calls."

292.    In June 2021, Seebohm, Van Over, and Baker arranged for the Feichts to participate in multiple live validation calls with existing franchisees, after instructing these existing franchisees to misrepresent the Semi-Absentee Model.

293.    On July 2, 2021, Seebohm gave the Unit Economics Presentation to the Feichts.

294.    On July 7 and 8, 2021, the Feichts attended Discovery Day, where Van Over, Seebohm, and Baker made the misrepresentations about the Semi-Absentee Model as described herein.

295.    In February of 2022, during a call with the Feicht's designated "success coach," Shannon Jones, Ms. Jones mentioned that the Feichts should only have monthly expenses of about $15,000—even though, in reality, monthly expenses were running, at that time, at about $25,000.

62

Ms. Jones, however, was still using the bogus information originally used by Defendants in their fraudulent sales pitch. Accordingly, she was of no help in saving the foundering enterprise.

296. In the end, the Feichts have incurred over $340,000 in liabilities, while the studio has lost over $121,000, year-to-date, with an additional $360,000 in lease liabilities—personally guaranteed. In short, Joe Feicht's entire retirement has been spent, at age 62.

*xiii.    The Frahms*

297. The Frahms currently have three PMA studios open in North Carolina, along with a fourth territory that they own. The first has been open approximately a year and a half; the second was purchased from a former PMA owner in late 2021; and the third just opened. The schools are losing money or barely breaking even on a month-to-month basis and have hovered around solvency since they have opened.

298. The only way these studios have been able to survive month-to-month is because both Darci and Dan Frahm work the studios, full-time, at upwards to 50 hours or more per week apiece. Indeed, the Frahms live and breathe PMA because they must; without their constant vigilance, the studios would crumble.

299. Mr. Frahm came from corporate America and needs to return there in order to make money for his family, but he is, in essence, stuck: if he goes back to a job that will actually pay him, he would need to abandon the PMA studios and the PMA studios would go under and all the time and money invested in them would be gone (not to mention the commercial leases with which the Frahms are saddled). Likewise, Darci Frahm never intended to work the studios full-time, as the Frahms have two kids at home and the plan (as the Frahms explained throughout the process) was that Darci Frahm could oversee the studios from a semi-absentee perspective, as Dan Frahm went back to the corporate world.

63

300. Like the other Plaintiffs in this lawsuit, the Frahms were induced into the PMA business through the concerted efforts of Seebohm, Van Over, Baker, and others.

301. Thus, the Frahms, who were exclusively seeking a semi-absentee model franchise business, were first introduced to Seebohm on July 1, 2020. Seebohm sold the Frahms the same story he was selling everyone else: this was a 10-hour-per-week business that the Frahms could actually manage from afar if they wanted to. In fact, Seebohm told the Frahms that he (Seebohm) was in the process of buying one or more PMA franchises and that he had other semi-absentee franchises that he was able to profitably manage *even though they were in another state*.

302. The next day, Seebohm gave the Frahms the Unit Economics Presentation, representing that the Frahms would have profit margins in excess of 40% by operating the franchise and that the financials shown in the presentation were representative of the Semi-Absentee Model. They were not.

303. The Frahms attended Owner Validation Calls on July 7 and 9, 2020, as well as at other times. The owners on these calls misrepresented the amount of time and effort required to operate the Semi-Absentee Model, at the direction of Seebohm and Van Over.

304. The Frahms ultimately attended "Discovery Day" on August 19 and 20, 2020, primarily via zoom as their Discovery Day occurred during the heart of the pandemic. On these Discovery Day zoom calls, the same false statements were repeated by Van Over and Baker: that PMA was a semi-absentee model; that PMA franchisees regularly achieved 40-50% net profit margins based on a 4-day work week; and that only 1.5 employees were needed.

305. At one point during a "Discovery Day" happy hour, Seebohm insisted that Dan Frahm speak with Aaron Hensley, who was presented as a PMA owner. Mr. Hensley raved about

the fact that his studios allegedly generated millions in revenue and that the PMA model was simply a "sure thing" based on the systems in place.

306.    At another point during "Discovery Day," the Frahms had a private zoom meeting with Van Over and Baker and these two made the same false statements that had previously been made by Seebohm.

307.    Ultimately, the Frahms decided to purchase three territories.

308.    Later, on or around December 15, 2021, the Frahms were contacted by owners of a nearby PMA studio about purchasing that studio from them. During the negotiations between the Frahms and the existing owners of the PMA studio, Van Over contacted the Frahms to confirm that an agreement had been reached and then volunteered that he would give extended time for the Frahms to develop their other territories since the Frahms would be adding this pre-existing studio and would need to invest time and effort to get it on track. Then, after they purchased the pre-existing studio, Van Over claimed that he had never made such an agreement and insisted that the Frahms must abide by the aggressive (and unreasonable) deadlines in the Area Development Agreement for their three territories.

309.    Because of these aggressive deadlines and fearing that they would lose the territories they purchased, the Frahms rushed the opening of their third studio—even though the other two were not profitable and, as mentioned above, were losing money or barely breaking even each month. Now, they are saddled with three commercial leases after, of course, expending substantial cost in building out the studios at issue.

310.    Ultimately, the false statements Seebohm, Van Over, and Baker made to the Frahms are the same as those they made to the other franchisees, including, but not limited to: a) that PMA was a proven semi-absentee model; b) that the costs would be far lower than they actually were;

65

c) that PMA would provide assistance with staffing, including, but not limited to, in the hiring of staffing and the provision of fill-in instructors as promised when staff was unavailable or quit—neither of which happened; d) that only 1.5 employees were required; and e) that PMA would provide modern, efficient, and automated systems, when, instead, the PMA technology was outdated and inefficient.

311.    Likewise, the Frahms' experience has been similar to the other franchisees in that the required vendors and service partners charge inflated prices and provide incompetent service; PMA has no system in place to profitably operate the studios; and PMA unreasonably pressures franchisees to develop additional territories even though PMA knows it makes no financial or practical sense for the franchisees to do so.

312.    Further, after the sale of PMA to Unleashed, the Frahms have been subject to frequent, purportedly "required" new contracts or other documents that purport to change material terms of previous documents, while, at the same time, Unleashed is unwilling to identify or explain the changes in those documents. Likewise, Unleashed has begun making material changes to what the Frahms were told was a proven and tested model.

313.    All told, the Frahms' preliminary out-of-pocket damages total approximately $820,000 and they are facing substantial additional potential liability related to the commercial leases, while, according to PMA, they are purportedly on the clock to get yet another studio up and running.

### xiv.    Fraser

314.    Fraser purchased three territories in Nevada, and she opened her first franchise in September 2021. She opened a second franchise in 2022. Despite being a practicing surgeon, Fraser has incurred hundreds of thousands of dollars in liabilities, and she has had to spend

upwards of 60 hours per week working on the franchises, causing her to be unable to perform surgeries.

315.   Seebohm began making misrepresentations to Fraser on an introductory call on September 18, 2019, during which Seebohm assured Fraser that she would be able to maintain her practice as a surgeon while operating the Semi-Absentee Model due to the effectiveness of the Semi-Absentee Model.

316.   On October 2, 2019, Seebohm, Baker, and Van Over arranged for existing franchisees to mislead Fraser during owner validation calls.

317.   On October 20, 2019, Seebohm and Van Over arranged for Fraser to participate in a "Discovery Day prep call" with Bobby Brennan. During this call, on October 25, 2019, Mr. Brennan repeated the misrepresentations about the Semi-Absentee Model, including by misrepresenting the amount of time that Fraser would need to work in the franchise and the financials of the franchises.

318.   Fraser attended Discovery Day in Knoxville, Tennessee on November 5 and 6, 2019, and Seebohm, Baker, and Van Over told Fraser that she could operate the Semi-Absentee Model without working on the franchise more than 10 hours per week. These Defendants gave Fraser the inaccurate financials that are part of the Unit Economics Presentation, representing that the financials related to the results obtained by franchisees operating the Semi-Absentee Model.

319.   Van Over informed Fraser that she was required to use RPM Construction LLC to build-out her franchises. RPM Construction LLC caused significant delays during the build-out phase, causing Fraser to miss the 6-month deadline imposed by Defendants and using up the 6 months of free rent that Fraser had negotiated with her landlord. When Fraser raised these issues

with Van Over, he stated that she had never been required to use RPM Construction LLC, which was not true.

320.    RPM Construction LLC's failures caused Fraser to engage another architect and complete the designs for the franchises herself, as she was concerned that falling behind on the 6-month deadline would enable Defendants to strip her of her franchises.

*xv.    Glass*

321.    Glass purchased five territories in two states, including New Jersey, in September 2019. Glass has lost over $450,000 opening and operating the franchise, in addition to entering into a multi-year commercial lease with hundreds of thousands of dollars in payments remaining due and incurring over $280,000 in lost income due to working in the franchise substantially more than he was led to believe would be necessary. When Glass could not open his franchises according to the Development Schedule imposed by PMA due to disruptions caused by the pandemic, Van Over assured Glass that PMA would not strip Glass of his territories and take them from him. Glass relied on these assurances and continued trying to operate his franchise. Nonetheless, after Unleashed acquired PMA, Unleashed forced Glass to give up his other territories.

322.    Glass had an introductory call with Seebohm on August 20, 2019, during which Seebohm told Glass that the Semi-Absentee Model was proven and effective, that Glass would have profit margins in excess of 40% by operating the Semi-Absentee Model, and that Glass could operate the franchise with one full-time and one part-time employee. Seebohm also emailed Glass a presentation developed by PMA and Van Over containing these false claims.

323.    The next day, Seebohm emailed Glass the financials used in the Unit Economics Presentation, and, during a call that day, Seebohm stated that the Semi-Absentee Model was highly profitable due to the systems put in place by PMA.

68

324.     Seebohm arranged for Glass to attend an Owner Validation Call on August 26, 2019, during which the existing owners selected by Van Over and Seebohm stated that the Semi-Absentee Model was effective, that the overhead costs were low and profit margins were high, and that operating the franchise was easy due to the systems offered by PMA.

325.     Glass attended Discovery Day in Knoxville, Tennessee on September 10 and 11, 2019. At Discovery Day, Van Over and Baker consistently stated that finding instructors to work in the franchise was easy, as there were many qualified people looking for such work.

326.     During Discovery Day, Van Over and Baker took Glass to a PMA studio, and they stated that the studio was successfully operated by one employee. Van Over and Bakr repeatedly stated that the Semi-Absentee Model enabled franchisees to operate the franchise on a 4-day schedule with one employee to achieve the advertised profits, and that an additional part-time employee might be helpful. They further stated that only one full-time employee would be needed during pre-sales.

327.     Based on these misrepresentations, Glass agreed to become a franchisee in September 2019, and Glass agreed to purchase territories in multiple states because Van Over and Baker assured him that the franchise could be operated on an absentee model and that the profits from the first franchise would fund his following franchises.

328.     After opening his franchise in July 2021, Glass was contacted by PMA because PMA stated that his franchise was the second most successful PMA franchise for upgrades in the month of October 2021. At this point, Glass's studio was barely profitable and was not close to hitting the 40% profit margins advertised by PMA.

329.     Representatives of PMA told Glass again that he was one of the most successful franchisees in terms of profitability. At this time, Glass's profit margins were less than 8%.

69

330. Glass later learned that the franchise could not be operated with one full-time and one part-time employee and that he had to spend substantially more than 10 hours per week working on the franchise and that the systems and assistance promised by PMA were nonexistent.

331. Despite his "success," Unleashed threatened to strip Glass of his remaining territories and forced him to relinquish them.

*xvi.    Griffith and Tabatabai*

332. Griffith and Tabatabai purchased two territories in February 2022, and they have not yet opened their first studio. They have spent over $100,000 in attempting to open the franchise.

333. Seebohm began making misrepresentations about the Semi-Absentee Model to Griffith and Tabatabai during a call on June 29, 2021, during which he stated that the Semi-Absentee Model was proven and effective, would generate profit margins in excess of 40%, and that they would not need to work more than 10 hours per week in the franchise or hire more than one full-time and one part-time employee.

334. Seebohm arranged for Griffith and Tabatabai to listen to Owner Validation Calls, in which existing owners told Griffith and Tabatabai that the franchise could be successfully operated by working in it four hours per week, that the franchise would be profitable within three months, and that the franchise generated $30,000 per month in the first six months after opening.

335. On July 1, 2021, Seebohm gave Griffith and Tabatabai the Unit Economics Presentation, during which Seebohm presented misleading financials, as discussed herein.

336. Griffith and Tabatabai attended Discovery Day in Knoxville, Tennessee from December 7 to 10, 2021. At Discovery Day, Seebohm, Baker, and Van Over repeated the misrepresentations detailed herein, including that the Semi-Absentee Model was a proven concept

70

that would not require more than 10 hours of work per week and that Defendants had in place systems and support to ensure that the franchise would generate the profit advertised by Defendants. Van Over told Griffith and Tabatabai that they were required to buy two territories, and that the first franchise would generate sufficient profit to fund the second franchise.

337.    At Discovery Day, Van Over and Seebohm further stated that no franchisee had ever failed. At this time, multiple Plaintiffs were failing, as detailed herein.

*xvii.    Herman and Johnson*

338.    Plaintiffs Kelli Herman and William Johnson are married and, through their company Herman Johnson LLC, purchased three territories in Michigan in July 2021. They have opened one franchise, and the other two territories remain undeveloped. Herman and Johnson have spent over $350,000 in preparing to open this franchise, which is not profitable and requires 5-6 times more working capital to operate than Defendants represented. Herman and Johnson each have to work on the franchise for 20-25 hours per week, preventing them from spending time with their children and maintaining their prior level of full-time employment. Recently, Defendants' representatives informed Herman and Johnson that, contrary to their original representations, three full-time employees will be necessary to operate the franchise.

339.    Herman and Johnson were introduced to Seebohm by a franchise broker, who told them that Premier Martial Arts "had the best support system he had ever seen" and that "the franchise units were flying off the shelf." Herman and Johnson were seeking a franchise that would not require more than 10-15 hours of work per week because they have two young children and are expecting a third and they intended to keep working full-time.

340.    Seebohm repeated the representations made by the business broker and stated that the Semi-Absentee Model would work for Herman and Johnson.

71

341.   When Seebohm gave the Unit Economics Presentation to Herman and Johnson on June 24, 2021, they specifically asked whether the "low estimate" was the lowest amount of profit made by a franchise during the period represented, and Seebohm assured them that the financials were accurate and could be relied upon, and he further misrepresented that no franchisee had ever failed or had profit of less than 35-40%. At this point, however, other Plaintiffs had been operating at a loss since opening their franchises.

342.   On July 8 and 9, 2021, Herman and Johnson attended Discovery Day via zoom because they were expecting another child, and they introduced themselves by stating that not working more than 10-15 hours per week on the franchise is critical for them because they have children and full-time jobs. Van Over, Baker, and Seebohm assured them that they would not have to work more than 10 hours per week in the franchise because of the effectiveness of the Semi-Absentee Model.

343.   Seebohm, Van Over, and Baker repeatedly emphasized that the support system would be "fantastic," that Herman and Johnson could trust in the systems, processes, and partners that Defendants had put in place, and that Defendants would be an immense help with hiring, site selection, and procurement.

344.   When Herman and Johnson asked questions about the financials provided, Seebohm and Baker misrepresented that the financials were accurate and that franchisees had profit margins of 40-45%.

345.   After Discovery Day, Seebohm called Herman and Johnson on July 12, 2021, using high-pressure sales techniques to induce Herman and Johnson to become franchisees, including by representing that other prospective franchisees were interested in the territories selected by Herman and Johnson.

346.     In addition, after Seebohm provided the draft Franchise Agreement, he told Mr. Johnson that all Franchise Agreements are the same and no changes would be allowed at all. Mr. Johnson then asked if any allowances had been made for other franchisees, and Seebohm said no allowances had been and that all agreements were uniform.

347.     When Herman and Johnson began developing their franchise, Unleashed held a meeting with franchisees at which Unleashed told the franchisees that the franchisees were required to solely use service providers selected by Defendants.

348.     One such service provider is Foxfield Construction Ltd., which replaced RPM Construction LLC as Defendants' designated contractor.

349.     In June 2022, Herman and Johnson emailed Van Over to raise concerns about the service providers that Defendants required the franchisees to use, as the service providers charged prices that substantially exceeded the costs stated by Defendants. After the meeting with Unleashed, Defendants required franchisees to use a service provider that charged $8,400 for AV & Security. Herman and Johnson pointed out that the Unit Economics Presentation stated that the "high" for AV & Security costs would be $4,700.

350.     Van Over refused to address these concerns and instead directed Herman and Johnson to contact Tom Piazza, the Vice President of Construction for Foxfield Construction Ltd.

351.     Johnson spoke to Mr. Piazza by telephone, and Mr. Piazza admitted that the Unit Economics Presentation used financial information that "hadn't been updated properly in the past year" because Unleashed had been in the process of acquiring PMA and Defendants did not want to "rock the boat."

352.    Likewise, the "success coach" assigned to Herman and Johnson had no experience in martial arts or sales. Herman and Johnson's program director referred to her as a "cheerleader who could read a script."

353.    In July 2022, legal counsel from Unleashed sent Herman and Johnson a document that purported to release Defendants from all claims that Herman and Johnson may have against them. Herman and Johnson refused to sign the document.

354.    In August 2022, Unleashed sent Herman and Johnson a new franchise agreement and informed Herman and Johnson that they were required to sign this new agreement to void their existing agreement. Herman and Johnson refused to sign the document.

*xviii.    The Hollands*

355.    The Hollands purchased four territories in Florida in December 2020, and they opened one franchise in February 2022. The franchise loses roughly $10,000 per month, leaving the Hollands unable to develop their remaining territories because the Hollands have spent hundreds of thousands of dollars opening and operating the franchise, as well as entering into leases with potential liabilities of approximately $700,000.

356.    A franchise broker, Andy Banker, introduced the Hollands to Seebohm in October 2020.

357.    On October 5, 2020, the Hollands began having telephone conversations with Seebohm, Baker, and Van Over. Following their initial contact with these Defendants, these Defendants arranged for the Hollands to listen to the Owner Validation Calls and provided the Unit Economics Presentation to the Hollands, which included the 40%+ profit margin representations.

74

358. During these conversations and in the marketing materials Seebohm and Van Over provided to the Hollands, the semi-absentee nature of the Semi-absentee Model was repeatedly emphasized. Further, Seebohm presented the FDD to the Hollands and represented that the financials in the FDD were representative of the Semi-Absentee Model, despite the fact that these financials do not represent the financial performance of the Semi-Absentee Model.

359. On December 8 and 9, 2020, the Hollands attended Discovery Day in Knoxville, Tennessee. At Discovery Day, Seebohm, Baker, and Van Over misrepresented the Semi-Absentee Model, falsely stating that the Semi-Absentee Model did not require the Hollands to work more than 10 hours per week, that the Semi-Absentee Model was "tried and true," and that the Semi-Absentee Model would enable the Hollands to spend more time with their children and each other.

360. At Discovery Day, Van Over told the Hollands that the franchise would be profitable operating four days per week with one full-time and one part-time employee. The Hollands expressed concerns about staffing the franchise, and asked Van Over what would happen if the Hollands' instructor needed time off or quit. Van Over assured the Hollands that he knew martial artists in every state and that staffing would be the least of the Hollands' concerns. He further referenced marketing material provided by PMA, in which PMA represented that PMA would assist franchisees with recruiting and training staff. The Hollands asked for clarification on how PMA would provide such assistance, and Van Over told the Hollands that they would be provided access to intructorfinder.com. Van Over further stated that the Hollands would be able to rely upon PMA's traveling team of instructors, who would quickly cover any staffing shortfalls that the Hollands might experience.

361.     Van Over and Baker told the Hollands that PMA's systems included "amazing lead generation and lead follow-up tools," which would track leads and send follow-up emails to increase conversion rates and drive revenue at the Hollands' franchise.

362.     In response to the Hollands' concerns about not knowing much about the martial arts business, Van Over assured the Hollands that PMA's "on-demand Success Coaches" would be ready and able to respond to any issues that might arise and ensure that the Hollands' franchise operated successfully. Van Over stated that whatever the issue, whether it was an upset parent, broken bone, a question on belt ranking, or any other issue, the "Success Coaches" would have solutions when needed.

363.     On December 9, 2020, Defendants provided a franchise agreement to the Hollands and told them that they must sign it by December 18, 2020. The Hollands became franchisees on December 20, 2020.

364.     Contrary to these Defendants' representations, the Hollands have been forced to spend countless hours, nights, and weekends working at the franchise to keep it afloat, and the franchise continues to lose money each month.

365.     Defendants strongly recommended and suggested that the Hollands contract with RPM Construction LLC for the build-out of the franchise, stating that doing so would move the completion process as quickly as possible and make the build-out as turn-key as possible, and the Hollands did so on June 17, 2021. RPM Construction LLC was terrible to work with and, among many, many other problems, failed to begin the build-out until late October 2021. The Hollands opened their franchise on February 7, 2022.

366.     After becoming franchisees, the Hollands discovered that, in addition to the misrepresentations about the semi-absentee nature of the franchise, the other representations about

76

the Semi-Absentee Model were also false. For example, when the Hollands needed to hire staff, they found that PMA provided no assistance, that instructorfinder.com was useless, and that they would be forced to figure out staffing on their own. Further, the Hollands learned that PMA did not have a team of instructors ready to come to the franchise and help fill in; rather, Van Over scrambled to assemble such a team after many franchisees began asking for the team's assistance. PMA, however, could never fulfill its promise of providing this team to franchisees who needed it, and the franchisees were left without the promised support.

367. The lead generation and related systems promised by Van Over and Baker never materialized. Instead, the system consisted of broken website and buggy software that did not generate or track leads, and which did not drive revenue to the Hollands' franchise. For example, once a potential student submits information to the website, the "automated system" fails to even send a thank you message or confirmation email.

368. The Hollands learned that PMA's "Success Coaches" provided no assistance, and instead, these young, inexperienced people had nothing but canned responses that did nothing to help the Hollands. Further, far from being "on demand," the Hollands experienced extreme delays in getting a response from their "Success Coach."

369. After the Hollands became franchisees, Van Over insisted that he had never stated that the Semi-Absentee Model was semi-absentee.

*xix. The Hollingsworths*

370. The Hollingsworths purchased three territories in July 2020, and they opened their first franchise in July 2022. Their franchise has never been profitable and loses over $8,000 per month. The Hollingsworths have spent over $615,000 in opening and operating the franchise, in addition to entering into a multi-year commercial lease that has over $500,000 in payments

77

remaining due. Since opening the franchise, the Hollingsworths have learned that the Semi-Absentee Model does not work and that the financials presented by Defendants were based on the former licensees and are not representative of the Semi-Absentee Model.

371.    On June 3, 2020, the Hollingsworths were introduced to FFL and Seebohm by Chelsey Boyce, a Sales Support Administrator with FFL.

372.    On June 15, 2020, the Hollingsworths had an introductory phone call with Seebohm, in which Seebohm began misrepresenting that the Semi-Absentee Model was effective, required no more than 10 hours of work per week, and would generate profit margins in excess of 40% due to the systems that Defendants put in place. Seebohm made these representations to the Hollingsworths on each subsequent call they had with Seebohm.

373.    On June 17, 2020, Seebohm gave the Hollingsworths the Unit Economics Presentation via a video call. He misrepresented that the financials shown in the Unit Economics Presentations were representative of the Semi-Absentee Model and further stated that the Hollingsworths would achieve 40% profit margins due to the systems put in place by Defendants.

374.    On July 7 and 8, 2020, the Hollingsworths attended Discovery Day in Knoxville, Tennessee.

375.    At Discovery Day, Van Over, Baker, and Seebohm told the Hollingsworths that the Semi-Absentee Model was effective due to the systems put in place by Defendants and the support that they would provide, including marketing, staffing, and training. These Defendants misrepresented the Hollingsworths that the Hollingsworths could operate three franchises on the Semi-Absentee Model while maintaining their full-time careers because the Semi-Absentee Model required no more than 10 hours of work per week.

78

376.     After Discovery Day, Seebohm emailed the Hollingsworths on July 8, 2020, stating that they must purchase their three territories in ten days, or else the territories would be "lost" because Defendants had so much interest from other prospective franchisees.

377.     On July 13, 2020, another representative of FFL, Bobby Brennan, called the Hollingsworths to reiterate that the Hollingsworths should purchase the three territories because the Semi-Absentee Model was proven and effective.

378.     On July 17, 2020, the Hollingsworths agreed to become franchisees.

379.     During the calls and conversations with Defendants, the Hollingsworths told Defendants that the Hollingsworths intended to purchase another franchise from an unrelated company at the same time that they purchased a franchise from Defendants. Defendants, in every conversation with the Hollingsworths, assured the Hollingsworths that purchasing the two franchises would not present any issues, that the Hollingsworths could operate both franchises at the same time because the Semi-Absentee Model required such a small amount of time, and that Defendants could arrange for the Hollingsworths to finance both franchises at the same time by using Defendants' preferred lender, Benetrends Inc.

380.     Seebohm, Baker, and Van Over told the Hollingsworths that Benetrends Inc. could finance both franchises with one business loan, secured against funds from the Hollingsworths' retirement accounts. Representatives from Benetrends Inc. confirmed that the Hollingsworths could do so.

381.     In August 2020, after the Hollingsworths became franchisees, representatives from Benetrends Inc. informed the Hollingsworths that the financing promised by Benetrends Inc. and Van Over, Seebohm, and Baker could not be completed. Instead, these representatives told the

79

Hollingsworths that Benetrends Inc. could finance only the franchise the Hollingsworths purchased from Defendants.

382.    On October 12, 2020, Baker emailed the Hollingsworths and stated that he had been unaware of the Hollingsworths' intention to purchase both franchises at once and finance them with the same loan.

383.    It took the Hollingsworths nearly one year to secure financing to fund the franchise purchased from Defendants, due to Defendants' misrepresentations about the available financing.

384.    In August 2021, the Hollingsworths began looking for locations for their franchises, using the real estate company that Defendants selected, Morrow Hill, and Defendants' preferred contractor, FoxField Construction.

385.    The Hollingsworths paid for a representative of FoxField Construction to fly to Houston, Texas to advise the Hollingsworths on which location to select. The Hollingsworths selected the location suggested by this representative, as this representative stated that the location would be the most cost effective, that it was a "vanilla box," and that only an office would need to be built out.

386.    A representative of FoxField Construction, Chuck Piazza, emailed the Hollingsworths on September 28, 2021, providing a timeline and cost summary for the build-out of the location that FoxField Construction's other representative had suggested. The Hollingsworths signed a lease for this location.

387.    On December 3, 2021, the Hollingsworths began working with FoxField construction to obtain bids for the build-out.

388.    The Hollingsworths began receiving bids for the build-out from FoxField Construction in February 2022.

80

389.     The bids received by the Hollingsworths through FoxField Construction came in at over $100,000. These bids were unnecessarily high because FoxField Construction bidded out the project to include features and construction that were not necessary, and FoxField Construction knew that these items were unnecessary because it had a copy of the Hollingsworths' lease, which stated that the landlord would provide these items.

390.     The Hollingsworths repeatedly contacted FoxField Construction, highlighting relevant portions of the lease to show why the bids were unnecessarily high.

391.     FoxField Construction failed to obtain acceptable bids for the project, and the Hollingsworths located an independent general contractor who agreed to complete the build-out for approximately $60,000.

392.     Despite using an independent general contractor, Defendants required the Hollingsworths to obtain approval of the build-out from FoxField Construction and Defendants, resulting in additional delays. As but one example, the Hollingsworths determined that a water-bottle filling station could be installed for $2,000, whereas a drinking fountain would cost $10,000. Van Over told the Hollingsworths to obtain approval for the filling station from FoxField Construction, and FoxField Construction told the Hollingsworths to obtain approval from Defendants. Going back and forth on this issue with Defendants prevented the Hollingsworths from opening the franchise for months.

393.     The Hollingsworths were able to open the franchise on June 1, 2022.

*xx.     House*

394.     House purchased four territories in Oklahoma in June 2021, and he opened his first franchise in May 2022. House has spent over $500,000 opening and operating this franchise, and the franchise loses between $13,000 and $15,000 per month. The franchise has never been

81

profitable. House entered into a multi-year commercial lease in order to open the franchise, and House has been unable to continue working his prior job since opening the franchise because he must work in the franchise 40 to 60 hours per week. House has also hired two full-time employees to help operate the franchise.

395. A franchise broker introduced House to Seebohm in January 2021.

396. Over the following months, Seebohm followed his usual practice of telling House to watch the videos produced by Defendants, giving House the Unit Economics Presentation, and arranging for House to attend Discovery Day.

397. House attended Discovery Day in Knoxville, Tennessee in June 2021.

398. As Discovery Day, Seebohm, Van Over, and Baker misrepresented that the Semi-Absentee Model would not require House to work more than 10 hours per week in the franchise or hire more than one full-time and one part-time employee.

399. Van Over falsely told House that House's franchise would be profitable within three months of opening due to the success of the Semi-Absentee Model.

400. Van Over told House that House should purchase multiple territories because the profits from the first franchise would be sufficient to open and operate the following franchises.

401. Van Over told House that House could rely upon the financials provided in the Unit Economics Presentation. He further stated that the financials were based on operating the franchise 4 days per week and that House would be even more profitable if House operated the franchise 6 days per week.

402. Van Over, Baker, and Seebohm falsely stated that the systems comprising the Semi-Absentee Model were "proven" and that they would work if followed.

82

403.    At Discovery Day, House asked Van Over whether Van Over intended or planned to sell the Premier Martial Arts franchise or concept. Van Over told House that he did not intend to sell. Van Over sold the concept to Unleashed less than 6 months later.

*xxi.*    *Ivey*

404.    Ivey was informed that she was required to purchase two territories and did so, but she has only been able to open one. Her one location opened in September 2022 and has lost $12,000 to $14,000 each month.

405.    On July 29, 2021, Ivey met with Daly about purchasing a franchise, and Daly told Ivey to purchase a PMA franchise due to the Semi-Absentee Model, which would result in Ivey having profit margins in excess of 40%, working no more than 10 hours per week, and successfully operating with one full-time and one part-time employee.

406.    The misrepresentations to Ivey continued with a one-on-one phone conversation with Seebohm on August 10, 2021, in which Seebohm stated that PMA's Semi-Absentee Model required only 1.5 employees and ten hours of the owner's time per week.

407.    During the Unit Economics call that followed on September 7, 2021, Seebohm presented the Economics Workbook and presented start-up costs that were significantly less than any bids that Ivey was later given. The Economic Workbook also did not include the required vendor services from Foxfield Construction.

408.    Ivey later attended three owner validation calls in September 2021 where the same misrepresentations regarding the Semi-Absentee Model were presented by Seebohm.

409.    Ivey then attended Discovery Day on September 21, 2021, attending virtually because she had recently had a baby. During Decision Day the Semi-Absentee Model was again presented, and Ivey was specifically told that the majority of PMA franchisees operate based on

83

the Model. The misleading financial start-up costs and expectations stated in the Economic Workbook were reinforced.

410.     In fact, on the same day as Discovery Day, Ivey had a one-on-one meeting with Van Over and Baker, during which they assured Ivey that all of the start-up numbers in the Economic Workbook were consistent with what to expect, and that PMA was there to support her every step of the way.

411.     Based on the misrepresentations, Ivey signed the agreement for opening PMA territories but has found that all of the start-up expectations and costs were false and that the Semi-Absentee Model is unworkable.

412.     Ivey has spent over $324,000 because of these false representations by PMA.

*xxii.*     *The Kaushals*

413.     The Kaushals purchased four PMA territories in January 2020. They have been able to open only two locations.

414.     The Kaushals began receiving false information about PMA during a Unit Economics call on December 16, 2019. During the call and a follow up email, Seebohm presented financials and marketing collateral claiming that PMA locations operated under the Semi-Absentee Model had 48% average EBITDA, had only a sixty-day buildout prior to opening, and operated with only 1.5 employees. None of these claims were true.

415.     In order to support these claims, PMA and FFL ended the Unit Economics call with a Q&A to review the business model and economics with an existing owner, Mark Taylor. PMA and FFL failed to clarify that Mr. Taylor's status was fundamentally different than what was being promoted to the Kaushals. Mark Taylor, as the Kaushals later found out, was a Legacy Owner, not

84

a new franchisee, was not a multi-unit owner and operator, and was not a semi-absentee owner. The experiences of a semi-absentee franchise owner were never presented or offered.

416.    The Kaushals attended Discovery Day on January 13 and 14, 2020 in Knoxville, Tennessee. The Kaushals also attended an in-person corporate training on January 30, 2021 to February 4, 2021. During these meetings, the same false and misleading economics and absentee ownership model were presented. In addition, the financial models given were based on misleading membership counts, class, and facility sizes.

417.    Defendants provided the FDD to the Kaushals, which misrepresented the financials of the Semi-Absentee Model. After becoming franchisees, the Kaushals discovered that the financials provided by Defendants were unachievable. In fact, Defendants led the Kaushals to believe that student count and revenues would be almost double what is achievable.

418.    Based on these misrepresentations, the Kaushals have invested nearly $890,000 and continue to lose money at the rate of approximately $8,000 per month, while potentially being bound by a ten-year lease subject to personal guarantees.

*xxiii.    Kettlewell*

419.    Kettlewell was originally contacted by Seebohm on December 22, 2021. Seebohm was very aggressive. Kettlewell communicated that she wanted to take the process slow and, eventually, booked a meeting with Seebohm for January 19, 2022 with subsequent calls with Seebohm on January 27 and February 11, 2022

420.    At this meeting, Seebohm, as he did with the other plaintiffs herein, discussed the "proven" Semi-Absentee Model. In particular, Seebohm said that there were only two territories left in Kansas City (so she needed to act fast); that it would take just 6-8 weeks to open the studio; that average profit was $160K per location per year; that Kettlewell would break even by the third

85

month; that monthly expenses were $18,000 to $20,000; that the studio could be successful on a four-day work week; that the owner commitment is simply one staff meeting per week and stopping by the school one time per week; and that PMA would provide assistance with staffing, including the purported "traveling team" who could fill in. Seebohm also told her that a minimum of two territories was required.

421.    In short, none of the videos, presentations, or statements presented by Seebohm represented the model being sold to the new franchisees, as, as has been now admitted by Van Over, the Semi-Absentee Model simply does not work.

422.    Kettlewell even specifically asked Seebohm about the Semi-Absentee Model, including how it would work with a full-time job. Seebohm assured her that owners were able to maintain their full-time job while working the PMA studio on the side.

423.    Kettlewell went to "Discovery Day" on April 14 and 15, 2022. During the "Discovery Day" event, Van Over stated that the new FDD would be coming out and would include very good numbers regarding the profitability of PMA studios. Van Over's point was that Kettlewell should sign up now before the new FDD came out to lock in the current franchise fee pricing.

424.    At the Discovery Day weekend, Van Over never said that owners needed to be full-time dedicated to PMA to be successful. After Kettlewell purchased two territories, at a conference hosted by Unleashed Brands, Van Over stated that an owner could *not* be successful with PMA part-time (even though, to this day, the PMA website says otherwise). This was the first time Kettlewell had heard this statement.

425.    Kettlewell has spent approximately $95,000 in fees and territory costs and other costs and expenses, but, due to the fact that Van Over admits that the model sold to franchisees is bogus, she did not sign a lease in an effort to avoid wasting additional funds on the endeavor.

*xxiv.    The Keys*

426.    The Keys purchased one territory and opened the franchise in mid-2022. They have spent over $350,000 opening and operating the franchise. The Keys entered into a multi-year commercial lease with over $400,000 in payments remaining due. The Keys agreed to become franchisees based on the representations about the Semi-Absentee Model because Jason Key intended to maintain his full-time employment. Due to the failure of the Semi-Absentee Model, Jason Key must work in the franchise significantly more than 10 hours per week, often working the studio until closing and then late into the evening, and the franchise is still not profitable.

427.    In November 2019, the Keys were introduced to Seebohm by a franchise consultant, who told the Keys that the franchise could operate on the Semi-Absentee Model and that the franchisees did not need martial arts experience.

428.    Seebohm began the misrepresentation campaign, and his primary focus was on making the Keys believe that the Semi-Absentee Model would be effective.

429.    On February 13, 2020, Seebohm organized a zoom call with the Keys to present the Unit Economics Presentation, where he emphasized the validity of these financials as proof that the Semi-Absentee Model was a low-overhead, high-margin business that would not require the Keys to work in the franchise more than ten hours per week.

430.    On February 17, 2020, Seebohm sent the Keys an email stating "[a]fter meeting with CEO Barry and VP Myles recently in Knoxville . . . we wanted to get you a timely and more thorough look 'behind the curtain' of PMA's robust and seamless systems for semi-absentee new

87

owners. The resources, training and modules are so comprehensive that sometimes our owners/validators can't best describe the breadth on our concise phone calls."

431.    The Keys attended Discovery Day on April 14 and 15, 2020 via zoom, where Van Over, Baker, and Seebohm repeated the misrepresentations about the Semi-Absentee Model. Specifically, Van Over emphasized the effectiveness of the Semi-Absentee Model and that martial arts experience was not necessary.

432.    At Discovery Day, Mr. Key asked Van Over if the Keys would be required to use the bookkeeping service that Defendants usually forced franchisees to use because Mr. Key had a background in finance. Van Over said: "No, it was not required." Defendants, later, forced the Keys to use the bookkeeping service.

433.    Following Discovery Day, the Keys were pressured to sign a franchise agreement quickly in order to not lose their territory. Likewise, they were told that a new FDD that had come out was only "procedural" and there were "no material differences," but that single territory options were going away. Thus, they moved forward.

434.    After the Keys agreed to become franchisees, the Keys attended training in Knoxville, Tennessee during the week of December 6, 2021. At this time, Baker informed the Keys that hiring more than one full-time employee was "critical" for owners, despite repeatedly representing that the Semi-Absentee Model would be effective with one full-time and one part-time employee.

435.    The Keys did not register for "instructorfinder.com" because they had been told by other franchisees that it simply did not work, which left the Keys to rely upon staffing the franchise through job sites such as Indeed.com because Defendants, otherwise, were incapable of providing any assistance.

88

436. Kormos purchased three territories in Ohio in July 2020, and he opened his first franchise in July 2021. The franchise has not been profitable, instead losing over $10,000 per month. In the franchise's best month ever, it lost $8,000. Kormos has spent over $370,000 opening and operating the franchise, in addition to taking out a business loan for over $220,000 and entering into a multi-year commercial lease that has over $260,000 in payments remaining due. Kormos and his wife, Veronica, must work in the franchise over 40 hours per week, and they have been forced to hire multiple full-time employees as well.

437. Seebohm began misrepresenting the Semi-Absentee Model to Kormos in mid-2020. During calls with Kormos, Seebohm stated that the Semi-Absentee Model would generate profit margins in excess of 40% and not require Kormos to work in the franchise more than 10 hours per week.

438. On June 19, 2020, Seebohm gave Kormos the Unit Economics Presentation, relying on the misleading financials that Seebohm stated were representative of the Semi-Absentee Model. Seebohm stated that Kormos would achieve the profit margins advertised by Defendants, in excess of 40%, by operating the Semi-Absentee Model.

439. Following this call, Seebohm arranged for Kormos to listen to Owner Validation Calls, during which existing owners misrepresented the time and cost involved in operating the Semi-Absentee Model, and Seebohm told Kormos that the calls were representative of what Kormos would experience when operating his franchise.

440. Kormos attended Discovery Day in Knoxville, Tennessee on July 8 and 9, 2020. At Discovery Day, Seebohm, Baker, and Van Over misrepresented the Semi-Absentee Model to Kormos, assuring Kormos that he would not have to work more than 10 hours per week in the

89

franchise to generate the profit margins advertised by Defendants. Van Over stated that the Semi-Absentee Model had been proven to be successful as a result of the systems put in place by Defendants, guaranteeing that Kormos would generate the profit margins advertised by Defendants without working in the franchise more than 10 hours per week. Van Over stated that Kormos should buy multiple territories because the Semi-Absentee Model was proven to generate sufficient profit to fund the cost of opening subsequent franchises.

441.    Kormos agreed to become a franchisee in July 2020.

*xxvi.    The Kulhaneks*

442.    The Kulhaneks purchased six territories in Michigan in June 2021, and they opened their first franchise in May 2022. The Kulhaneks have spent over $431,000 opening and operating this franchise, and the franchise has never been profitable. Instead, it has had an operating loss that exceeds $120,000 to date this year. Additionally, the Kulhaneks entered into a multi-year commercial lease that has over $198,000 in payments potentially remaining due. The franchise cannot operate with fewer than two full-time employees and two part-time employees, in addition to the nearly 40 hours per week that the Kulhaneks must work in the franchise. To date, the Kulhaneks have been forced to work over 1,500 hours in the franchise.

443.    On May 14, 2021, the Kulhaneks were introduced to PMA and the Semi-Absentee Model during a phone call with Seebohm. During this call, Seebohm began telling the Kulhaneks that the Semi-Absentee Model would not require them to work in the franchise more than 10 hours per week and that the franchise would immediately generate profit margins in excess of 40%.

444.    On May 18, 2021, Seebohm arranged a video call with the Kulhaneks, during which Seebohm gave the Kulhaneks the Unit Economics Presentation, and he further made false statements, such as that the franchise would operate successfully with one full-time and one part-

time employee, that the Kulhaneks needed no martial arts experience, and that the systems Defendants put in place would ensure that the Kulhaneks franchise was profitable and successful without requiring the Kulhaneks to work in the franchise more than 10 hours per week.

445.    Between May 21, 2021 and June 15, 2021, Seebohm sent 20 individual emails and arranged multiple calls with the Kulhaneks to convince the Kulhaneks to become franchisees, including by arranging for the Kulhaneks to watch Owner Validation Calls, in which existing owners had been pressured by Defendants to falsely represent the Semi-Absentee Model.

446.    On June 15 and 16, 2021, the Kulhaneks attended Discovery Day in Knoxville, Tennessee.

447.    At Discovery Day, Seebohm, Van Over, and Baker repeated the false statements that they had previously made to the Kulhaneks. These Defendants told the Kulhaneks that the profit margins in excess of 40% would be achieved by operating the studio four days per week and that the Kulhaneks would achieve higher profit margins by operating the studio six days per week. Seebohm told the Kulhaneks that he intended to "personally invest" in 6 to 8 territories because it was "such a great semi-absentee model" and that he intended to open pairs of studios in multiple different states because the Semi-Absentee Model was so effective that Seebohm would not need to be located in the same state as his franchises, since he would not need to work in them.

448.    At Discovery Day, the Kulhaneks repeatedly asked Van Over and Baker whether the Kulhaneks needed martial arts experience, as the Kulhaneks were concerned that they could not operate the franchise successfully without such experience. These Defendants repeatedly assured the Kulhaneks, stating that the Semi-Absentee Model had been proven to work with semi-absentee owners who owned multiple franchises and only worked in their franchises 8-12 hours per week total.

91

449.     At Discovery Day, Van Over told the Kulhaneks to purchase multiple territories, stating that the profits from the first franchise would provide funding to open the following franchises. Van Over also stated that the model and corporate support ensures profitability within the first 3 month of operation, ensuring that profits from the operational studios will be available to fund future studios. Van Over and Seebohm stated that they will not sell individual territories and that the minimum number a franchisee can purchase is two. Seebohm, likewise, assured the Kulhaneks that opening two franchises is ideal because the Kulhaneks could then hire one program director who would oversee both franchises if located relatively close together.

450.     Kulhaneks were concerned about the travel distance between available territories and the impact that this would have on their time investment and overall success. Again, at the Discovery Day closing discussion, they were reassured by Van Over and Baker that the semi-absentee model allows owners to operate remote territories successfully without additional burden and encouraged them to purchase six territories in Michigan that were all 60 to 90 minutes from the Kulhaneks' home. Seebohm also reiterated that the semi-absentee model was so successful that he was in the process of purchasing 6 to 8 territories in pairs, likely in the State of Colorado in spite of his residence in the Midwest, so that he could have one program director manage two territories.

451.     On June 16, 2021, immediately upon conclusion of Discovery Day, Seebohm sent a "refined territory map" showing 10 potential territories and scheduled a "Decision Call" for the Kulhaneks on June 18, 2021.

452.     On June 18, 2021, Seebohm called the Kulhaneks for this "Decision Call," during which Seebohm pressured the Kulhaneks to become franchisees and repeated false statements about the Semi-Absentee Model.

453.     Defendants continued to email and call the Kulhaneks over the following days to convince them to become Franchisees, at least 8 emails are on record between June 18th and June 28th continuing the pitch, as well as phone calls from Seebohm.

454.     On June 28, 2021, the Kulhaneks became franchisees.

455.     After becoming franchisees, the Kulhaneks learned that the operating costs of the franchise are significantly higher than what Defendants represented these costs would be. In many cases, the Kulhaneks' operating costs are 150% to 200% higher than what Defendants stated the costs would be, both in financial models provided to the Kulhaneks and during conversations with the Kulhaneks. These costs are often higher because Defendants require the Kulhaneks to use vendors and service providers selected by Defendants who charge higher prices than Defendants stated they would charge.

456.     The Kulhaneks have achieved student membership numbers in line with the targets set by Defendants, at which point Defendants stated that the Kulhaneks would be profitable. The Kulhaneks' revenue is still significantly below Defendants' lowest projections with the best month to date resulting in a net loss of $6,500.

457.     Defendants have told the Kulhaneks to book weekend birthday parties and other activities that will require hiring even more employees, further contradicting the Semi-Absentee Model. For example, at a conference in Orlando in October 2022, Van Over stated that franchisees should book five birthday parties each week in order to generate income.

458.     The Kulhaneks' first franchise has not generated profit that can be used to open the second franchise, despite Defendants' representations, and the Kulhaneks do not see a path to profitability because the system provided by Defendants is fundamentally flawed.

93

459. Defendants, including Unleashed, have begun telling the Kulhaneks to open more locations, despite the fact that the Kulhaneks' franchise is operating at a loss. Defendants state that opening multiple locations will help "spread" expenses. In reality, however, opening more locations will simply cost the Kulhaneks more time and money and further enrich Defendants.

*xxvii.  Larson*

460. Larson purchased eight territories in the Greater Seattle, Washington area in June 2021 for $256,500, and opened her first franchise at the end of November 2022. Larson entered into a 10-year commercial lease and spent approximately $500,000 opening this franchise location. Larson currently has three full-time employees and works 40-60 hours per week in the franchise, with additional hiring needs required to move to a 6-day-per-week program and launch birthday parties and other purported revenue-generating events.

461. In May 2021, Larson worked with a franchise consultant to identify semi-absentee franchise opportunities. As an entrepreneur and investor, Larson was specifically seeking a semi-absentee model where she would have the bandwidth to quickly scale the business and build-out several territories simultaneously or in short-sequence. Additionally, Larson was seeking a franchise where (i) start-up costs would be recovered within two-to-three years; (ii) cash flow from open franchise locations would fund future franchise locations; (iii) well-developed business systems and processes were in place; and (iv) the owner would not be required to be involved in day-to-day operations. PMA was identified as a strong fit based on these requirements.

462. Larson attended the PMA Unit Economics Presentation with Seebohm on May 19, 2021, and participated in several additional calls/video conferences with him thereafter. During these calls and informational sessions, Seebohm repeatedly stated that the Semi-Absentee Model is a proven, successful, and profitable semi-absentee business model requiring an owner to work

94

approximately ten hours per week per location. He further reiterated that the franchise would operate successfully with one full-time employee and one part-time employee, that no martial arts experience was required, and that there were robust business and marketing systems and processes in place to allow for profitability within 2-3 months after opening. Seebohm confirmed that PMA more than satisfied the requirements Larson was seeking in a franchise investment.

463.    On June 15 and 16, 2021, Larson, along with her husband, attended Discovery Day in Knoxville, Tennessee.

464.    At Discovery Day, Van Over, Baker, and Seebohm repeated the statements about the business model that had previously been made to Larson. During the presentation, they stated that 1 employee is needed for the first 80 students, 1.5 employees after 80 students, and 2 employees when at full capacity at 6 days per week. They further demonstrated the studio management software and stated that it covered everything needed to successfully run operations allowing for an owner to work 10 hours per week. Amid questions about legacy owners and whether results could be replicated by a non-martial artist, Defendants made assurances that no martial arts experience was required and that this was a proven semi-absentee business model. To assuage any concerns, Defendants further discussed their ongoing recruitment of instructors and their "database" of instructor candidates, along with the traveling CIT team should a franchisee urgently need an instructor on a short-term basis to continue operations.

465.    During the one-on-one meeting with Van Over and Baker at the end of Discovery Day, Larson, Van Over, and Baker further discussed the semi-absentee business model. As Larson was considering purchasing eight territories, Van Over stated that each location would require approximately 10 hours per week, so a general manager would need to be hired after Larson opened four locations in order to enable Larson to continue developing the remaining four

95

locations. Van Over further explained the benefits of purchasing multiple locations near each other, so that a Program Director could be shared between two locations thereby reducing expenses. Additionally, Van Over discussed the feasibility of developing eight territories within the development time frame as the profits from one territory would provide funding to open the following territory.

466.    On June 16, 2021, Seebohm emailed Larson notifying her that she was approved as a PMA franchisee and scheduled a Decision Call on June 18, 2021. Seebohm stated that although 90%+ of franchisees sign franchise agreement documents personally and then assign it to their LLC, she could go ahead and set up her Washington corporate entity to sign as a member of that entity.

467.    On June 22, 2021, Larson, through her corporate entity, became a franchisee.

468.    After becoming a franchisee and later beginning presales, Larson discovered that the semi-absentee business model presented and sold by Defendants was not viable. PMA's "robust" business and marketing systems do not exist. Studio Pro, PMA's studio management software, has subpar functionality and is deficient in providing an owner with the information the owner needs to make an informed decision about the business. Statistical information provided by the software is often inaccurate or incomplete depending on how it is entered into the software.

469.    Larson spends an inordinate amount of time manually building KPI and membership trackers, as well as manually auditing information in Studio Pro, so that she and her team have accurate information about the health of the studio. The PMA guest registration form and membership contract must be completed by a prospective member on paper forms, which creates even more manual work to then enter into Studio Pro. Furthermore, the membership contracts provided by PMA require the prospective member to enter their full credit card

96

information, including CCV number, on the paper form, which is not PCI compliant and subjects the franchise owner to liability should an employee or third-party access this credit card information.

470. Defendants are acutely aware that their studio management software is deficient and incapable of allowing owners to operate their business in an efficient and productive manner. Despite the fact that there are numerous successful studio management software programs on the market that would resolve the vast majority of these issues, including allowing prospective members to securely enter their credit card information, PMA continues to use and attempt to update Studio Pro, with each update causing more issues with the software. Unleashed acknowledges that Studio Pro is deficient and is modifying their "Command Center" software to ultimately migrate PMA franchises to Command Center. However, legacy and non-legacy owners continue to express concerns about Unleashed's ability to convert their CRM software to sufficiently meet the needs and requirements of a martial arts studio.

471. Furthermore, Defendants' marketing and lead generation systems lacked "expert" level competency causing Larson to spend considerable time and financial resources to develop effective digital marketing with outside vendors. For example, at the beginning of pre-sales, Larson set a digital marketing budget of $3,500 per month with PMA's in-house digital marketing. Once the digital marketing campaign launched, Larson was receiving leads from the Dallas, Texas area, over 2,000 miles from Larson's franchise in Renton, Washington. When this issue was addressed with PMA, it was discovered that these ad sets "were somehow crossed with another studio" and "brand new ones were created with the correct [Facebook] account location."

472. After exactly one month of running digital marketing on Facebook, all leads stopped. Larson contacted PMA again to report that no leads had been received, which was odd as

Larson usually received 3-6 leads per day given the digital marketing budget set. Larson requested that PMA confirm that there were no issues on PMA's end and inquired whether ads should be paused or if there were different ads that could be posted, so that Larson was spending ad money wisely. PMA stated that this was "normal" after leads have been running for a while (they had only been running for one month), that leads fluctuate heavily, and this was a lull in the lead generation. After 4 days with no leads, Larson moved her digital marketing ads to an outside "approved" vendor, and immediately began receiving 3-6 leads per day again. This turned out not to be a "lull" in leads, but rather an issue with the set-up of Larson's Facebook digital marketing by PMA. While Larson immediately moved her digital marketing to a non-PMA vendor to ensure that she was receiving sufficient leads to promote studio growth and justify the $3,500 per month investment, numerous other franchisees stayed with PMA's digital marketing and experienced continued issues with proper lead generation.

473. In addition to issues with digital marketing, Unleashed stated that PMA's website was "sub-optimal from a usability and SEO perspective." Unleashed launched a new website for PMA franchises in November 2022. Despite confirmation by Unleashed that testing was done prior to launch, PMA franchisees experienced numerous and ongoing issues with lead generation from the new website.

474. Although Larson was in presales and PMA required a free lesson and free martial arts uniform as part of the pre-sale process, Larson's website was updated to require prospective members to pay $39 for two lessons and a uniform. Larson informed PMA of the incorrect information and was told that Unleashed was aware of the issue. During this period where the website was requiring prospective members to pay $39 for a trial, such prospective members paid the fee, but these leads were not provided to the franchisees. Even though all trials should be free

during pre-sales, Larson's franchise was contacted by one such prospective member stating that they had paid the $39 for a trial but was never contacted (because PMA never provided the lead information due to integration issues).

475. Website issues continued after Unleashed announced that almost all issues had been resolved. For example, Larson's website had the correct address listed on the website, but the map included on the website specifically directed visitors to Fairwood Martial Arts, a nearby martial arts competitor. Additionally, there were ongoing issues with leads coming through the website and into Studio Pro. Leads would come in with the parent's name, along with a separate lead with the child's name showing as a "Hot Adult Lead." Again, PMA stated that Unleashed was aware of this issue and it was a Studio Pro integration issue. These ongoing lead issues caused additional manual work by Larson and her team to audit and update each lead in Studio Pro to ensure accuracy.

476. Unleashed acknowledged that leads were not coming through the website for approximately a week. As a result of ongoing website issues, Larson decided to cancel Google ads with PMA until she can be assured that leads generated through Google Ad purchases are properly being delivered. These ongoing marketing issues by PMA and Unleashed have impacted Larson's lead generation, as well as caused her to spend considerable time and financial resources seeking outside vendors and solutions to grow her membership base.

477. Furthermore, during the hiring process prior to pre-sales, Larson discovered that it was not possible to run a viable franchise with one full-time employee and one-part-time employee, and it was a high-risk business practice to operate with only one martial arts instructor. For a non-martial artist, semi-absentee owner, a new PMA franchise is highly vulnerable if the sole instructor is sick, resigns, or is terminated. PMA's solution to this issue is for the franchise to

build their "bench strength" with an in-house CIT program; however, this program is supposed to be launched six-months after opening, not after the beginning of pre-sales. This leaves a new franchise vulnerable for approximately 8-10 months where the owner must rely on a "traveling CIT team" that may or may not be available/staffed or incur the additional expense of having a second lead instructor. Despite Defendants' representations regarding the number of employees to run a successful franchise, Larson elected to hire a second instructor during pre-sales despite the additional expense to ensure continuity of operations.

478.    It also became evident during pre-sales that the Program Director position is not a part-time position as Defendants advertised. To properly grow the membership base, the Program Director position is a full-time position to work leads, perform introductory lessons and upgrades, perform student check-ins, and handle customer service and member management. This position requires additional assistance to process all the manual administrative work with the studio management software. Despite Defendants' assertion that a full-time Program Director could be shared between two locations, doing so is not a sound business practice if the intent is to have strong recurring membership revenue.

479.    Notwithstanding Defendants' claims to the contrary, it was never feasible for an owner to use the proceeds from the first franchise to fund the development of the next franchise. Due to substantially higher start-up and operating costs, it would be virtually impossible for a semi-absentee owner to be able to generate sufficient proceeds from the first location to meet the 26-month development timeframe for the second location. As Larson's franchises are self-funded, Larson relied on this claim from Defendants' in deciding the quantity of territories to purchase and her ability to develop all eight territories within the 5-year timeframe outlined in her Area Development Agreement.

480. Finally, during an Unleashed system-wide meeting with PMA owners, Unleashed representatives stated that Unleashed needs to make substantial changes to PMA's website, marketing, products, and systems because the current systems in place by PMA are ineffective. For clarity, these are not enhancements to the business model but rather wholesale changes to every aspect of the business.

481. Larson did not invest in PMA to be a part of endless pilot testing of every aspect of the business. Larson invested in a "proven" and "semi-absentee" business model with "robust" business and marketing systems and processes in place. None of these claims by Defendants have been demonstrated to be accurate.

482. PMA should never have required franchisees to purchase a minimum of two territories, let alone encouraged or allowed the purchase of multiple territories, given that this is not a semi-absentee business model and there are not proven and tested business and marketing systems in place to allow a franchisee to be successful strictly following PMA's business program. Any success Larson has achieved in pre-sales and opening her first franchise has been due to identifying deficiencies in PMA's business model and systems and seeking alternative solutions. However, this business model is not scalable, especially within the development time frame outlined in PMA's Area Development Agreement, without jeopardizing the viability of Larson's opened franchise.

*xxviii. Lasku*

483. Lasku purchased two territories in Texas in December 2020, and he was forced to close the one franchise that he opened because the franchise was not profitable and cost Lasku thousands of dollars per month to keep afloat. Lasku spent over $550,000 opening and operating the franchise, in addition to entering into a multi-year commercial lease with thousands of dollars

101

in payments remaining due. He worked in the franchise over 40 hours per week before closing the franchise, causing him to leave his well-paying full-time job. For several months, Lasku was forced to pay more than $8,000 per month to keep the franchise open. He was forced to close the franchise because the Semi-Absentee Model promised by Defendants was a lie.

484.    Daly steered Lasku to PMA by promising Lasku that the Semi-Absentee Model was truly semi-absentee and that Lasku could successfully operate the studio working no more than 10 hours per week. Lasku informed Daly that Lasku had practiced martial arts as a teenager, and Daly used this information to further assure Lasku that he would be successful at operating the franchise. Daly was excited by the prospect of Lasku becoming a franchisee, ad she connected Lasku with Seebohm.

485.    Seebohm began misrepresenting the Semi-Absentee Model to Lasku in Fall 2020. During calls with Lasku, Seebohm stated that the Semi-Absentee Model would generate profit margins in excess of 40% and not require Lasku to work in the franchise more than 10 hours per week. Seebohm relied on the misleading financials shown to other Plaintiffs during calls in which Seebohm gave Lasku the Unit Economics Presentation.

486.    Seebohm arranged for Lasku to listen to Owner Validation Calls, during which an existing owner told Lasku that "I only spend around 10 hours per week on my school."

487.    Lasku attended Discovery Day in Knoxville, Tennessee on December 8 and 9, 2020. At Discovery Day, Seebohm, Baker, and Van Over misrepresented the Semi-Absentee Model to Lasku, assuring Lasku that he would not have to work more than 10 hours per week in the franchise to generate the profit margins advertised by Defendants. Lasku asked Baker for clarification on this point, and Baker told Lasku that Lasku would only need to work in the franchise for an hour or so on Fridays to meet parents and make it known that Lasku was the

owner. Van Over told Lasku that the systems put in place by Defendants were so reliable and proven that he could "run this business through a computer." Van Over and Baker told Lasku that the Semi-Absentee Model would be successful with only one full-time and one part-time employee and that Defendants would help staff Lasku's franchise. Van Over stated that Lasku's overhead in operating the studio would not exceed $15,000 per month, enabling Lasku to achieve the levels of profitability advertised by Defendants.

488. Lasku agreed to become a franchisee on December 21, 2020. After becoming a franchisee, Lasku learned that Defendants provided no assistance with staffing the franchise, leaving Lasku to find instructors on his own. Defendants also understated the operating costs of the franchise and overstated the income generated by the Semi-Absentee Model, causing Lasku's franchise to lose money each month. The costs to open the franchise were more than twice the costs that Defendants stated Lasku would incur, and Lasku was forced to stop working at his full-time job to work in the franchise over 40 hours per week.

489. A PMA "Success Coach" visited Lasku's franchise and informed Lasku that he was operating the franchise in accordance with the Semi-Absentee Model; however, the franchise continued to be unsuccessful. Lasku utilized the limited resources offered by PMA, but these resources did not help Lasku in operating the franchise. For example, Lasku paid PMA and its affiliates for online marketing, and PMA's marketing produced roughly five leads per week. By contrast, when Lasku used a third party for the same type of marketing, the third-party marketing produced sixty to seventy leads.

### xxix.   Lifschutz

490. Lifschutz purchased four territories in California in October 2020. Lifschutz invested his 401(k) into this endeavor and, to date, has spent well over $300,000 above and beyond

the expected investment (not including the cost of the additional "territories" or the $700,000 in lease liabilities hanging over his head) and losses continue to mount, month after month. Lifschutz has spent over $725,000 on opening and operating his franchises.

491.    Indeed, Lifschutz was forced to leave his corporate job in March 2021 once it became apparent that the Semi-Absentee Model did not work and he would have to operate the studio as a full-time job. Obviously, losing that salary has only compounded the financial devastation.

492.    In particular, PMA instructed Lifschutz to use Foxfield Construction Ltd. for construction purposes and the bids were double the projections and actual spends in the workbook provided by PMA—not to mention the "fee" Foxfield Construction Ltd. charges just for arranging bids.

493.    Upon opening his first studio, it became readily apparent that revenue projections were completely unrealistic due to, among other things, the fact that the membership base (and resulting revenue) take far longer than three months on average to build.

494.    Further, Defendants and, in particular, Van Over highlighted the purported success of "legacy" schools, but, among other things detailed above, those schools have typically been in operation for 5+ years and often do not follow the PMA franchise standard of operations (despite Defendants' false statements and/or omissions otherwise).

495.    Lifschutz had an introductory call with Seebohm on August 10, 2020 and, prior to that call, Seebohm forwarded the same videos detailed above.

496.    On August 12, 2020, Lifschutz participated in the "Unit Economics Webinar" with Seebohm in which the "estimated initial investment" calculation was wildly false and grossly

understated. The same day, Seebohm sent Lifschutz the FDD, which contained misrepresentations regarding he profitability of the Semi-Absentee Model.

497.    On August 17, 2020, Lifschutz participated in another video call with Seebohm and still others on August 26 and September 16, 2020 as Seebohm continued the same false statements, including, but not limited to, the fact that the studio could be operated "semi-absentee."

498.    Lifschutz participated in Discovery Day in Knoxville on September 21 and 22, 2020 in which the same statements detailed above were repeated, again and again. Lifschutz asked about competition in the markets where Lifschutz was considering purchasing territories, and Seebohm, Baker, and Van Over told Lifschutz that "competition proves there is demand in the market" and encouraged Lifschutz to go ahead with purchasing the territories. Van Over and Seebohm told Lifschutz that the franchise would be profitable in 3 months. Van Over also stated that all licensees became franchisees, and he stated that the financial success of the licensees-turned-franchisees was representative of the financial success of the Semi-Absentee Model, despite knowing that the licenses did not operate according to the Semi-Absentee Model.

499.    After some additional back-and-forth, Lifschutz sent his wire payment to PMA to purchase the franchises on October 4, 2020.

500.    After becoming a franchisee, Lifschutz discovered that the systems and support promised by Van Over, Seebohm, and Baker did not work and that the Semi-Absentee Model could not be operated with one full-time and one part-time employee. For example, although Van Over and Baker promised that PMA would handle marketing for Lifschutz and generate leads, the marketing provided by PMA was virtually worthless. Lifschutz was forced to retain a third party to provide the services promised by PMA, and this third party performed substantially better than PMA.

105

501.    Further, the construction costs that Van Over and Baker told Lifschutz that he would incur were incorrect. The contractors that PMA required Lifschutz to use charged Lifschutz more than twice as much as PMA told him that they would charge.

502.    When Lifschutz raised these concerns with Baker during a corporate training event and suggested that PMA should allow Lifschutz to use third party vendors and contractors, Bakr stated "well, you shouldn't have bought into a franchise!"

*xxx.    Lobb*

503.    Lobb purchased three territories in Kansas, and he opened his first franchise in September 2020. Lobb has incurred over $600,000 in costs in opening and operating the franchise, as the franchise has continued to lose money since opening at a rate of approximately $12,000 per month.

504.    After initial conversations with Seebohm and Van Over in September and October 2019, Lobb attended Discovery Day in Knoxville, Tennessee on November 3, 2019. At this time, Seebohm, Baker, and Van Over misrepresented the Semi-Absentee Model, including the amount of time that Lobb would need to work in the franchise and the financials.

505.    After becoming a franchisee, Lobb raised concerns with Van Over and Baker about the poor performance of the customer generation system that Defendants required Lobb and other franchisees to use. Baker blamed Lobb for the poor performance. Van Over later reiterated that Lobb was to blame for the poor performance.

506.    After these conversations, Lobb learned that Van Over openly bragged about the fact that Van Over would be entitled to take the franchises from Lobb due to Lobb's purported inability to conform to the standards that Defendants imposed.

*xxxi.    The Logans*

507.    The Logans purchased six territories for $206,500. One was later sold to the Moorhouses for $25,000, but Unleashed forced the Logans to relinquish the remaining five territories as part of the sale to the Moorhouses. The requirement to relinquish all six locations was contrary to what was represented by Van Over, Seebohm and Baker that an owner was permitted to sell the other territories on the open market.

508.    The Logans were prompted to invest in PMA through a series of calls. On September 3, 2021, the Logans participated in an introductory call with Daly, during which Daly told the Logans that the Semi-Absentee Model would enable the Logans to have profit margins in excess of 40% by working no more than 10 hours per week. Then on September 16, 2021, Seebohm held another call explaining the PMA model and showed youtube videos selling the scheme. A number of validation calls followed in which Van Over, Seebohm, and other franchisee owners represented the business model was semi-absentee, profitable, and offered a great lifestyle.

509.    The Logans were then given the FDD, which appeared to show a healthy financial situation for all PMA owners. The Logans were also told that franchisees were profitable within three months of being open, which was incorrect.

510.    The Logans were also told that all licensees had switched to the franchise model, which was untrue.

511.    Based on these misrepresentations, the Logans have invested approximately $336,500, which they never would have invested if presented with accurate statements about the Semi-Absentee Model and the profitability of the franchises.

512.  The Loomises have purchased six territories in total but have so far been able to open only one location. This franchise loses roughly $19,000 per month.

513.  The misrepresentations to the Loomises began in April 2021 in conversations with Pete Gilfilan. The Loomises attended a PMA Unit Economics Webinar on April 15, 2021, a territory Review with Seebohm on April 19, 2022, a Confirmation Day Prep Video Call with Seebohm on June 2, 2022, and Discovery Day on June 15 and 16, 2021.

514.  At each of these meetings, the Loomises were led to believe various misrepresentations about the Semi-Absentee Model, including that profitable management of each studio required only one-and-a-half to two employees; that the studio management software covered everything needed to run operation; and that PMA had a marketing operation platform that would provide new leads daily. Ultimately, it was represented to the Loomises that they would be profitable in three to six months.

515.  The Loomises soon found out that each of these representations was false and/or misleading. Opening their one location and attempting to open their second location has exhausted all of their savings and liquidated assets and caused them to accrue approximately $500,000 in debt.

516.  Opening just the one studio requires much more time than the ten to fifteen hours of owner time per week that was represented to them. Indeed, Ms. Loomis has had to leave her full-time occupation to try to manage their one PMA location.

517.  A franchise consultant introduced the Loomises to PMA on April 7, 2021. The consultant was clear that PMA advertised itself as "semi-absentee" and could be operated in "10-15 hours per week". It was this flexibility and the "30-40% profit margins," combined with the

108

mission of "making a positive impact on our community" and "making a positive impact on kids' well-being and development" that drew the Loomises to PMA, as well as PMA's advertisements about its "extensively tested and highly effective systems" that were developed during the licensing phase with the legacy owners and its statements that "100% of PMA owners agreed to transfer from the license model to the franchise model."

518.     The Loomises had an initial call with Seebohm on Monday April 12, 2021. He told them that PMA was "a proven business model that is easy to run and easy to scale" and that they would need "1.5 to 2 employees."  He also indicated that the Semi-Absentee Model was "great" and he "had purchased a territory" himself.

519.     Seebohm sent the Loomises videos on April 12, 2021, which the Loomises watched. The videos were clear that PMA is "built for the non-martial-artist and a semi-absentee owner" working "10 hours a week or so." In these videos, PMA promised a fully automated customer recruitment program; proven marketing and sales system: fully integrated CRM software with billing, POS, management and marketing; regional owner and staff training events; and free consulting on demand. Each of these promises induced the Loomises to become franchisees.

520.     The Loomises had a Unit Economics Call with Seebohm on April 15, 2021. Multiple times on this call and in previous and subsequent communications, he told the Loomises that they would only need one full-time and one part-time employee; all support and marketing systems are in place a well-tested; and PMA franchisees should expect to be "cash flow positive when they open their doors."

521.     Van Over sent the Loomises links to recorded calls of Van Over and Baker discussing the processes for new franchisees. The Loomises listened to these calls, wherein Van Over extolled the virtues of the semi-absentee model and profit margins of over 40%.

522. The Loomises had a call with Seebohm on April 19, 2021 related to the FDD and a Territory Review. Seebohm told them that they should join weekly calls to hear from existing owners. They attended some of these Owner Validation Calls.

523. The Loomises had a PMA Check In call with Brent on May 24, 2021 as they had not gone to a Discovery Day that took place in May 2021.

524. The Loomises agreed to attend Discovery Day, and they had a Preparation Call for Discovery Day on June 11, 2021 with Seebohm.

525. They attended Discovery Day on June 15 and 16, 2021 in Knoxville, Tennessee. At Discovery Day, Van Over and Baker told the group that the Semi-Absentee Model was "proven" and "effective" and would produce margins of 30-40%. Van Over was clear that the four-day model would provide these good margins and that going to the six-day model was just an enhancement. He stated the Loomises would need one full-time and one part-time employee and that this was a great investment for a semi-absentee owner. The Loomises were also told that there was a group health insurance policy that they could access for their employees. Van Over told the Loomises that that PMA had a "marketing expert" to manage advertising and social media for the franchises.

526. Van Over stated that since the Loomises were considering purchasing 6 territories, he was happy to know that Ms. Loomis would quit her job once they had multiple territories open to manage the enterprise. At no time did Van Over indicate that doing so would be required (or even suggested) for the first franchise or even for all six franchises. At the end of Discovery Day, the Loomises were told that they could purchase up to 6 territories.

527. When the Loomises asked Van Over whether he planned to remain the owner of PMA, he told us he had no plans to sell. When they asked Van Over and Baker whether they

110

needed martial arts experience, Van Over and Baker repeatedly reassured them that the Semi-Absentee Model had been proven to work with non-martial-artists and there was no reason for the Loomises to worry.

528.     Seebohm called the Loomises to press them to complete the transaction on June 18,2021 (Decision Day Call). He provided wiring instruction via email. He told the Loomises that they needed to close their purchase in the next 7 to 10 days. They were encouraged to buy as many territories as they could afford because of the discounted franchise fees; and the financial success of the initial location(s) would pay for the developing the other locations. Seebohm told them that no franchises had failed, that PMA had bought back the territories of 2 owners who signed just prior to the pandemic and "got cold feet," and that no franchise locations had been closed. He told them not to worry about signing the original documents personally and that we could transfer the agreement at a later date.

529.     The Loomises agreed to become franchisees on June 23, 2021.

530.     The Loomises attended the PMA conference in Las Vegas from October 7, 2021 to October 10, 2021. At this conference, Van Over urged the franchisees to move forward with the 6-day-per-week model, even though Van Over had told the Loomises repeatedly that that the 4-day model was perfectly fine and financially viable. In fact, Baker told the Loomises that his wife was going to use the 4 day a week model because they did not want the hassle of extra staff and extra days, including weekends.

531.     The Loomises attended corporate training prior to hiring staff on November 7, 2021 to November 11, 2021 to better learn and understand how pre-sales and other operational items work. They went to dinner with a highly successful Legacy Owner and learned that his studios

were the basis for many of the numbers in the FDD and they were mostly schools that had been in existence for years and that did not operate according to the Semi-Absentee Model.

532. The Loomises started the California Owner's Group on November 17, 2021 to improve communication between owners and ensure that all received the same information since the Loomises learned that some owners were told one thing and other owners were told something else on myriad issues from training, layout, presales numbers, marketing website, StudioPro, and other issues. This group provided support for each other on issues like employee hiring and employee handbooks because they received no real support from PMA on key business issues.

533. The Loomises met with this group on a weekly basis and organized their own leadership retreat on June 11, 2022, and they invited a representative of PMA, Reid Presley, to train their staff on October 22 and 23, 2022, since they were trying to make their franchises and those of the other California owners successful.

534. Ms. Loomis attended corporate training in Knoxville from April 24, 2022 to April 29, 2022 with the Loomises' Program Director and Instructor.

535. After starting pre-sales for their first franchise on May 2, 2022, the Loomises discovered that many of the representations about the Semi-Absentee Model were false, including that the fully automated customer recruitment system did not work, the website did not work for modern SEO or other basic marketing and CRM functions, PMA's marketing did not work, PMA provided no help in hiring martial arts instructors, PMA provided no group health insurance for the Loomises to access, and turnover rates were much higher than those quoted by Van Over and Baker which showed that the revenue projections advertised by PMA were false.

112

536. Ms. Loomis was forced to quit her job in May 2022, as it became clear that the Loomises' first franchise location was requiring 50+ hours per week and the Semi-Absentee Model did not work.

537. Mr. Loomis attended corporate training from August 21, 2022 to August 26, 2022 with the Loomises' Program Director and Instructor. At this time, PMA backtracked and told Mr. Loomis that the Loomises needed at least 2 full-time employees per school and that 3 would be preferable.

538. The Loomises attended the Unleashed Brands conference in Orlando, Florida in October 2022. At this time, the Loomises learned from Legacy Owners that the Semi-Absentee Model had not been tested in semi-absentee studios and that the Legacy Owners are nearly all owner operators (even if they have multiple locations, they still work in the studios daily); they have larger studios (2,000+ sf); and they have multiple staff members or supplement their staff through their leadership programs (which are not possible for the first 1-2 years in a new school). The Legacy Owners indicated their skepticism regarding the likelihood that the Semi-Absentee Model could ever work. The Loomises also learned that Legacy Owners do not pay the same royalties to PMA that the franchisees must pay, further compromising the economic model that had been presented to the Loomises.

539. Van Over told the franchisees that they should all be doing multiple birthday parties per weekend to help generate income. Doing so would necessitate hiring more staff, and Baker had told the Loomises at a leadership event in June 2022 that PMA and Unleashed did not have a proven model for how to accomplish this effectively.

540. Unleashed representatives told the Loomises to expect large changes in marketing and memberships, including 1-day-per-week memberships, that in no way align with the mission

of the brand to develop children. They also made it clear that they expected the Loomises to get away from paid-in-full memberships and go toward more monthly memberships, despite paid-in-full memberships being a core part of the Semi-Absentee Model. The sales funnel expectations as communicated multiple times by Unleashed do not play out in real life.

541.    Unleashed released a new marketing website in November 2022, without fully testing the process and system. The Loomises do not get viable leads from this system, as half of the links are broken, the leads are going to personal emails, the forms do not work, and the Loomises cannot have their studio email address on the website. As such, the Loomises must pay an outside marketing agency to generate leads.

542.    Although the Loomises are ahead of their development schedule, at this point, it is unclear whether they will be able to open their second location due to their past and ongoing losses and large amounts of additional capital needed for buildouts.

543.    Ms. Loomis has worked countless hours on nights and weekends because the business requires her constant attention and PMA has not provided any guidance on how to make it a semi-absentee business, except to say that they "should have expected the first year to be all consuming" despite PMA's assurances to the contrary.

*xxxiii.  McMahon and Seligman*

544.    On August 10, 2021, McMahon and Seligman were introduced to Seebohm and FFL. Seebohm introduced McMahon and Seligman to PMA as "one of the fastest growing franchises" in the United States.

545.    On August 9, 2021, Seebohm hosted a Zoom call with McMahon and Seligman to go over PMA performance and the PMA organization.

114

546. On August 24, 2021, McMahon joined a Zoom call with Seebohm to go over purported Unit Economics for PMA franchises. Seebohm discussed the franchise fees for the development territories, as well as median profit and expense figures for schools in 2019 and 2020 from the 2021 FDD.[7] Expenses were, again, woefully understated.

547. On August 26, 2021, McMahon and Seligman participated in another Zoom meeting with Seebohm in which the FDD was again discussed. Likewise, on this call, Seebohm said that at least two territories were "required." Seebohm also discussed the anticipated costs for opening the studio, pre-sale performance, and the median expenses and profit figures for the studios. Seebohm also presented the territories. McMahon selected two territories for

---

[7] Like the 2019 FDD, the 2021 FDD is riddled with false statements, including the "financials" presented in Item 19. First, PMA continually changed how it described the financials in each new year of the FDD. Thus, for example, the 2019 financials in the 2021 FDD are the same as those 2019 financials presented in the 2020 FDD. In the 2020 FDD, these financials purportedly came from "eighteen franchised PMA studios that were open for all of 2019." In the 2021 FDD, PMA noted as follows:

> We had sixty franchised outlets operating for the entire year of 2019. The majority of these franchised outlets were previously licensees of our Parent, PMAI, that entered into franchise agreements with us. These franchisees do not fully operate within the franchise model offered under this disclosure document. Eighteen of the franchised outlets operated during all of 2019 under this franchise model and were compliant with their franchise agreements. Their financial performance data is displayed below.

But, in the 2019 FDD, PMA admits that "[a]ll franchisees" that existed in 2018 were "conversions from licensees," while 60 franchisees were listed at the end of 2018. In the 2020 FDD, only 5 additional franchisees were added during the course of 2019 for a total of 65. Accordingly, it is unclear where the 2019 "eighteen franchised PMA studios" came from. Despite PMA's statement that they were not part of the "Legacy Owners" who transitioned to franchisees, if they exist at all, they appear to certainly be "Legacy Owners" who allegedly transitioned to the franchise model. But, even the "Legacy Owners" who purportedly transitioned to the franchise model still operate under a completely different business model as the new franchisees.

Albuquerque, New Mexico. Seebohm said that those two were premium territories that would produce exceptionally well. Seebohm also said that PMA had never closed a school in 17 years.[8]

548.    On September 1, 2021, McMahon participated on a call with PMA owners and prospects, and PMA and the purported PMA owners discussed the success of the studios.

549.    On September 29, 2021, McMahon scheduled "Discovery Day" in Knoxville for October 19-20, 2021. McMahon also sent Seebohm an email including preapproval of an SBA loan through FranFund for $250,000.

550.    On October 19-20, McMahon traveled to Knoxville for "Discovery Day" and met in person with Seebohm, Van Over, Baker, and the PMA staff. During this time, it was reiterated in private and to the group of franchise applicants that no locations had closed in 17 years with PMA; that owners would only need to work 10 hours per week; the 40%+ EBITDA figures were real; and the schools were all considerably successful. Seebohm, Van Over, and Baker also stated that pre-sale programs generate an average of 100 members and that studios typically will be profitable the first month after opening.[9] Seebohm, Van Over, and Baker spent considerable time covering the FDD profitability and expected expenses with the group. Seebohm, Van Over, and Baker also noted, on multiple occasions, that a franchisee did not need to be a martial artist to run one of these studios. (Indeed, even today, on the PMA website, Unleashed continues to state that they want "business people, not blackbelts.").

---

[8] The 2019 FDD lists 17 "Legacy Owners" who "have left the system."

[9] Seligman and McMahon later learned through the PMA owners Facebook page that most schools have less than 100 members consistently and are struggling to survive; that it would take 200 students to break even; and that very few schools with non-martial-artist owners see greater than 150 students.

116

551.    On a call during this "Discovery Day" weekend with Seligman, McMahon, and Baker, Baker reiterated that a 10-hour-per-week investment was all that was needed, and he guaranteed that financial performance would come under the PMA system.

552.    On October 21, 2021, Seebohm had a call with Seligman and McMahon to discuss "Discovery Day" and to inform them that they had been "approved" as franchisees.

553.    On October 25, 2021, Seebohm requested wire information from Seligman and McMahon for the franchise fees and territory payments. FFL's Amie Hawk sent final documents to sign. Seligman and McMahon signed the documents and wired the money.

554.    As noted by others, Seligman and McMahon were required to use the vendors named by PMA: Morrow Hill, Foxfield Construction, Franchise Resource, Royal Sign Company, Forecast Procurement, and Fran Fund.

555.    McMahon began working with Morrow Hill and their agent Mike McCoy. McCoy presented locations and eventually an LOI was submitted. McMahon signed a 10-year lease and secured an additional SBA loan. He began construction in October of 2022, but the construction cost was double the initial estimates.

556.    Thereafter, in late 2022, on the PMA owners Facebook page, many owners began sharing information about their failing schools, while one poll showed 80% or more of those polled were making less than $2,500 per month in profit. Likewise, a number of PMA owners were sharing that their schools had to be closed.

557.    McMahon and Seligman have spent approximately $380,000 on franchise fees (including the additional territory fees), the construction build-out, and other costs and expenses. Likewise, they have signed a ten-year lease with a potential, additional $500,000 liability.

117

558. In late 2022, McMahon, desperate, reached out to Joe Luongo at Unleashed Brands for help—noting that McMahon was facing potential bankruptcy.

*xxxiv. McNally*

559. McNally purchased two territories in Massachusetts in February 2021, and he opened his first franchise in October 2022. His franchise has not been profitable, and he has therefore been unable to open his second franchise. He has invested over $425,000 in opening and operating the franchise, in addition to entering into a multi-year commercial lease with over $550,000 in payments potentially remaining due. The franchise loses money every month.

560. McNally was contacted by Seebohm in June 2020, and during June and July, Seebohm misrepresented the Semi-Absentee Model by sating that it was proven and effective, that McNally would have profit margins in excess of 40%, and that the franchise could be operated with one full-time and one part-time employee without requiring McNally to work in the franchise more than 10 hours per week.

561. During the summer and fall of 2020, Seebohm provided the FDD, Unit Economics Presentation, and other misleading materials to McNally. McNally also attended Owner Validation Calls and other conference calls with Van Over and Baker, during which Van Over and Baker repeated their usual misrepresentations about the Semi-Absentee Model.

562. McNally attended Discovery Day in Knoxville, Tennessee from January 6 to 8, 2021. At Discovery Day, Van Over and Baker told McNally that the Semi-Absentee Model was proven to be effective with owners working 10 to 14 hours per week, generating profit margins in excess of 40%, and requiring only one part-time and one full-time employee. Van Over stated that one full-time employee would be sufficient to "handle everything" until more than 80 students signed up at the studio. Van Over stated that these systems would enable McNally to become

profitable soon after opening, and he further stated that many franchisees were profitable as soon as they opened their franchises. Van Over and Baker told McNally that the system was so effective that no franchisee had ever closed or been unsuccessful.

563. Van Over and Baker presented financial data that they represented was indicative of the Semi-Absentee Model, which showed that franchises had profit margins of 40%. This financial data was not representative of the Semi-Absentee Model, as it was compiled from a select number of Legacy Owners, who operated a substantially different business than the Semi-Absentee Model.

564. Van Over and Baker led McNally to believe that the Semi-Absentee Model was effective and profitable and that it would enable McNally to make a positive impact on his community by enriching children's lives.

565. Van Over stated that the systems offered by PMA would make operating the Semi-Absentee Model easy because PMA would help with staffing and training, handle digital marketing, generate leads, and provide McNally with trusted service providers who would ensure that McNally could open the franchise smoothly and in a cost-effective manner.

566. After McNally became a franchisee, he discovered that these "trusted service providers" charged inflated prices to the franchisees in order to provide kickbacks of 20% or more to PMA. Further, McNally has been forced to work in the franchise between 40 and 50 hours per week, and the franchise is not profitable.

567. Because Van Over, Baker, and Seebohm convinced McNally that the franchise would be profitable once it opened or just a couple months later, McNally is quickly running out of money to continue operating the franchise.

119

568. The transactions involving McNally took place primarily and substantially within the Commonwealth of Massachusetts, and Defendants are and were, at all relevant times, engaged in trade or commerce in the Commonwealth of Massachusetts in connection with the transactions giving rise to McNally's claims.

*xxxv.   The Moorhouses*

569. The Moorhouses purchased two territories in November 2021 but have so far not been able to open either of those territories. Instead, in July 2022, the Moorhouses purchased a studio Ryan Logan had already built out but had yet to open for $25,000. The Moorehouses opened the former Logan location on August 26, 2022 and signed a five-year lease. Despite much work being put into making pre-sales, they have not seen any profit and have found the business model sold to them by Defendants to be false and/or misleading.

570. Seebohm began making misrepresentations to the Moorhouses about the Semi-Absentee Model during a call on September 23, 2021, in which he stated that the business would require only 10-15 hours per week from the owners.

571. Additional calls and webinars occurred on September 27th, October 7th, 8th, 11th, 15th, 25th, and November 4th, 2021. The Moorhouses attended Discovery Day on November 11, 2021. All of these interactions included the same deceit—that the Semi-Absentee Model required only 10-15 hours per week based on one and a half full-time employees as shown in the Economics Workbook.

572. The Moorhouses soon came to find out that these claims were false, and the economics do not work as communicated. The Moorhouses have found that these studios would need at least 3 full-time employees to run the Semi-Absentee Model.

573. The Moorhouses were further misled into believing that Legacy Owners who were represented as profitable incurred the same costs that Moorhouses and other new franchisees had incurred (but they had not).

574. Based on the misrepresentations, the Moorhouses invested approximately $200,000 and are continuing to lose $15,000 per month, even while having to abandon their ordinary occupation to work full-time on PMA.

*xxxvi.* *The Patels*

575. The Patels purchased two territories in New Jersey at the end of 2019, and they have opened one franchise. The Patels have spent over $500,000 in opening and operating the franchise, in addition to entering into a multi-year commercial lease with thousands of dollars in payments remaining due and working substantially more than 10 hours per week in the franchise each week. Nonetheless, the franchise has not been profitable and continues to lose over $10,000 each month.

576. Seebohm began misrepresenting the Semi-Absentee Model to the Patels in a call on July 30, 2019, during which Seebohm stated that the Semi-Absentee Model was proven and effective, that the Patels would not have to work more than 10 hours per week in the franchise in order to generate profit margins in excess of 40%, and that Defendants had in place systems and support that would ensure the success of the Patels' franchise. For example, Seebohm stated that "staffing will be the least of your concerns" because Defendants would help hire and train instructors, such that the Patels would not need martial arts experience. He further stated that the Patels would achieve these results by hiring only one full-time and one part-time employee.

577. Seebohm repeated these and similar misrepresentations on calls with the Patels throughout August 2019.

121

578. On August 5, 2019, Seebohm gave the Patels the Unit Economics Presentations, relying on misleading financials to assure the Patels that the Patels' franchise would achieve the profit margins Seebohm promised and that the Semi-Absentee Model was effective even when owners worked in the franchise no more than 10 hours per week. Seebohm further presented an FDD that purported to contain financials representative of the Semi-Absentee Model, but these financials were not representative of the Semi-Absentee Model.

579. Seebohm arranged for the Patels to listen to Owner Validation Calls on August 6 and 8, 2019, during which existing owners stated that the franchise "can certainly be run as a semi-absentee business" and that the Patels did "not need any martial arts experience" because the systems provided by Defendants were so reliable. These owners had been pressured to make these false statements by Seebohm, Baker, and Van Over.

580. The Patels attended Discovery Day in Knoxville, Tennessee on September 10 and 11, 2019. At Discovery Day, Seebohm, Baker, and Van Over repeated the misrepresentations discussed above. These Defendants told the Patels that the Patels' franchise would have profit margins in excess of 40% if the Patels followed the Semi-Absentee Model because the Patels would be able to rely on the systems put in place by Defendants. Van Over stated that "there are a ton of martial artists everywhere looking for jobs," so the Patels would have no difficulty in staffing the franchise, and that Defendants would train the Patels' employees, so the Patels would not need any martial arts experience. Van Over and Baker told the Patels that Defendants would "have [their] back" and provide staffing to the Patels if the Patels had any difficulty finding staff for the franchise. Van Over stated that the Patels' cost to build-out the studio would be "extremely low" and that the Patels would be profitable within a couple months of opening because the systems put in place by Defendants guaranteed the success of the franchisees.

122

581.    The Patels agreed to become franchisees shortly after Discovery Day, as Defendants told the Patels to decide quickly or else the Patels' territories would be given to another prospective franchisee.

582.    After becoming franchisees, the Patels learned that the Semi-Absentee Model was not proven or effective, that Defendants dramatically overstated the financial success of the Semi-Absentee Model, and that the costs to operate the Semi-Absentee Model are substantially higher than Defendants represented. The Patels have not received the promised support from Defendants, causing the Patels to hire multiple full-time employees to work in the franchise because the Patels do not have martial arts experience and need to have back-up instructors available, since Defendants do not help with hiring or staffing the franchise. The Patels have learned that no franchisees operating the Semi-Absentee Model have the level of success that Defendants advertised.

### xxxvii. Pendergast

583.    Pendergast purchased three territories in Pennsylvania in January 2022, and he has spent over $125,000 and a significant amount of time on purchasing these territories and attempting to open his first franchise. After becoming a franchisee, Pendergast discovered that the representations made by Van Over, Baker and Seebohm were false, and as such, he has placed his plans to open his first franchise on hold.

584.    Daly began emailing Pendergast on October 12, 2021, as Pendergast was searching for a franchise business. Daly and Pendergast spoke on the phone on October 14, 2021, and Daly inquired about Pendergast's criteria for a franchise business, which included that the business be semi-absentee and have a proven track record of success. On October 22, 2021, Daly told

Pendergast that PMA's Semi-Absentee Model fit these criteria and she instructed Pendergast to set up a call with Seebohm through the FFL portal.

585.     After that, Seebohm contacted Pendergast by phone on November 10, 2021, and Seebohm gave Pendergast the Unit Economics Presentation on November 18, 2021. During this call, Seebohm repeated the same misleading pitch, representing that the financials shown during the call were representative of the Semi-Absentee Model, that the Semi-Absentee Model was proven and effective, and that the Semi-Absentee Model generated profit margins in excess of 40%. Seebohm stated that this profit and success required just 10 hours per week of Pendergast's time.

586.     In December 2021, Pendergast worked on financing the franchise with an SBA loan by using Benetrends, the financing company selected by PMA.

587.     Pendergast attended Discovery Day in Knoxville, Tennessee on January 6 and 7, 2022. At Discovery Day, Van Over and Baker hammered home the empty promises and representations regarding the profits generated by the Semi-Absentee Model. Each represented that the Semi-Absentee Model generated profit margins in excess of 40% on a schedule of four days per week, with the owner work just 10 hours per week. As part of their pitch, Van Over and Baker assured Pendergast that PMA had the systems and support that would ensure Pendergast's success and that the Semi-Absentee Model needed only one full-time and one part-time employee.

588.     Representatives of Unleashed were at this Discovery Day and were present when Van Over and Baker made these representations, as Unleashed had recently acquired PMA. During Discovery Day, Unleashed's acquisition of PMA was announced, and Pendergast and the other prospective franchisees were assured that Unleashed would maintain the continuity of PMA's business and operations.

124

589.     Van Over provided the FDD to Pendergast, which contained misrepresentations regarding the financial success of the Semi-Absentee Model, and Pendergast acknowledged receipt of the FDD on January 16, 2022. He agreed to become a franchisee on January 31, 2022.

590.     After becoming a franchisee, PMA provided an "Onboarding Coach" to Pendergast, and this person informed Pendergast that hiring two full-time employees would be necessary.

591.     As instructed by PMA, Pendergast engaged FoxField Construction to begin the process of developing his first franchise. Shortly thereafter, a representative of FoxField Construction informed Pendergast that the construction costs would be roughly double the costs represented in the FDD and that the costs represented in the FDD had been "extremely low for quite some time."

592.     Pendergast then learned that a PMA franchisee in Connecticut planned to abandon their franchise because the Semi-Absentee Model did not work as advertised or otherwise. Although Pendergast had located a site for his first franchise, he declined to execute a lease as he began to discover the scope of the misrepresentations made regarding the Semi-Absentee Model.

*xxxviii. The Petrosevichs*

593.     The Petrosevichs purchased three territories in Florida in June 2021, and they opened their first franchise in August 2022. The Petrosevichs told Defendants they wanted to become franchisees to build a better quality of life for their family while having a positive impact on their community, including by replacing Mr. Petrosevich's full-time job, spending more time with their kids, and building their retirement. Defendants assured the Petrosevichs that the Semi-Absentee Model would enable them to achieve these goals.

125

594. The Petrosevichs have spent over $425,000 opening and operating the franchise, far exceeding the costs that Defendants stated the Petrosevichs would incur, in addition to entering into a multi-year commercial lease with over $530,000 in payments remaining due. The franchise has lost money every month since opening. The Petrosevichs must spend over 60 hours per week driving to the franchise and working in the franchise. When selecting a territory for the franchise, Seebohm assured the Petrosevichs that selecting a franchise far from the Petrosevichs' home would be a good idea because they would only need to be in the studio "one or two days per week."

595. Seebohm began making misrepresentations to the Petrosevichs in a call on May 14, 2021. Beginning in this call, and continuing throughout the sales process, Seebohm told the Petrosevichs that the Semi-Absentee Model was built for semi-absenteeism and that the Petrosevichs would only need to be at the franchise as much as they would like to but no more than a couple times a week.

596. On May 18, 2021, Seebohm gave the Petrosevichs the Unit Economics Presentation, during which Seebohm relied on the fraudulent financials produced by Defendants and stated that the Petrosevichs would make $150,000 in net revenue, with a minimum of 30% profit margins, by operating the Semi-Absentee Model four days per week.

597. Following this call, Seebohm told the Petrosevichs to attend a "Weekly Leadership Call" hosted by Van Over on May 19, 2021. The Petrosevichs did so and, during this call, Van Over told the Petrosevichs that the Semi-Absentee Model was effective and would result in them achieving the profit margins represented by Seebohm.

598. On May 21, 2021, Seebohm emailed the Petrosevichs and told them to listen to Owner Validation Calls. During these calls, existing owners who had been pressured by Seebohm, Van Over, and Baker to make misleading statements, misrepresented the Semi-Absentee Model.

126

In one indication of the coaching to which Seebohm subjected these existing owners, one such owner asked Seebohm for permission to answer a question posed by a prospective franchisee before answering.

599.    Defendants continued to contact the Petrosevichs by phone and email in order to convince them to become franchisees, eventually telling the Petrosevichs to attend Discovery Day. During these communications, Defendants told the Petrosevichs to attend more "Weekly Leadership Calls," weekly check-in calls with Seebohm, and constant validation calls designed to lead the Petrosevichs to believe that the Semi-Absentee Model was a highly profitable business that would allow them to be semi-absentee.

600.    Prior to Discovery Day, Seebohm told the Petrosevichs that they should "prepare to be interviewed by PMA executives" because "not everyone is chosen."

601.    The Petrosevichs attended Discovery Day in Knoxville, Tennessee on June 10, 2021.

602.    At Discovery Day, Van Over, Baker, and Seebohm repeated the same lies about the Semi-Absentee Model discussed above, including that the Semi-Absentee Model would not require the Petrosevichs to work in the franchise more than 10 hours per week. Van Over told the Petrosevichs that they would achieve the profit margins advertised because Defendants provide a "proven system," comprised of various forms of support that were never forthcoming. Van Over was asked whether he intended to sell PMA, and he denied having any intention of doing so. He sold PMA to Unleashed fewer than six months later.

603.    At Discovery Day, Van Over told the Petrosevichs to purchase multiple territories, assuring the Petrosevichs that the first franchise would be sufficiently profitable within three months of opening to fund the following locations.

127

604. The Petrosevichs became franchisees on June 22, 2021.

605. After becoming franchisees, the Petrosevichs asked Seebohm whether all prospective franchisees who had attended Discovery Day were "chosen" by Defendants to become franchisees. Seebohm admitted that all prospective franchisees had been so "chosen."

606. The systems promised by Defendants have not been provided. The franchise has not been profitable. The vendors that Defendants require the Petrosevichs to use charge inflated prices that exceed the costs that Defendants stated the Petrosevichs would incur.

607. Defendants took unauthorized drafts from the Petrosevichs' bank account, claiming that they had "changed" the date that royalty payments were due. The franchise agreement requires that Defendants provide written notice of any changes to royalty payment due dates. Defendants did not provide any such notice prior to making the withdrawals from the Petrosevichs' account.

608. The Petrosevichs have learned that "successful" franchisees will "coach" franchisees on how to be successful. For a fee, these successful franchisees will tell other franchisees how to become profitable, which requires disregarding the "proven systems" that Defendants assured the Petrosevichs would work for them.

609. The Petrosevichs see no path to profitability, operating the franchise on a semi-absentee basis, or generating sufficient income from the franchise to open franchises on the other territories they purchased.

### xxxix. The Rhotons

610. The Rhotons purchased three territories in California in July 2021, and they opened their first franchise in June 2022. They have spent over $500,000 in opening and operating the franchise, in addition to entering into a five-year commercial lease with hundreds of thousands of dollars in payments remaining due. The franchise loses an average of $10,000 per month, and the

128

Rhotons do not believe they can continue operating the franchise for much longer if it continues to lose such a large amount of money each month.

611.    On May 26, 2021, the Rhotons attended a "discovery" call with Andrew Horton, a representative of a franchise consulting company associated with Daly, FranChoice. Mr. Rhoton informed Mr. Horton that Mr. Rhoton was evaluating online e-commerce businesses because Mr. Rhoton's goal was to generate income by working on a business part-time. Based on this information, Mr. Horton told the Rhotons about PMA, which Mr. Horton indicated was a semi-absentee business model.

612.    Following this conversation, Mr. Horton arranged for the Rhotons to meet with Seebohm. The Rhotons had an introductory call with Seebohm on June 7, 2021. During this call, Seebohm began misrepresenting the Semi-Absentee Model, informing the Rhotons that it was a semi-absentee business model, that the build-out costs were low, and that the Rhotons could successfully operate the franchise with one full-time and one part-time employee.

613.    Following this call, Seebohm emailed the Rhotons the two videos described above, which stated that owners of PMA franchises would only work on the franchise "10 hours a week or so" and that PMA provided the necessary support for franchisees to be successful, including marketing, sales, training, and free consulting on demand.

614.    Seebohm gave the Rhotons the Unit Economics Presentation the same day, during which he told the Rhotons that the Semi-Absentee Model would generate profit margins in excess of 35% based on a 4-day per week schedule with one full-time and one part-time employee.

615.    During this call, Mr. Rhoton indicated that the time commitment required by the Semi-Absentee Model was important to him, and he informed Seebohm that he could not stop working his full-time job because it was the Rhotons' primary source of income. Seebohm assured

the Rhotons that PMA was "not that kind of business" and that Seebohm successfully operated similar semi-absentee businesses while working full-time for FFL.

616. On June 11, 2021, Seebohm held another call with the Rhotons to discuss territories and the FDD. During this call, Seebohm instructed the Rhotons to choose a minimum of two to three territories. He also assured the Rhotons that the financials in the FDD were representative of the Semi-Absentee Model.

617. The Rhotons attended Discovery Day in Knoxville, Tennessee on July 8 and 9, 2021.

618. During Discovery Day, Van Over and Baker told the Rhotons that the Semi-Absentee Model was "proven and effective" and that the franchise would produce profit margins of 35-40%.

619. Van Over and Baker repeatedly stated that purchasing two or more territories was a "requirement." This "requirement" became and continued to be a recurring theme in the pitch directed at the Rhotons, and it led the Rhotons to believe that, if they wanted to move forward with becoming franchisees, they would have to purchase multiple territories.

620. On July 9, 2021, Seebohm emailed the Rhotons to inform them that they had been "approved" to become franchisees, and he stated that the Rhotons must conform to an aggressive, 7-day timeline in order to become franchisees, pressuring the Rhotons to make a decision.

621. On July 10, 2021, Mr. Rhoton emailed Seebohm, laying out Mr. Rhoton's plan for funding the purchase and development of the Rhotons' franchise, with detailed information on the source and amount of funds. Mr. Rhoton's plan was based on the financials represented in the FDD, but even more conservative, and it amounted to $318,000. Mr. Rhoton asked Seebohm to "take a look at it and let me know if you think I'm missing anything."

622. In response, Seebohm called the Rhotons, and Seebohm stated that the funding amount would be "more than enough." He assured the Rhotons that most franchisees were profitable within their first three months. Ms. Rhoton expressed concern about the cost of developing the Rhotons' second and third franchises, and Seebohm assured the Rhotons that the cash flow from the first franchise would fund the following franchises.

623. Seebohm called the Rhotons again on July 14, 2021 to "check in." Mr. Rhoton expressed concerns regarding the development timeline that PMA imposes on franchisees who purchase multiple territories, stating that the Rhotons wanted to avoid being in a position where they might lack funds to develop their second and third territories within the timeline imposed by PMA. Seebohm assured the Rhotons that they would have multiple options to sell any territories they could not or did not want to develop, as PMA had so much demand for franchises and was growing so fast.

624. Based on these various assurances and the repeated representations that the Semi-Absentee Model would be a low-expense, high-margin and semi-absentee business, the Rhotons agreed to become franchisees on July 14, 2021.

625. The Rhotons began using PMA's selected firm for real estate services, Morrow Hill, in July 2021. Like other service providers and vendors PMA selects, Morrow Hill was inept and caused delays. For example, the Rhotons regularly had to wait a week at a time to get updated site lists, and when the Rhotons received these lists, they could tell that Morrow Hill had scrambled to throw together a list with limited useful information. Mr. Rhoton was forced to spend 20 hours per week searching for and sourcing potential locations for the Rhotons' franchise. After doing Morrow Hill's job for them, Mr. Rhoton located a site for the franchise. He asked Morrow Hill to send a letter of intent to the landlord as quickly as possible because the landlord informed Mr.

Rhoton that multiple competitors wanted the same location. A week later, Mr. Rhoton discovered that Morrow Hill had failed to send the letter of intent.

626.     From October 7 to 10, 2021, the Rhotons attended a PMA conference in Las Vegas in order to learn more about how to operate the franchise in a semi-absentee manner.

627.     From November 7 to 11, 2021, the Rhotons attended corporate training in Knoxville, Tennessee to learn how to conduct pre-sales and manage other operational aspects of the franchise.

628.     The Rhotons began pre-sales in February 2022, following the pre-sales model designed by PMA. By following the model, the Rhotons incurred over $70,000 in expenses in three months, quickly depleting their working capital.

629.     Since February 2022, Mr. Rhoton has had to work more than 40 hours per week on the franchise, causing him to miss deadlines at the full-time job that he told Seebohm and Van Over he could not quit.

630.     In November 2022, after finding that the "assistance" offered by PMA was nonexistent or ineffective, Mr. Rhoton engaged a business coach to provide training and support in an attempt to avoid being forced to close the franchise.

631.     In addition to learning that the other aforementioned representations were false, the Rhotons also discovered that the "requirement" that they buy multiple territories was inconsistent with the fact that other franchisees had been "allowed" to purchase just one territory.

*xl.     The Richwines and Baumgartner*

632.     The Richwines and Baumgartner purchased four territories in Oregon in February 2022, and they have not opened a franchise because they have discovered that the Semi-Absentee Model as represented by Seebohm, Van Over, and Baker does not exist. They spent over $150,000

132

on franchise fees to purchase these territories, which they would not have bought if they had not been manipulated into believing that the Semi-Absentee Model would be as profitable as Defendants promised and require no more than 10 hours of work per week.

633.     The Richwines and Baumgartner began working with Daly on August 27, 2021. Daly presented them with 3 different franchises, one of which was PMA. She stated that PMA's main focus was a semi-absentee model that would only require the Richwines and Baumgartner to work a few hours per week while being financially successful. Daly told them that they could have one full-time and one part-time employee run the business 4 days per week with hours around 3pm to 7pm in a 1,200 sq. ft. location, and have margins over 40%. She emphasized the importance of having several locations because of the profitability of multiple locations.

634.     Daly paired them up with Seebohm, and they began meeting with Seebohm on October 5, 2021, at which point Seebohm began touting the bogus Semi-Absentee Model.

635.     On October 12, 2021, Seebohm gave them the FDD and the Unit Economics Presentation.   He told them that it would be best for them to purchase several territories because they could use the funds from the first one to fund the second one and the second one to fund the third and the third to fund the fourth, and so on due to the high profit margins.

636.     Seebohm told them that they needed to buy more than one territory and that it was better to buy more, such as four, and then later sell them back instead of only purchasing one or two in the beginning. Seebohm stated that it was hard to add territories later.

637.     He told the Richwines and Baumgartner that they could make amazing net profits each month. He told them that all they needed was one full-time employee and another who could work part-time or up to full-time.

638. During October 2021, Seebohm showed the Richwines and Baumgartner Owner Validation Calls and arranged for them to attend zoom meetings with Van Over and Baker, and, during these interactions, Seebohm, Van Over, and Baker told the Richwines and Baumgartner that the Semi-Absentee Model was proven and effective and that they would achieve profit margins in excess of 40% by following PMA's system.

639. The Richwines and Baumgartner attended Discovery Day in Knoxville, Tennessee on January 6 and 7, 2022.

640. At Discovery Day, Van Over and Seebohm told the Richwines and Baumgartner that they would make profits over 40% each month in a 1,200 to 1,400 sq. ft. location by running the business only 4 days per week. Van Over also told them that all Legacy Owners became franchisees.

641. At Discovery Day, Van Over stated that PMA had a team of instructors that would come out within a short amount of time and help the Richwines and Baumgartner if they needed help with staffing. Van Over and Seebohm assured them that they would have support in case of employee problems.

642. During a "one-on-one" meeting with Van Over and Seebohm, the Richwines and Baumgartner asked whether they could purchase just one territory, and Van Over stated that they should purchase more than one territory to have "more for profitability."

643. The Richwines and Baumgartner asked what would happen if they agreed to purchase multiple territories and could not meet the development schedule that PMA imposed. Van Over stated that PMA would work with them to buy back the territories or work with them to help them sell the territories to others. Van Over and PMA provide no such help.

134

644. After becoming a franchisee, Mr. Richwine attended a conference hosted by Unleashed in October 2022. At this time, he met other PMA franchisees and learned that the franchisees were losing substantial amounts of money, including, for some, their retirement savings because of the Semi-Absentee Model, that they were forced to work 50 to 60 hours per week, and that they were losing thousands of dollars every month. In other words, Mr. Richwine discovered that the Semi-Absentee Model is a lie.

*xli.* *The Raglands*

645. The Raglands purchased one territory in Missouri in July 2022 and are in the process of opening the franchise. The Raglands have incurred over $160,000 in costs in purchasing and opening the franchise.

646. In April 2022, a representative of FFL, Jake Hamburger, contacted the Raglands to discuss the Semi-Absentee Model.

647. Hamburger provided the Raglands with the FDD, and he informed the Raglands that the Raglands would not incur more than $200,000 in costs in opening the franchise and operating the franchise for 3 months, including the franchise fee, and that the franchise would be profitable within 3 months of opening. According to Hamburger and the FDD, the average net income of a PMA studio would be between $89,000 and $140,000 per year.

648. The Raglands agreed and planned to attend Discovery Day in May 2022; however, representatives of PMA then informed the Raglands that they could not attend Discovery Day at that time because Unleashed had purchased PMA.

649. In June 2022, Mr. Ragland asked Baker whether any franchises had failed or were in the process of closing, and Baker's response was "none."

135

650. The Raglands were invited to a later Discovery Day, which they attended on July 7 and 8, 2022.

651. The 3-month delay in attending Discovery Day caused the Raglands to push back their projected opening date by 3 months as well. PMA was aware that the Raglands would be a one-salary family by the end of 2022 and its representatives stated that the Raglands would be "well taken care of."

652. During this delay, Unleashed edited the FDD, and the resulting FDD that the Raglands received prior to Discovery Day was considerably less understandable and more convoluted; nonetheless, fundamental misrepresentations about the Semi-Absentee Model and its profitability remained in the "new" FDD.

653. At Discovery Day, Van Over and Baker told the Raglands that the Raglands' investment in opening and operating a franchise would be less than $200,000, that it would be semi-absentee and not require more than 10 to 15 hours of work per week, and that the Raglands would achieve the advertised financial success by operating four days per week with one full-time and one part-time employee. They further told the Raglands that the Raglands would be profitable within 3 to 5 months of opening. Van Over and Baker stated that PMA had a "fine-tuned" system and playbook, and that as long as the Raglands followed this system and playbook, they would be successful. Van Over advertised the support systems that would ensure this success, including help training and evaluating staff, coaching assistance, help hiring candidates, and other training and support.

654. Another prospective franchisee asked Van Over whether any franchisees had failed or closed their franchise, and Van Over told the group, including the Raglands, that no franchisee had failed or closed a franchise.

136

655.     Baker and Van Over told the Raglands that PMA had a team of instructors who could fill in for the Raglands if the Raglands could not find consistent staffing or needed an instructor on short notice. They presented this service as a benefit offered to franchisees in order to reassure prospective franchisees, like the Raglands, who did not have martial arts experience.

656.     After becoming a franchisee, the Raglands discovered that the Semi-Absentee Model does not work. Mr. Ragland has learned that multiple owners selected by Van Over to be on Owner Validation Calls were "encouraged" to withhold details about the size of their studios, the number of students, and the number of hours they worked, and they were otherwise instructed to "sell" the Semi-Absentee Model.

657.     The Raglands have also learned that the expenses represented in the FDD are not accurate and that the profitability advertised by the FDD, Baker, and Van Over is not possible with the Semi-Absentee Model, if at all.

658.     The Raglands also learned that the team of instructors advertised by Baker and Van Over is not available when owners need them, and rather than being a benefit offered to PMA franchisees, the franchisee must pay inordinately high costs for this "benefit," such as airfare, per diems, and other costs.

659.     The Raglands have also discovered that none of the support systems advertised by Van Over and Baker are sufficient or effective, if they exist at all. For example, Van Over and Baker told the Raglands that if they had trouble closing sales or maintaining students, PMA would have people watch the Intro lessons and classes and coach the Raglands and their staff on what to do to improve. If that did not help, then PMA would send someone from corporate, at no expense, to help monitor and coach. After becoming franchisees, the Raglands learned that the franchisees who ask for this help do not receive it.

137

660.    Mr. Ragland recently asked a representative of Unleashed, Joe Luongo, about this nonexistent "help" that Van Over promised, and Mr. Luongo assured Mr. Ragland that Unleashed was doing everything it could to get the right people in those positions to offer the promised support, indicating to Mr. Ragland that no such people were or are currently in those positions.

<em>xlii.    The Rubants</em>

661.    The Rubants were first engaged by FFL in July 2019 when Seebohm presented PMA to the Rubants as a semi-absentee business model where the owner could expect to work approximately ten hours per week. In the same presentation, Seebohm communicated that the Rubants would only need to hire one full-time employee and one part-time employee.

662.    In the weeks that followed, the Rubants attended thirteen Owner Validation Calls and Q&A calls with Van Over, Baker, and legacy PMA owners. On these calls, the Rubants and other participants specifically inquired whether a non-martial artist owner could be involved only 10 hours per week with 1.5 employees. The answer given was repeatedly "yes," including by Van Over and Baker. It was never disclosed that the results of Legacy Owners were not typical for new franchisees.

663.    The Rubants further inquired how they would staff their location if one of their 1.5 employees missed work due to illness or unexpectedly quit. Van Over advised that "corporate" would send staff to fill in when needed and could even have someone there the same day if needed. Van Over repeatedly assured the Rubants that staffing was not an issue as there were many martial artists desiring to work for PMA.

664.    The Rubants asked Van Over how many franchises had gone out of business. Van Over replied that no franchise had ever gone out of business.

138

665. The Rubants attended Discovery Day in Knoxville on August 14 and 15, 2019 where these same misrepresentations were made by Van Over, Baker, and Seebohm.

666. The Rubants signed the Franchise Agreement on September 3, 2019 and purchased two territories but have only been able to open one.

667. Since opening their first franchise, the Rubants have found the statements made to them before becoming a franchisee to be false.

668. The expenses incurred are much higher than presented in the FDD that Van Over and Seebohm presented to the Rubants. For 2021 and 2022, the Rubants were expending approximately $21,000 per month. The labor costs, merchant fees, cost of goods sold, and marketing fees are all higher than represented by PMA, even though PMA sets the prices for many of these costs.

669. Of the 32 months the Rubants have operated their franchise, they have only managed a profit in three of those months.

670. Van Over's representations about staffing have also proved to be false. The Rubants have had to employ two full-time and one part-time employee to operate the franchise, and Mr. Rubant must work in the franchise for thirty to forty hours per week.

671. When the Rubants requested staffing help from PMA, they were told an additional $2,000 was required to pay for the staff to work for 4 days. This requirement was not disclosed to the Rubants before signing the Franchise Agreement.

672. The Rubants have lost over $165,000 on their franchise and owe an additional $125,489 for the remainder of their five-year lease. They foresee no ability to recover their total investment of over $478,000 by continuing to operate the franchise.

139

673. In addition to losing their personal investment based upon the false representations, Mr. Rubant was persuaded by Seebohm to participate in validation calls and was coached by Seebohm to push how much of an absentee owner you could be. Upon realizing how much money he was losing and that the semi-absentee model is unworkable, Mr. Rubant withdrew from participating in the calls.

*xliii.* *The Silbermans*

674. The Silbermans purchased three territories in Pennsylvania in March 2020 and opened their first franchise in May 2022. The Silbermans have spent over $370,000 opening and operating this franchise and were forced to close their franchise as it had operated at a loss since opening.

675. The Silbermans attended Discovery Day in Knoxville, Tennessee in February 2020. At Discovery Day, Van Over, Seebohm, and Baker misrepresented the Semi-Absentee Model, including by stating that many instructors would be available to work in the franchise and that, by following the systems designed by Defendants, the Silbermans would convert 50% of prospective students to paying memberships. These Defendants also told the Silbermans that the Silbermans would have access to support from Van Over and Baker.

676. When the Silbermans asked for help from Van Over and Baker after opening, these Defendants told the Silbermans that they were developing a program for low performing studios that would be released soon. Baker held a zoom meeting with the Silbermans, during which he stated that "we made a promise to you folks, and we are going to help you turn things around." The only "help" that Defendants provided consisted of two boilerplate emails from Baker and Van Over that provided no assistance to the Silbermans.

140

677.    When the Silbermans informed Van Over that the Silbermans could not continue operating the franchise, Van Over stated that the Silbermans should "revisit your initial WHY, [sic] that you wanted to operate PMA studios, and really contemplate this decision."  He stated that "[i]n the current environment[,] selling territories is extremely difficult," and that "[i]f you are wanting a release from your current franchise agreement, you can't just close the studio . . . the home office has the first right to buy or assume and we are creating a team to do just that."

678.    He further stated that "you[r] [Area Development Agreement] has expired by not having your second location opened by 8/26/22. In situation where the owner is still focused on operation[,] Unleashed Brand [sic] will consider a small extension with the intent of getting the second location lease signed [sic] and construction started . . . My suggestions are again, [sic] to refocus on the success of your newly opened location."

### xliv.    The Steeles

679.    The Steeles purchased four territories in November 2020 and opened their first location in April 2022. After becoming franchisees, the Steeles learned that the Semi-Absentee Model does not work. Mr. Steele must work 60 hours or more in the franchise each week, and the Steeles have been forced to hire two full-time employees as well. To fund the franchise, the Steeles have drained Mr. Steele's 401k retirement account and mortgaged their home. The Steeles have spent over $650,000 opening and operating the franchise, including over $200,000 in operating losses this year to date, and the Steeles entered into a 5-year commercial lease backed by a personal guarantee with hundreds of thousands of dollars in payments remaining due. Due to the inordinate time requirements of the Semi-Absentee Model, Mr. Steele was forced to quit his job in January 2022, losing out on hundreds of thousands of dollars in income.

680.    Seebohm began misrepresenting the Semi-Absentee Model to Mr. Steele in August 2020. On August 28, 2020, Seebohm called Mr. Steele and stated that the Semi-Absentee Model was proven and effective, that the franchise needed only one full-time and one part-time employee, and that Mr. Steele would not need to work more than 8 to 10 hours per week in the franchise.

681.    On September 2, 2020, Seebohm held a video call with Mr. Steele, in which Seebohm gave the Unit Economics Presentation and misrepresented that the associated financials were representative of the Semi-Absentee Model and that the Steeles would achieve profit margins in excess of 40%. Seebohm stated that these profits would be achieved by operating part-time for four days per week and that the Steeles would have higher profits by operating six days per week.

682.    Seebohm repeated these misrepresentations in calls with Mr. Steele on September 4 and 9, 2020, and he further told Mr. Steele to watch the aforementioned videos, in which Defendants misrepresent the Semi-Absentee Model, including by stating that 100% of licensees converted to being franchisees, that Defendants would provide a "fully-automated customer recruitment program," and that Defendants would provide "proven marketing sales systems" to franchisees. Seebohm also told Mr. Steele that Seebohm was planning on purchasing "a couple" PMA franchises himself in the Colorado area in order to assure the Steeles that the Semi-Absentee Model was a safe investment.

683.    On October 15 and 16, 2020, Mr. Steele attended Discovery Day in Knoxville, Tennessee.

684.    At Discovery Day, Van Over, Baker, and Seebohm repeated the misrepresentations described in the preceding paragraphs, including by stating that the financials presented were based on a franchise being open 4 days per week and operating with one full-time and one part-time

142

employee. These Defendants told Mr. Steele that the Steeles would have profit margins in excess of 40% because of the systems put in place by Defendants comprising the Semi-Absentee Model.

685.    Van Over told Mr. Steele that these profits would be increased by operating the franchise 6 days per week. He further misrepresented that the Steeles would not need to work more than 10 hours per week in the franchise.

686.    After Unleashed purchased PMA, Unleashed held a "system-wide" meeting where representatives of Unleashed stated that Unleashed needed to make wholesale changes to Defendants' websites, marketing, products, and other systems because the systems put in place by PMA, Van Over, and Baker were ineffective. For example, Unleashed stated that Defendants' website was "sub-optimal from a usability and SEO perspective."

687.    Unleashed further stated that focus groups did not like the sales strategies put in place by Defendants, because these strategies amounted to a "high pressures sales experience in the franchises" that dissuaded potential clients from purchasing services from franchisees.

### *xlv.    Taylor*

688.    Taylor purchased a territory in Nebraska in April 2020, and he opened a franchise at this location in June 2021. He has spent over $650,000 opening and operating this franchise, in addition to entering into a multi-year commercial lease which poses an additional $163,500 liability. Taylor was forced to leave his well-paying job in order to work in the franchise full-time because the Semi-Absentee Model sold by Defendants is a lie. He must work 40 to 60 hours per week in the franchise.

689.    Defendants misrepresented the Semi-Absentee Model to Taylor. On multiple occasions, Seebohm and Van Over told Taylor that operating the Semi-Absentee Model successfully would not require Taylor to work in the franchise more than 10 hours per week. They

represented that the franchise was a semi-absentee business that would allow Taylor to maintain his full-time job.

690. Taylor attended Discovery Day in Knoxville, Tennessee on March 11, 2020.

691. At Discovery Day, Van Over, Baker, and Seebohm repeated the same misrepresentations directed to the other Plaintiffs, including that the Semi-Absentee Model would generate profit margins in excess of 40% without requiring Taylor to work in the franchise more than 10 hours per week. Van Over told Taylor that Taylor should use the project management and construction companies selected by Defendants because the companies would "handle the build-out from beginning to end," with Taylor only needing to "pick up the keys" when they finished. Instead, construction was continually delayed due to inflated bids, unnecessary costs, unlicensed contractors, and general incompetence, and Taylor incurred an additional $96,000 in damages just in connection with the build-out.

692. Prior to and at Discovery Day, Taylor asked Seebohm and Van Over how Taylor would hire and train instructors and whether Defendants would offer support if Taylor's instructor was not able to teach classes. Seebohm and Van Over told Taylor that Taylor needed no martial arts experience because Defendants would find and train instructors for Taylor. They further stated that Defendants had a "travelling team" of instructors who would fly out to teach classes at Taylor's franchise if Taylor needed an instructor.

693. Taylor became a franchisee on April 2, 2020.

694. After becoming a franchisee, Taylor learned that the representations about the financial performance of the Semi-Absentee Model were false, that he needed to spend substantially more than 10 hours per week working in the franchise, and that the franchise could not be operated with one full-time and one part-time employee.

695. Defendants failed to provide the promised support with regard to finding and training instructors, and Defendants did not provide the "travelling team" when Taylor needed it. Taylor's instructor quit shortly before the grand opening of Taylor's franchise, and Taylor informed Defendants that he would require the promised assistance from the "travelling team."

696. Rather than send someone from the "travelling team," Van Over made a post on Facebook, requesting that people join a "newly formed travelling team," indicating that no such team existed when Defendants promised Taylor otherwise. As a result of this lack of assistance, Taylor saw reduction in membership of around 30% between the time he lost the instructor and hired a new one. When hiring instructors, Taylor was told that www.instructorfinder.com, which, upon information and belief, is also owned by Van Over, would be a huge help, when, in fact, this site was full of instructors who had already been hired by other locations.

*xlvi.    The Thibeauxes*

697. The Thibeauxes purchased two locations in Texas in February 2022 and are currently in the process of building out their first franchise. The Thibeauxes have spent over $170,000 on purchasing and opening their franchise, in addition to entering into a ten-year commercial lease with hundreds of thousands of dollars in payments remaining due.

698. Seebohm began contacting the Thibeauxes regarding the Semi-Absentee Model in October 2021. Seebohm spoke with the Thibeauxes by phone and video conference multiple times in October and November 2021, during which he stated that the Semi-Absentee Model was proven and effective and that the Thibeauxes would achieve the advertised profit margins working no more than 10 hours per week.

145

699. Seebohm further arranged for the Thibeauxes to listen to Owner Validation Calls, during which existing owners misrepresented the amount of time and money necessary to operate the franchises, at the urging of Seebohm and Van Over.

700. The Thibeauxes attended Discovery Day in Knoxville, Tennessee on January 6, 2022. At Discovery Day, Van Over told the Thibeauxes that the Semi-Absentee Model would be successful with one full-time and one part-time employee and that the Thibeauxes would not have to work more than 10 hours per week on the franchise. Van Over showed the Thibeauxes financial data that purportedly showed the profitability of the Semi-Absentee Model, which included data showing that the Semi-Absentee Model would result in profit margins in excess of 40%. Van Over told the Thibeauxes that the Semi-Absentee Model was so profitable that many franchisees who funded the business through SBA loans were able to pay off the loans within 3 to 6 months of opening their first franchise.

701. Based on these misrepresentations, the Thibeauxes agreed to become franchisees.

*xlvii.    The Tholaths*

702. The Tholaths purchased three territories in November 2021, and they opened their first franchise in November 2022. The Tholaths have spent over $500,000 opening and operating the franchise, and it has not been profitable. The Tholaths personally guaranteed a five-year lease to open the franchise with hundreds of thousands of dollars in payments remaining due.

703. In September 2021, Paul Whitaker, a franchise consultant from FranChoice, the franchise consulting company associated with Daly, told the Tholaths that the Semi-Absentee Model was semi-absentee, and Mr. Whitaker connected the Tholaths with Seebohm.

704. Seebohm provided the Tholaths the Unit Economics Presentation on or about October 5, 2021, during which Seebohm told the Tholaths that the Semi-Absentee Model was

proven an effective, that the Tholaths could operate the Semi-Absentee Model with one full-time and one part-time employee, and that the financials provided by Defendants were representative of the Semi-Absentee Model.

705.     On October 8, 2021, Seebohm emailed the Tholaths to encourage the Tholaths to watch prerecorded Owner Validation Calls and videos of Van Over and Baker making misrepresentations about the Semi-Absentee Model, including those noted in the preceding paragraph.

706.     After the Tholaths watched these misleading videos, Seebohm told the Tholaths to attend Discovery Day in Knoxville, Tennessee.

707.     The Tholaths attended Discovery Day on November 11, 2021, where the same misrepresentations regarding the Semi-Absentee Model and profitability of the studios was presented by Seebohm, Baker, and Van Over. Van Over told the Tholaths that they should purchase multiple territories because the income generated by the first franchise would fund the development of following franchises. Van Over further stated that the financials in the Unit Economics Presentation were representative of the Semi-Absentee Model, despite that not being the case.

708.     Based on these misrepresentations, the Tholaths agreed to become franchisees on November 16, 2021.

*xlviii.   The Torrents*

709.     The Torrents purchased four territories in July 2020 and have lost over $460,000 in opening and operating their franchises. Although the Torrents opened two franchises, they have been forced to close one franchise because the costs were too high to continue operating. The

147

Torrents entered into two multi-year commercial leases for the franchises, with roughly $600,000 in payments potentially remaining due.

710.    In April 2020, Seebohm contacted the Torrents and scheduled a meeting to promote PMA and the Semi-Absentee Model. Thereafter, the Torrents participated in Owner Validation Calls and attended Discovery Day in Knoxville on July 8 and 9, 2020.

711.    During these calls and at Discovery Day, Seebohm, Van Over, and Baker misrepresented the Semi-Absentee Model by stating that it was a proven and effective business that would generate profit margins in excess of 40% and that the systems put in place by Defendants would ensure the Torrents' success as franchisees.

712.    Based on these and similar misrepresentations, the Torrents purchased four territories, and opened their first location in Wauwatosa, Wisconsin in February 2021. The Torrents opened a second location in August 2021.

713.    The Torrents have discovered that Defendants lacked a basis for their statements regarding the profitability of the Semi-Absentee Model and their assurances that the Semi-Absentee Model was proven and effective.

714.    In fact, in one call in which the Torrents participated over a year after buying into PMA, Van Over admitted that the representations made initially are not accurate. Van Over stated that "PMA does not care what Franchise Fastlane told you about the absentee owner situation" because PMA was no longer working with FFL. Van Over stated that owners need to be prepared to work full-time for at least the first nine months to a year. However, Van Over had made the same representations of absentee ownership that Seebohm and Baker had made to the Torrents when the Torrents were considering whether to become franchisees.

148

715.     Trotman purchased eight territories in Connecticut in March 2020, and he opened one franchise. Trotman opened his franchise in November 2021, and he was forced to close his franchise on November 30, 2022, because he lost over $500,000 opening and operating the franchise, which was never profitable. Trotman also entered into a multi-year commercial lease with hundreds of thousands of dollars in payments remaining due.

716.     Trotman met with a franchise broker in December 2019. This franchise broker, Pete Gilfillan, shared information about four franchises with Trotman, one of which was PMA.

717.     The same day, December 18, 2019, a representative of FFL, Chelsey Boyce, emailed Trotman to arrange for Trotman to meet with Seebohm.

718.     Trotman agreed to meet with Seebohm on December 30, 2019, and prior to the meeting, Seebohm told Trotman to watch the two videos described above.

719.     During Trotman's first call with Seebohm on December 30, 2019, Seebohm told Trotman that average profit margins of the Semi-Absentee Model were 48% and that average revenue was between $317,000 and $455,000. Seebohm told Trotman that most franchisees operating the Semi-Absentee Model were cash-flow positive within 4 months of opening, and that Trotman would break even once 60 to 70 students signed up.

720.     On January 3, 2020, Seebohm gave Trotman the Unit Economics Presentation via a video call. During this call, Seebohm stated that updated financials for the Semi-Absentee Model would be released in April 2020, although the schedule that Seebohm told Trotman to follow would result in Trotman becoming a franchisee prior to April 2020. Seebohm stated that these updated financials would "look lean" because PMA had "a few early groups that are not indicative of the

kind of unit economics that PMA is selling." Seebohm told Trotman that his studio should be between 1,500 and 3,000 sq. ft. and that Trotman would spend $1,500 per month on marketing.

721.    The same day, Seebohm emailed Trotman information on Owner Validation Calls that Seebohm instructed Trotman to attend. He also encouraged Trotman to agree to come to a Discovery Day.

722.    On January 6, 2019, Seebohm provided Trotman with a link to three group validation calls from 2019, during which the participants downplayed the amount of time and money necessary to operate the Semi-Absentee Model.

723.    At Seebohm's direction, Trotman attended several Owner Validation Calls and other meetings with Seebohm during January 2020, including a call with Ken Brayman, a studio owner who later became a Success Coach for PMA, on January 7, 2020.

724.    On January 22, 2020, Trotman indicated he would like to attend Discovery Day in February 2020 and asked Seebohm how to meet with PMA franchisees in a setting other than the group calls orchestrated by Seebohm, Van Over, and Baker. Seebohm ignored this request, but he provided Trotman with information related to the February 2020 Discovery Day.

725.    Trotman spoke with Seebohm by phone on January 23, 2020, and Trotman again asked Seebohm how Trotman could speak to existing franchisees individually rather than on the group calls orchestrated by Seebohm and PMA. Seebohm told Trotman that what Trotman was requesting was not usually done. Trotman persisted, and Seebohm eventually arranged for Trotman to speak to an existing franchisee. This existing franchisee echoed the misrepresentations about the revenue and success of the Semi-Absentee Model that Trotman had already heard. Trotman later learned that this existing owner sold his franchises back to PMA and became an employee of PMA.

726.     Trotman attended Discovery Day in Knoxville Tennessee on February 11 and 12, 2020. Prior to Discovery Day, on February 10, 2020, Trotman spoke with Bobby Brennan, who informed Trotman that Brennan would manage the process of Trotman becoming a franchisee after Discovery Day.

727.     At Discovery Day, Van Over and Baker told Trotman that Van Over had helped hundreds of people become successful business owners through the Semi-Absentee Model. They told Trotman that he would achieve the profit margins that they advertised, in excess of 40%, by operating the Semi-Absentee Model because the systems provided by PMA were proven and effective. For example, they told Trotman that PMA's software, StudioPro, would make managing the franchise easy. They also told Trotman that he would make a positive impact on his community and children's lives by becoming a franchisee.

728.     The day after Discovery Day, February 13, 2020, Seebohm emailed Trotman to inform Trotman that he was approved to purchase 8 territories.

729.     On February 17, 2020, Brennan followed up with Trotman, emailing Trotman to inform him that he should quickly wire funds to secure his territories, and creating a sense of urgency to close the transaction.

730.     Two days later, Trotman wired 10% of the total franchise fees to PMA, $19,450.

731.     On February 28, 2020, Brennan and another representative of FFL, Amie Hawk, as well as Van Over and Baker called Trotman to convince him to wire the remaining franchise fees. Trotman did so, paying a total of $194,500 in franchise fees.

732.     After becoming a franchisee, Trotman discovered that the Semi-Absentee Model was not proven and effective, that the systems provided by PMA did not work, and that it was not possible to operate the franchise by working 10 hours per week with one full-time and one part-

time employee, as Seebohm, Baker, and Van Over had promised. Further, Trotman learned that the financials presented in the Unit Economics Presentation and FDD were not accurate, as most franchisees were not profitable.

<em>l.    Vadlamudi</em>

733.    Vadlamudi purchased two territories in Texas in June 2021 and opened his first franchise in June 2022. Vadlamudi has spent over $307,000 opening and operating this franchise (along with 5-year lease obligations), and he has had to work in the franchise 40 to 60 hours per week since January 2022. The franchise that Vadlamudi opened has never achieved the level of profitability that Defendants stated it would, and most months the franchise operates at a loss.

734.    Seebohm began making misrepresentations to Vadlamudi about the Semi-Absentee Model in May 2021. After the first call with Seebohm, Vadlamudi emailed Seebohm on May 16, 2021 to ask for clarification about some of the statements that Seebohm made during the call. Among other things, Vadlamudi asked Seebohm "[f]or a semi-absentee owner, how many times do you expect the owner to visit the unit in the first year per week? [A]nd in the second year? Do you have numbers based on you experience/stats?" He further asked "what is the fallback when a manager quits suddenly" and "[d]o most PMA owners create a separate LLC [W]hat is the recommendation?"

735.    Seebohm emailed Vadlamudi the same day, stating "ALL very good questions that are largely covered within our 2nd (unit economics/financials) screenshare call . . . You'll have all of these questions and more answered this week for certain!" Defendants told Vadlamudi that he should agree to the Franchise Agreement in his personal capacity, then create an entity to which he could transfer the rights, as Defendants stated that Vadlamudi "should not worry" about creating an entity prior to becoming a franchisee.

152

736.	On May 18, 2021, Vadlamudi had a video call with Seebohm, during which Seebohm gave Vadlamudi the Unit Economics Presentation. During this call, Seebohm misrepresented that the Semi-Absentee Model could be successfully operated by a semi-absentee owner who maintained a full-time job, that a non-martial artists can manage the franchise, and that the franchises are profitable and have net revenue between 30% and 42%.

737.	On May 21, 2021, Seebohm emailed Vadlamudi links to Owner Validation Calls, and the existing owners on these calls repeated the misrepresentations that Seebohm previously made to Vadlamudi.

738.	On June 15 and 16, 2021, Vadlamudi attended Discovery Day in Knoxville, Tennessee.

739.	At Discovery Day, Seebohm, Van Over, and Baker told Vadlamudi that the financials provided in the FDD were representative of the Semi-Absentee Model and that Vadlamudi would achieve profit margins in excess of 40% by following the Semi-Absentee Model due to the systems put in place by Defendants. These Defendants repeated the misrepresentations that Vadlamudi did not need martial arts experience, that the systems put in place by Defendants were effective and proven, and that Vadlamudi would be able to successfully operate the franchise and achieve the profit margins advertised by Defendants without working more than 10 hours per week.

740.	These Defendants relied on the financials shown to Vadlamudi during the Unit Economics Presentation, but they did not disclose that the financials provided to Vadlamudi represented the performance of legacy owners, who were primarily martial artists not operating the Semi-Absentee Model. Further, these legacy owners have higher profit margins than franchisees operating the Semi-Absentee Model because, among other things, Defendants force

153

new franchisees to pay ongoing royalties and system improvement fees totaling 8% of revenue, which legacy owners are not required to pay. Defendants concealed this fact from Vadlamudi.

741.     On June 22, 2021, Vadlamudi became a franchisee.

742.     On June 19, 2022, legal counsel from Unleashed emailed Vadlamudi and provided him with a document purporting to assign Vadlamudi's franchise to an entity created by Vadlamudi, as Vadlamudi had followed Defendants' advice to wait and create such an entity after becoming a franchisee.

743.     On the same day, Vadlamudi responded to this email and asked for clarification, including by specifically asking for someone to "walk me through the major differences."

744.     On June 28, 2022, legal counsel from Unleashed emailed Vadlamudi. In this email, this person stated: "I'm one of the corporate counsels representing PMA." This person stated that the document "center[s] your leased location" and "assigns your franchise agreement." She further stated that Vadlamudi "must sign" the document when "you are ready to start developing your second location in Frisco."

745.     The document that Unleashed provided to Vadlamudi included a provision that stated as follows: "[Vadlamudi] understands the facts in respect of which this general release is given may hereafter turn out to be other than or different from the facts known or believed to be true." It is unclear what this provision means from a legal—or common sense—perspective. Indeed, it seems to be an unconscionable effort to get Vadlamudi to agree to something

746.     In the beginning, Vadlamudi asked about exit options and Defendants explained that he could sell his franchise back to corporate or other franchise owners; Defendants presented the option is easy because there would be a pool of franchise owners ready to buy.

154

### li.    *The Walters*

747.    The Walters purchased three territories in Ohio in September 2019. The Walters opened their first franchise in September 2020, and the franchise has not been profitable since opening. The Walters have spent over $500,000 in opening and operating the franchise, in addition to entering into a 10-year commercial lease that has over $380,000 in payments remaining due. The franchise incurs substantial losses each year. Walters works in the franchise full-time, over 50 hours per week, and Ms. Walters works in the franchise part-time. In addition, the Walters have hired two full-time employees and one part-time employee.

748.    The Walters spoke with Seebohm by phone on August 6, 2019, and during this call, Seebohm began misrepresenting the Semi-Absentee Model, including by stating that the Walters could operate the franchise with one full-time and one part-time employee without working in the franchise more than 10 to 15 hours per week. Seebohm instructed the Walters to watch the two videos described above, and they did so.

749.    On August 7, 2019, another representative of FFL, Amy Roberts, emailed the Walters, stating that PMA "combines a 15-year history of robust business systems, marketing expertise, and ongoing training of just 2 employees with turnkey simple buildout, fast profitability, and 95% student retention rate. It is simply a remarkable semi-absentee and scalable brand."

750.    On August 9, 2019, Seebohm gave the Walters the Unit Economics Presentation, during which Seebohm stated that the Walters would achieve profit margins in excess of 40% by working no more than ten hours per week and hiring only one full-time and one part-time employee.

751.    Seebohm arranged for the Walters to listen to an Owner Validation Call on August 15, 2019, during which existing owners told the Walters that they would break even within 3 to 6

months, then achieve profit margins of 48%, and that PMA "does all digital marketing which accounts for half of your leads."

752.    Seebohm and Ms. Roberts continued to email the Walters in August and September 2019, repeatedly arranging for more misleading Owner Validation Calls and repeating the same misrepresentations discussed above.

753.    The Walters attended Discovery Day in Knoxville, Tennessee on September 10 and 11, 2019. In addition to the misrepresentations discussed above, at Discovery Day, Van Over told the Walters that they would easily achieve profit margins of 35%-48% by operating the Semi-Absentee Model. Van Over told the Walters that they should purchase three territories because the first franchise was proven to generate sufficient profit to fund the costs of opening subsequent locations.

754.    At Discovery Day, Van Over, Seebohm, and Baker told the Walters that they did not need martial arts experience because Defendants would help them recruit, hire, and train instructors and that the Walters only needed to focus on learning the business systems provided by Defendants.

755.    After becoming franchisees, the Walters learned that the financials presented by Defendants are not representative of the Semi-Absentee Model. For example, the Walters discovered that the operating costs that Defendants told the Walters that the Semi-Absentee Model would incur are substantially lower than in reality. Further, Defendants failed to provide the assistance that they promised with regard to recruiting, hiring, and training instructors. The Walters have had to spend time and money learning martial arts because they need martial arts experience to operate the franchise.

756.    Because the franchise has operated at a loss since opening, the Walters have not been able to use the profits from the first franchise to open subsequent locations.

*lii.    The Watermans*

757.    The Watermans bought two territories in Colorado in November 2020, and they opened their first franchise in June 2022. Despite following the systems designed and advertised by Defendants, the Watermans' franchise is not profitable and loses roughly $20,000 per month. The Watermans have spent over $500,000 in opening and operating the franchise, including by spending down the Watermans' retirement savings and taking out a loan against their home. Mr. Waterman has worked nearly 40 hours per week in the franchise since May 2022, and Ms. Waterman was forced to take a leave of absence from her job in May 2022 to help run the franchise.

758.    Seebohm began misrepresenting the Semi-Absentee Model to the Watermans in August 2020. Seebohm held phone and video calls with the Watermans during August, September, and October 2020.

759.    During these calls, Seebohm told the Watermans that the average retention rate for students of the franchise was over three years, that the Watermans would have 12-20 new students sign up each month, that the student retention rate was between 95% and 97%, that the Watermans' revenue would be $400,000 per year or more, that the Watermans' profit margins would be nearly 50%, that expenses would be $12,000 to $140,000 per month, and that Seebohm loved PMA so much that he intended to open his own PMA franchises.

760.    During this period, Seebohm arranged for the Watermans to attend Owner Validation Calls and watch videos produced by PMA, including those discussed above. As in other Owner Validation Calls, Seebohm and PMA caused these owners to tell the Watermans that the Watermans' franchise would be profitable within a few months after opening, that their systems

works successfully and thus no franchises had closed, and that the Watermans could successfully operate the Semi-Absentee Model working no more than 10 hours per week.

761.    The Watermans attended Discovery Day in Knoxville, Tennessee on October 15 and 16, 2020.

762.    At Discovery Day, Baker and Van Over repeated the misrepresentations described above. Additionally, Baker told the Watermans that their monthly expenses operating the franchise would be $15,000 to $16,000. Van Over stated that the Semi-Absentee Model "bleeds green," as it is so profitable due to the systems put in place by PMA to ensure the success of the franchisees.

763.    The Watermans agreed to become franchisees on November 23, 2020.

764.    After becoming franchisees, the Watermans learned that the representations made by Defendants were false. For example, the Watermans' franchise cost more to develop and operate than represented in the FDD that was provided to the Watermans, the Watermans' monthly expenses far exceed the expenses that Baker and Seebohm stated that they would incur, the student retention rates are far below the rates stated by Seebohm, and the Watermans' franchise does not "bleed green."

*liii.    The Watts*

765.    The Watts purchased five territories in November 2019, and they opened their first franchise in January 2021. The Watts have been unable to open franchises in their remaining territories because, contrary to Defendants' representations, the first franchise is not able to generate sufficient profit to open the other locations. The Watts have spent over $350,000 opening and operating the franchise, including a $105,000 home equity loan. In addition, they signed a lease that totals over $250,000 over its five-year term. The franchise has continued to lose money most months while they work in the franchise more than 40 hours per week and employ multiple

full-time employees. The Watts have never come close to achieving the profit margins that the Defendants represented.

766.     In August 2019, the Watts' franchise broker, Mariel Miller, introduced them to PMA and other franchise business opportunities.

767.     On September 10, 2019, a representative of FFL, Debra Kurland, emailed the Watts to schedule a video call with Seebohm about the Semi-Absentee Model, and she included the two videos discussed above.

768.     On September 11, 2019, the Watts had a video call with Seebohm, during which Seebohm began repeating the same misrepresentations about the Semi-Absentee Model that he directed to the other Plaintiffs. Seebohm told the Watts that the Semi-Absentee Model guarantees "such great profit margins with such low hours" that he would buy several locations and stop working with FFL.

769.     On September 16, 2019, Seebohm gave the Watts the Unit Economics Presentation, during which he showed the Watts videos and spreadsheets promoting PMA and stating the inflated revenue projections, that the Watts would not need to work more than 10 to 15 hours per week, and that only one full-time and one parti-time employee would be needed. Given the profit projections and number of hours of work required of PMA owners, the Watts decided and informed Mariel Miller that they would stop looking at two other franchise opportunities as these other franchises required a larger number of staff with full-time involvement from the owners for the first year before transitioning to a semi-absentee model.

770.     On September 20, 2019, Defendants provided the FDD to the Watts, which misrepresented the financials of the Semi-Absentee Model as discussed herein.

771.    On September 21, 2019, Seebohm told the Watts to listen to Owner Validation Calls. These calls were with legacy owners. Seebohm led the Watts to believe that the calls were with franchisees operating the Semi-Absentee Model to cause the Watts to believe that they could achieve the results promised by Defendants by operating the Semi-Absentee Model.

772.    On November 5 and 6, 2019, the Watts attended Discovery Day in Knoxville, Tennessee. At Discovery Day, Van Over, Baker, and Seebohm repeated the misrepresentations stated above, including that the Watts could successfully operate the Semi-Absentee Model with one full-time and one part-time employee, have profit margins in excess of 40%, and not work in the franchise more than 10 hours per week.

773.    Defendants stated that the Watts review the franchise agreement, sign it, and wire the $149,500 fee for territories within 10 days. A representative of FFL, Bobby Brennan, pressured the Watts to sign the agreement, stating that the Watts could not lock in the territories without paying the full fee even though the Watts offered to pay a deposit. Defendants told the Watts that they could have an attorney review the agreement, but that PMA would not agree to any changes, so if the Watts wanted in, they had to accept it as is.

774.    After becoming franchisees, the Watts had calls with representatives of PMA, so-called "Success Coaches," who had no business experience and continually reiterated that the Watts must follow Defendants' processes that were ineffective. A representative of Unleashed admitted during a call on November 16, 2022 that the "Success Coaches" are not adequate and that Unleashed is looking to bring on coaches with more business experience.

775.    On June 10, 2021, the Watts had a call with Van Over to tell him that the Watts were spending substantially more hours in the business than they were led to believe and that operating the franchise was taking a toll on their health and hurting their full-time jobs.

776.     On July 22, 2022, the Watts had another conversation with Van Over, letting him know they could not keep operating the franchise because the franchise placed too much strain on them and they could not do this any longer. Van Over told the Watts to provide their financials to him and that he would "hand pick" existing owners that might be interested in purchasing the Watts' franchise. The Watts provided the financials and never heard back from Van Over.

777.     On September 16, 2022, during a PMA training in Houston, Texas, the Watts saw Van Over and reiterated their need to get out of the business and asked about the progress of a potential buyer for their franchise. Van Over told them to reach out to him to schedule "another deep dive."

778.     On October 11, 2022, the Watts sent Van Over a text message requesting time to get on his calendar to continue the conversation about selling their franchise and exiting the business. To date, they have never head back from Van Over.

779.     On November 27, 2022, the Watts emailed Van Over and Baker, informing them that the Watts would be forced to close the school on January 31, 2023, due to lack of profitability, the franchise not being an semi-absentee business, and an ongoing dispute with the Watts' landlord regarding the noise caused by operating the franchise.

780.     On November 30, 2022, the Watts responded to an email from Kelli Tankersley, the Watts' "Success Coach," wherein Ms. Tankersley requested a status update from the Watts. The Watts informed Ms. Tankersley that the Watts would be closing their franchise, as she was unaware.

781.     On December 2, 2022, the Watts attended a Zoom call with Ms. Tankersley and Baker, during which the Watts were informed that Ms. Tankersley was leaving PMA and that Baker would be the Watts' interim "Success Coach."

782. On December 4, 2022, the Watts noticed that they were no longer able to access the PMA Owners Facebook Group and that the group was hidden to the Watts even when the Watts used the search function to try to locate the group. The Watts never received any communication telling them that they would be removed or banned from the group, nor an explanation as to why they were removed and banned.

783. On December 5, 2022, the Watts emailed Baker, in his capacity as their "Success Coach," requesting help with accessing the Facebook Owners Group and informing Baker that, since the Watts would not be closing until January 31, 2023, they needed to use that group for support.

784. To date, the Watts have not heard from Van Over, Baker, or Unleashed regarding the Watts closing their franchise or the Watts' removal from the PMA Owners Facebook Group.

### liv. *Yen and Wang*

785. Yen and Wang purchased two territories in Minnesota in November 2021. They opened their first franchise on October 10, 2022, holding a grand opening on November 14, 2022, and they are conducting pre-sales in anticipation of opening their second franchise. Yen and Wang have spent hundreds of thousands of dollars in opening and operating their franchises, and Wang was forced to abandon her career in Human Resources to work in the franchise. Further, as Wang was pregnant at Discovery Day, Van Over stated that the Semi-Absentee Model would be a great fit for a new mother due to the limited time commitment. Yen and Wang have missed invaluable bonding time with their newborn due to the time commitment that the Semi-Absentee Model requires, which is far higher than what Van Over, Baker, and Seebohm represented.

786. On September 20, 2021, Seebohm scheduled a call with Yen and Wang to discuss the Semi-Absentee Model. During this call, on September 30, 2021, Seebohm told Yen and Wang

that the Semi-Absentee Model was proven and effective, that it would not require more than ten hours of work per week, and that Yen and Wang would have profit margins in excess of 40%.

787. On October 5, 2021, Seebohm gave Yen and Wang the Unit Economics Presentation, relying on financial information that was not representative of the Semi-Absentee Model, despite representing that this information was representative of the Semi-Absentee Model.

788. Yen and Wang received the FDD on October 9, 2021, and they discussed the FDD on a call with Seebohm on October 9, 2021. During this call, Seebohm stated that the FDD is accurate and shows how well all the franchisees are doing. Seebohm stated that Yen and Wang should envision their own studios by looking at FDD documents, that none of the franchises had any bad experience, all of them are profitable, and they are very easy to sell or transfer in the future. Seebohm emphasized that there was no history of a single PMA franchise closing, making the Semi-Absentee Model "great for a retirement investment."

789. After the call, Wang emailed Seebohm to ask specific questions about the financials represented in the FDD, including the number of students that need to be recruited to break even, how many students need to be retained to cover operational costs, and how many students the Semi-Absentee Model can accommodate.

790. Seebohm refused to answer Wang's questions via email, so Yen asked Seebohm to address these questions when they spoke by phone. Seebohm refused to answer specific questions and told Yen and Wang to further review the FDD, stating that they could get all financial answers from the FDD. Seebohm dodged the questions and stated that everything Yen and Wang wanted to know about the store and its profit margin could be reverse calculated using the numbers in the FDD. He assured them that the FDD is of the highest standard and representative of the experience of franchisees of the Semi-Absentee Model.

163

791. The FDD stated that the median profit of the 8 lowest performing Semi-Absentee Model franchises was over $83,000 in 2020, that the median profit of the next eight franchises was over $88,000, and that the median profit of the top eight performing franchises was over $151,000. These numbers were not true or representative of the Semi-Absentee Model.

792. Yen and Wang attended Discovery Day in Knoxville, Tennessee on November 11 and 12, 2021.

793. At Discovery Day, Van Over and Baker repeated the claims Seebohm made to Yen and Wang. Van Over and Baker emphasized the "model" 1,200 sq. ft. school and how easy it is to build up a sizable student base and turn profitable just within a few months of opening. They emphasized the continued success of their current franchisees and the fool-proof business plan and support system that they would provide. When Van Over and Baker mentioned the success of Legacy Owners and were asked about difference between Legacy Owners and new franchisees, they told Yen and Wang that the Legacy Owners were simply people that converted their already running studio into the Semi-Absentee Model and that the Legacy Owners were otherwise essentially the same as what PMA was selling to the prospective franchisees. They omitted the fact that many of the studios operated by Legacy Owners have a substantially different footprint and layout, the owners are generally martial arts instructors, and the business model is completely different.

794. Van Over and Baker stated that the franchisee does not need any martial arts experience, that the franchise could be run profitably by managing it for 10-15 hours a week, and that some owners even run the franchises remotely. During self-introductions, Van Over and Baker pointed to Wang, who was expecting a baby within three months, and mentioned that even with a newborn and other time commitments, Yen and Wang could successfully operate the franchise.

164

795. Van Over and Baker stated that the Semi-Absentee Model was built upon field-tested strategies and that, as long as Yen and Wang followed the manual, they would easily be successful and that most franchises break even within 3-4 months of opening. They informed Yen and Wang that "corporate" gives extensive support every step of the way and would assist them in being successful. They further stated that hiring staff is extremely easy as PMA had an extensive pool of reliable, "in-system" candidates waiting to find work and that the franchises operated in a niche market so that pay compensation trends low.

796. Relying on these misrepresentations and the misleading and falsified numbers in the FDD, Yen and Wang agreed to become franchisees. Despite the FDD stating that a franchisee could purchase just one territory, during the last hour of Discovery Day, Van Over told Yen and Wang that they must purchase at least two territories.

797. Yen and Wang have learned that the representations made by Seebohm, Van Over, and Baker were false.

798. For example, instead of providing support, PMA forced Yen and Wang to use vendors and service providers that were substantially more expensive and less effective than third parties, including selling Yen and Wang expensive PMA logo goods and equipment that further enriches PMA. Further, the promised pool of "reliable" candidates were those candidates already rejected by other franchisees. Additionally, Yen and Wang have had to spend substantially more than 10 hours per week working on the franchise, as the franchise cannot be operated as advertised by Defendants.

799. Yen and Wang have learned that the legacy owners did not operate according to the Semi-Absentee Model and that their financial performance was not representative of the Semi-Absentee Model, despite PMA, Van Over, Seebohm, and Baker representing that it was.

800.     Having discovered that the representations about the Semi-Absentee Model were false, Yen and Wang have been forced to stop construction and pre-sales at their second franchise location.

801.     They had decided to move ahead with construction at the second location after a PMA "Onboarding Coach" assured them during the summer of 2022 that opening two franchises in quick succession was advisable. When they asked the "Onboarding Coach" whether they should enter into a lease and begin construction at the second location, the "Onboarding Coach" stated that many franchisees open two locations in quick succession and are successful as a result. Relying on this information, Yen and Wang entered into a second lease and began construction at the second location. They have now discovered that the "Onboarding Coach" misled them, as Yen and Wang do not believe that any franchisee has opened two locations in quick succession successfully, that is, without losing thousands of dollars every month. Absent these misrepresentations, Yen and Wang never would have agreed to personally guarantee yet another multi-year commercial lease and incur these additional construction costs.

## COUNT I[10]
## Violation of RICO, 18 U.S.C. § 1962(c)

802.     Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

803.     Defendants' conduct as described herein has damaged Plaintiffs in their businesses and property through the conduct of an enterprise through a pattern of racketeering activity.

804.     Defendants devised the scheme described herein to defraud Plaintiffs by systematically misrepresenting the Semi-Absentee Model, inducing Plaintiffs to become

---

[10] Each Plaintiff brings each claim herein against each Defendant, unless otherwise stated.

166

franchisees, and causing Plaintiffs to collectively spend millions of dollars on a franchise concept that Defendants knew was unsuccessful.

805.    Each Defendant is a person within the meaning of 18 U.S.C. § 1961(3).[11]

806.    Defendant Premier Franchising Group LLC is an enterprise within the meaning of 18 U.S.C. § 1961(4), and, in violation of 18 U.S.C. § 1962(c), the agents and representatives of Defendant Premier Franchising Group LLC conducted the affairs of this enterprise so as to affect interstate commerce through a pattern of racketeering activity. This enterprise is an ongoing, continuous unit of persons associated together for the common purpose of routinely, repeatedly, and fraudulently inducing prospective franchisees to become franchisees. The persons comprising this enterprise participate in and are part of the enterprise, and they have an existence separate and distinct from the enterprise. Systematic linkages exist between these persons because they have contractual relationships, a hierarchy, and coordinate their activities. Van Over, Baker, and Seebohm control and direct the affairs of this enterprise and use other persons comprising the enterprise to carry out the scheme to fraudulently induce prospective franchisees. The scheme devised by these persons was facilitated by the use of the United States mail and/or wires and constitutes racketeering activity because these persons caused innumerable instances of wire fraud to be committed. As the forgoing paragraphs demonstrate, these persons used the mail and wires to effectuate their scheme to defraud Plaintiffs, including by distributing false financial information to Plaintiffs by email, arranging for Plaintiffs to attend Discovery Day by email, and otherwise inducing and assuring Plaintiffs by email both before and after Plaintiffs agreed to

---

[11] For the purposes of all claims herein, the agents and employees of Defendants that are entities, such as Van Over, Seebohm, and Baker acted within the scope of employment when engaging in the acts described herein and/or, in the alternative, acted outside the scope of employment when engaging in the acts described herein, and the officers of these entities directed the entities and/or the agents of the entities to engage in the acts described herein.

167

become franchisees. These predicate acts of wire fraud as described herein are part of the nexus of affairs of this enterprise, and these persons committed these related acts with a similar method and purpose, involving similar persons, and causing similar effects upon Plaintiffs. This pattern of racketeering activity is ongoing, open-ended, and threatens to continue indefinitely unless this Court enjoins this racketeering activity. As a direct and proximate cause of these violations of 18 U.S.C. § 1962(c), Plaintiffs have been damaged in their businesses and property. The persons comprising this enterprise are jointly and severally liable to Plaintiffs for treble damages, all costs of this action, and reasonable attorney's fees, as provided in 18 U.S.C. § 1964(c).

807. In the alternative, Defendants Premier Franchising Group LLC, Unleashed Brands LLC, and Franchise FastLane LLC constitute an enterprise within the meaning of 18 U.S.C. § 1961(4), and, in violation of 18 U.S.C. § 1962(c), Defendants Unleashed Brands LLC and Premier Franchising Group LLC conducted the affairs of this enterprise so as to affect interstate commerce through a pattern of racketeering activity. This enterprise is an ongoing, continuous unit of persons associated together for the common purpose of routinely, repeatedly, and fraudulently inducing prospective franchisees to become franchisees. The persons comprising this enterprise participate in and are part of the enterprise, and they have an existence separate and distinct from the enterprise. Systematic linkages exist between these persons because they have contractual relationships, a hierarchy, and coordinate their activities. Van Over, Baker, and Seebohm control and direct the affairs of this enterprise and use other persons comprising the enterprise to carry out the scheme to fraudulently induce prospective franchisees. The scheme devised by these persons was facilitated by the use of the United States mail and/or wires and constitutes racketeering activity because these persons caused innumerable instances of wire fraud to be committed. As the forgoing paragraphs demonstrate, these persons used the mail and wires to effectuate their scheme

to defraud Plaintiffs, including by distributing false financial information to Plaintiffs by email, arranging for Plaintiffs to attend Discovery Day by email, and otherwise inducing and assuring Plaintiffs by email both before and after Plaintiffs agreed to become franchisees. These predicate acts of wire fraud as described herein are part of the nexus of affairs of this enterprise, and these persons committed these related acts with a similar method and purpose, involving similar persons, and causing similar effects upon Plaintiffs. This pattern of racketeering activity is ongoing, open-ended, and threatens to continue indefinitely unless this Court enjoins this racketeering activity. As a direct and proximate cause of these violations of 18 U.S.C. § 1962(c), Plaintiffs have been damaged in their businesses and property. The persons comprising this enterprise are jointly and severally liable to Plaintiffs for treble damages, all costs of this action, and reasonable attorney's fees, as provided in 18 U.S.C. § 1964(c).

808. In the alternative, Defendants Premier Franchising Group LLC, Franchise FastLane LLC, Unleashed Brands LLC, Van Over, Seebohm, Daly, and Baker constitute an enterprise within the meaning of 18 U.S.C. § 1961(4), and, in violation of 18 U.S.C. § 1962(c), Defendants Premier Franchising Group LLC and Van Over conducted the affairs of this enterprise so as to affect interstate commerce through a pattern of racketeering activity. This enterprise is an ongoing, continuous unit of persons associated together for the common purpose of routinely, repeatedly, and fraudulently inducing prospective franchisees to become franchisees. The persons comprising this enterprise participate in and are part of the enterprise, and they have an existence separate and distinct from the enterprise. Systematic linkages exist between these persons because they have contractual relationships, a hierarchy, and coordinate their activities. Van Over, Baker, and Seebohm control and direct the affairs of this enterprise and use other persons comprising the enterprise to carry out the scheme to fraudulently induce prospective franchisees. The scheme

devised by these persons was facilitated by the use of the United States mail and/or wires and constitutes racketeering activity because these persons caused innumerable instances of wire fraud to be committed. As the forgoing paragraphs demonstrate, these persons used the mail and wires to effectuate their scheme to defraud Plaintiffs, including by distributing false financial information to Plaintiffs by email, arranging for Plaintiffs to attend Discovery Day by email, and otherwise inducing and assuring Plaintiffs by email both before and after Plaintiffs agreed to become franchisees. These predicate acts of wire fraud as described herein are part of the nexus of affairs of this enterprise, and these persons committed these related acts with a similar method and purpose, involving similar persons, and causing similar effects upon Plaintiffs. This pattern of racketeering activity is ongoing, open-ended, and threatens to continue indefinitely unless this Court enjoins this racketeering activity. As a direct and proximate cause of these violations of 18 U.S.C. § 1962(c), Plaintiffs have been damaged in their businesses and property. The persons comprising this enterprise are jointly and severally liable to Plaintiffs for treble damages, all costs of this action, and reasonable attorney's fees, as provided in 18 U.S.C. § 1964(c).

809. As part of the scheme to defraud, Defendants intended to defraud Plaintiffs by making calculated misrepresentations designed to target prospective franchises like Plaintiffs who were seeking a franchise concept that would enable them to maintain their existing work and family commitments and make a positive impact on their communities by enriching the lives of children.

810. Defendants created a series of lies about the Semi-Absentee Model, which they systematically directed at Plaintiffs, including that the Semi-Absentee Model required no more than 10 hours of work per week, that it could be operated with one full-time and one part-time employee, that the systems Defendants developed had been tested and were successful, and that

Defendants would provide ongoing support, training, and other services such as customer lead generation. Defendants created videos, recordings, presentations, and other materials to disseminate these misrepresentations to Plaintiffs.

811.   Defendants repackaged and/or fabricated financial information from the prior licensee model and falsely represented that it represented the Semi-Absentee Model. When Defendants learned that the Semi-Absentee Model was failing, and that franchisees, including multiple Plaintiffs, never made any profit on the franchises, Defendants continued to provide false financial information to prospective franchisees, including multiple Plaintiffs.

812.   Defendants knew that these foregoing misrepresentations were false or made these misrepresentations with reckless disregard of their falsity, and they further knew or should have known that the wires would be used to effectuate this scheme.

813.   To effectuate this fraudulent scheme, Defendants engaged in innumerable acts of wire fraud, including by emailing and calling Plaintiffs as described herein, which directly led to Plaintiffs' injuries.

814.   Defendants have engaged in this conduct for multiple years and continue to do so at this time. According to Defendants, this scheme is in "rapid growth mode."

### COUNT II
### Violation of RICO, 18 U.S.C. § 1962(d)

815.   Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

816.   As described herein, Defendants conspired to violate 18 U.S.C. § 1962(c), causing Plaintiffs injuries to their businesses and property.

817.    The agents and representative of Defendant Premier Franchising Group LLC agreed to carry out the scheme to defraud described herein and use the wires to effectuate this scheme.

818.    In the alternative, Van Over, Baker, and Seebohm agreed to make the misrepresentations described herein and use the wires to effectuate this scheme.

819.    In the alternative, Defendants Premier Franchising Group LLC, Franchise FastLane LLC, Unleashed Brands LLC, Van Over, Daly, Seebohm, and Baker agreed for their respective representatives and agents to engage in the scheme to defraud described herein and use the wires to effectuate this scheme.

820.    Each Defendant's participation in the scheme led to Plaintiffs' injuries, as Plaintiffs would not have become franchisees but for the misrepresentations described herein.

821.    As a direct and proximate cause of these violations of 18 U.S.C. § 1962(d), Plaintiffs have been damaged in their businesses and property. The persons comprising this enterprise are jointly and severally liable to Plaintiffs for treble damages, all costs of this action, and reasonable attorney's fees, as provided in 18 U.S.C. § 1964(c).

## COUNT III
## Fraudulent Inducement

822.    Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

823.    Defendants fraudulently induced Plaintiffs to become franchisees and enter into a number of different contracts by engaging in the conduct described herein, including the many intentional misrepresentations of material facts detailed above.

824.    Plaintiffs reasonably relied on these false statements to their detriment.

172

825.     Defendants committed these breaches of contract intentionally, fraudulently, maliciously, and/or recklessly, entitling Plaintiffs to punitive damages.

826.     As a direct and proximate cause of Defendants' actions, Plaintiffs have been damaged.

827.     Defendants are jointly and severally liable for the damages caused by this and the other claims herein, in part because they intentionally united in the acts and conduct that damaged Plaintiffs, as each Defendant actively participated in committing these acts, each Defendant intentionally aided the other Defendants in committing the acts, and each Defendant ratified and adopted the acts by accepting and retaining the benefits derived from the wrongful conduct despite knowing that the benefits were procured wrongfully and fraudulently. For example, in addition to agreeing to participate in the fraudulent conduct by repeatedly playing the same part in the fraudulent scheme and relying on the other Defendants to do the same, each Defendant agreed to split the proceeds of the amounts paid by Plaintiffs with the other Defendants, such that each Defendant benefited from this wrongful conduct pursuant to their agreement and coordinated acts.

## COUNT IV
## Breach of Contract, as to the Franchise Agreements[12] (in the alternative)

828.     Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

829.     As detailed above, Defendants fraudulently induced Plaintiffs into entering into the Franchise Agreements at issue and, accordingly, the contracts are void and of no effect. Assuming *arguendo*, however, that the contracts are deemed to be enforceable, PMA has breached those contracts in a host of different ways.

---

[12] Defendants are in possession of all of the Franchise Agreements at issue.

830.    PMA's breaches of the Franchise Agreement include, but are not limited to, violations of Sections 1.3, 2.3, 5.4, 5.5(a), and 9.1. In short, PMA did not have a "system" in place that would allow the Plaintiffs to operate their studios in a profitable manner; PMA's "defining" of the personnel needed was wrong and did not allow for a profitable studio to operate; in certain instances, PMA violated the Protected Market Area by either selling franchises to others that violated this area, selling territories that could not be developed within the area according to the PMA "system," or otherwise infringing on a franchisee's rights to the area; PMA did not identify necessary services for Plaintiffs to sustain operations in a profitable manner; the "System Standards" and "Business Management System" incorporated by reference into the Franchise Agreement failed and PMA failed to provide the services and system contemplated in these documents for a semi-absentee owner, as promised; and, again, the system was not functional.

831.    Defendants committed these breaches of contract intentionally, fraudulently, maliciously, and/or recklessly, entitling Plaintiffs to punitive damages.

832.    As a direct and proximate result of PMA's breaches of contract and breaches of the duty of good faith and fair dealing, Plaintiffs have been damaged.

**<u>COUNT V</u>**
**<u>Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing, as to the Franchise Agreements (in the alternative)</u>**

833.    Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

834.    As detailed above, Defendants fraudulently induced Plaintiffs into entering into the Franchise Agreements at issue and, accordingly, the contracts are void and of no effect. Assuming *arguendo*, however, that the contracts are deemed to be enforceable, PMA has breached the contracts and its duty of good faith and fair dealing therein in a number of ways.

174

835.    As noted above, part of Defendants' fraudulent scheme was to attempt to trick Plaintiffs into "releasing" certain claims against Defendants by stating that, as part of the "on-boarding" process (or otherwise), a franchisee had to enter into an "entity transfer addendum," an "assignment and assumption of franchise agreement," and/or a similar document[13] in order to transfer the Franchise Agreement from the individual franchisees to a business entity created by the franchisees (or effectuate some other purported legal act). The real—and only—reason Defendants did this was because they had embedded "releases" into the follow-on document that purport to say that the franchisee was releasing PMA from claims.

836.    Defendants concocted this scheme in an effort to, among other things, circumvent the FTC's Franchise Rule, which requires, among other things, that a franchisor cannot require a franchisee to waive reliance on representations in the Franchise Disclosure Document ("FDD"),[14] its exhibits, or amendments. Thus, in the Franchise Agreements, the following language is included in purported compliance with this rule:

> This Agreement, including the introduction, addenda and exhibits to it, constitutes the entire agreement between you and us. There are no other oral or written understandings or agreements between you and us concerning the subject matter of this Agreement. Except as expressly provided otherwise in this Agreement, this Agreement may be modified only by written agreement signed by both you and us. ***Notwithstanding the foregoing, nothing in any agreement is intended to disclaim the express representations made in the Franchise Disclosure Document, its exhibits and amendments.***

(Emphasis added).

837.    Then, in the follow-on document, which was presented by Seebohm as part of the "on-boarding" process—or, later, by Unleashed, as some sort of necessary legal act—the

---

[13] Defendants are in possession of all such documents at issue.

[14] Defendants are in possession of this document (and all versions thereof) as well.

document purports to release PMA and its affiliates and officers from claims arising before the date of the follow-on document. Defendants wanted such a release to include statements in the FDD. That is, Defendants were intentionally attempting to circumvent federal law in the process of trying to fraudulent induce franchisees into releasing claims for being fraudulently induced.

838. Unfortunately for Defendants and their fraudulent scheme, PMA and all of the contracting parties have a contractual duty to act in good faith and deal fairly with the other contracting parties, which, in this case, were the Plaintiffs. The standard by which PMA was required under the law to amend or otherwise modify the Franchise Agreements or otherwise act was the standard of good faith and fair dealing.

839. Defendants' manipulative, fraudulent scheme and effort to circumvent federal rules and regulations was, of course, the exact opposite of good faith.

840. Defendants have, thus, breached the Franchise Agreements and their duty of good faith and fair dealing contained therein by purporting to amend and/or otherwise modify the Franchise Agreement to circumvent federal rules and regulations and trick Plaintiffs into agreeing to a document that purportedly released claims that Plaintiffs had against PMA.

841. As a direct and proximate result of PMA's breaches of contract and breaches of the duty of good faith and fair dealing, Plaintiffs have been damaged.

842. PMA committed these breaches of contract intentionally, fraudulently, maliciously, and/or recklessly, entitling Plaintiffs to punitive damages.

## COUNT VI
## The Declaratory Judgment Act, 28 U.S.C.A. § 2201

843. Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

176

844.    PMA fraudulently induced Plaintiffs to sign documents provided by PMA in order to become franchisees. These include the Franchise Agreements, as well as the "entity transfer addendum" or "assignment and assumption of franchise agreement" documents, along with Area Development Agreements, which are also in the possession of Defendants.

845.    These documents do not constitute enforceable contracts because they are unconscionable contracts of adhesion, violate public policy, are illegal under the laws of Tennessee and other states, and were procured by fraud.

846.    Certain such provisions include the arbitration provisions found in the Franchise Agreements. The arbitration provisions are unenforceable for a host of different reasons. First, the provisions are intentionally designed to be cost-prohibitive. For example, a number of the Franchise Agreements purport to require three arbitrators. For PMA franchisees, like the majority of the Plaintiffs in this Complaint, the PMA franchise has been an unmitigated financial disaster which has decimated their savings and/or retirement and left them deep in debt operating a PMA studio which loses up to $10,000 or more every month while they are shackled with a long-term commercial lease. If the only option for raising a dispute with the franchisor is paying a very high filing fee with the prospect of paying 50% of arbitration fees for three arbitrators on top of the monthly losses PMA studios incur every month, a franchisee is priced out of any dispute-resolution possibility, rendering the "remedy" offered by the Franchise Agreements illusory and impossibly burdensome. That is, of course, exactly why PMA designed it this way, as it has the effect of deterring virtually all of PMA's franchisees from bringing their claims.

847.    Second, the follow-on documents that Defendants forced onto Plaintiffs do not contain arbitration provisions and uniformly state that those follow-on documents represent the entire agreement of the parties. Thus, to the extent Defendants contend those documents are

enforceable, those agreements supersede any arbitration provisions and/or are not subject to arbitration. For example, the Area Development Agreements have no arbitration provision. Accordingly, any disputes related to these contracts are not subject to arbitration.

848. Third, along with the contracts, the arbitration provisions themselves were induced by fraud—that is, as detailed above, Defendants' scheme of fraudulently inducing franchisees into entering Franchise Agreements which contain arbitration provisions, while, at the same time, attempting to trick franchisees as part of the "on-boarding" process (or otherwise) to sign documents purporting to release claims purportedly governed by the arbitration provisions means that the franchisees were fraudulently induced to enter into the arbitration provision in the first place. Including the arbitration provisions in the Franchise Agreements, indeed, appears to be a fraudulent bait-and-switch—make franchisees believe that they can pursue a dispute via arbitration while attempting to slip in a purported release at the same time.

849. Fourth, the particular arbitration provisions at issue contain a host of internal conflicts, including but not limited to, the fact that the provisions in the Franchise Agreements purportedly require arbitration of fraud but then provide the arbitrator with no authority other than interpreting the contract. If an arbitrator cannot adjudicate fraud, then a fraud claim must be brought in court. Any interpretation otherwise would violate black-letter law. Likewise, the arbitration provisions in the Franchise Agreements provide for conflicting rules to govern the arbitration. That is, the provisions state that the commercial rules of the American Arbitration Association will be used but, also, that the National Arbitration Forum's "Code of Procedure" will be used. (The "Code of Procedure" for the National Arbitration Forum is the set of commercial rules which govern arbitration in the National Arbitration Forum.) In addition, the provision does not make clear in which forum any arbitration should be filed. PMA presumably left this part

ambiguous so that, if a franchisee were to file an arbitration demand in a particular forum, PMA would argue that it was not the right forum in an effort to increase the franchisee's costs.

850.    In addition, federal law, certain franchise statutes, and/or other laws of certain states prohibit the arbitration provision as written. For example, the arbitration provisions purport to limit the damages and claims available against PMA, and enforcing these provisions would undermine the rights protected by and the purposes of 18 U.S.C. §§ 1961, *et seq.*

851.    And, further, the arbitration provisions are unconscionable contracts of adhesion; indeed, as noted above, Seebohm routinely told prospective franchisees that no changes would be made to the Franchise Agreement at all, that a prospective franchisee had to accept the Franchise Agreement as is, and that it was not worth retaining an attorney because the Franchise Agreements were nonnegotiable. Accordingly, Plaintiffs had no meaningful choice.

852.    Plaintiffs respectfully request that the Court enter judgments declaring that these documents do not constitute enforceable contracts under one or more of the aforementioned doctrines and rescind the contracts.

### COUNT VII
### The Declaratory Judgment Act, 28 U.S.C.A. § 2201

853.    Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

854.    Assuming *arguendo* that any of the contracts entered into in this case are enforceable—which they should not be as they were induced by fraud and are otherwise void for the reasons noted herein—certain Plaintiffs signed Area Development Agreements related to certain Plaintiffs' purchase of PMA "territories."

855.    The language of these Area Development Agreements is riddled with internal conflicts and is, in certain sections, incomprehensible. For example, Section 10(a) details the

179

"[s]ite [s]election [s]ervices" that PMA promises to provide to a franchisee who signs the Area Development Agreement. Section 8, however, notes that PMA purportedly has no "obligation" in connection with any site selection services. Obviously, a party cannot contract to do something and then attempt to contract out of any obligation to do the thing that they have promised to do within the contract. Such would not be a contract.

856. In addition, PMA cannot, for example, agree to an Area Development Agreement that says its "affiliates" have no obligation to the franchisee in connection with any services provided to the franchisee in connection with site selection and, then, simultaneously require the franchisee to use PMA's vendors as part of the Franchise Agreement. As written, such would make other contracts with affiliates null and void, which does not make sense.

857. In addition, the relationship between these Area Development Agreements and the Franchise Agreements is unclear. For example, the Area Development Agreement provides that it is the "entire agreement of the parties with regard to the subject matter of the Agreement" and then provides that the exclusive venue and forum for an action arising out of or in any way related to this Agreement" are courts in Knox County, Tennessee—not arbitration as the Franchise Agreements purport to require. Likewise, the Area Development Agreements appear to conflict with the Section 2.3 of the Franchise Agreements related to a franchisee's "Protected Market Area," as the Area Development Agreement states that PMA does not have to abide by the "Protected Market Area," which, again, does not make sense.

858. As detailed above, a genuine dispute exists between certain of the parties with respect to their legal rights and obligations as to the Area Development Agreements.

## COUNT VIII
## Violation of Tenn. Code Ann. § 47-18-101, *et seq.* and other state law equivalents

859.    Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

860.    Defendants' conduct described herein constitutes deceptive and unfair trade practices.

861.    By engaging in the conduct described herein, Defendants have violated the California Unfair Competition Law and False Advertising Act, Cal. Bus. & Prof. Code § 17200 *et seq.* and Cal. Bus. & Prof. Code § 17500 *et seq.*, the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101 *et seq.*, the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110a *et seq.*, the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201 *et seq.*, the Georgia Uniform Deceptive Trade Practices Act and Fair Business Practices Act of 1975, Ga. Code Ann. § 10-1-370 *et seq.* and Ga. Code Ann. § 10-1-390 *et seq.*, the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623 *et seq.*, the Massachusetts Unfair and Deceptive Trade Practices Act, M.G.L. c. 93A § 2 et seq., the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901 *et seq.*, the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. § 325D.44 *et seq.*, the Missouri Unfair Trade Practice Act,  Mo. Ann. Stat. § 375.930 *et seq.*, the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. Ann. § 87-301 *et seq.*, the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 41.600 *et seq.*, the New Jersey Deceptive Trade Practice Act, N.J. Stat. Ann. § 56:8-1 *et seq.*, the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 *et seq.*, the North Carolina Consumer Protection Act, N.C. Gen. Stat. Ann. § 75-1.1 *et seq.*, the Ohio Consumer Protection Act, Ohio Rev. Code Ann. § 1345.01 *et seq.*, the Oklahoma Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78, § 51 *et seq.*, the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. Ann. § 646.638 *et seq.*, the Pennsylvania

Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. § 201–1 *et seq.*, the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.*, the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*, the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41 *et seq.*, the Washington Unfair Business Practices Act, Wash. Rev. Code Ann. § 19.86.020 *et seq.*, and the Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. § 100.18 *et seq.*

862.    For example, by engaging in the willful and knowing conduct described above, Defendants have violated the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq.* and the other aforementioned statutes, which prohibit the same or similar conduct, by intentionally and knowingly engaging in unfair and deceptive acts including, among others:

> (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;
> …
> (7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
> …
> (9) Advertising goods or services with intent not to sell them as advertised;
> …
> (12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law.

863.    Defendants directed their misrepresentations, actions, and other conduct toward each Plaintiff in each Plaintiff's state or commonwealth of residence, Plaintiffs entered into the transactions in each Plaintiff's state or commonwealth of residence, and the economic and other harm caused by Defendants' conduct as described herein was directed at and has affected each Plaintiff in each Plaintiff's state or commonwealth of residence. Each Plaintiff brings this claim against all Defendants pursuant to the statutes applicable to each Plaintiff's state or commonwealth

182

of residence and each Defendant's state or commonwealth of residence, including Tenn. Code Ann. § 47-18-101, *et seq.*

864. Defendants' conduct described herein was willful, knowing, intentional, and done with malice.

865. As a direct and proximate cause of Defendants' actions, Plaintiffs have been damaged and are entitled to all remedies and damages permitted under these Consumer Protection Acts, including actual damages, treble damages, attorneys' fees, and injunctive relief.

**COUNT IX**
**Negligence Per Se**

866. Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

867. The FTC promulgates regulations pertaining to the marketing and sale of franchises. S*ee* 16 C.F.R. § 436.1 *et seq. T*hese regulations establish a standard of care that franchisors must meet. Among other things, these regulations provide that "[i]t is an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act for any franchise seller covered by part 436 to: (a) [m]ake any claim or representation, orally, visually, or in writing, that contradicts the information required to be disclosed by this part[;] (b) [m]isrepresent that any person… operated a franchise of the type offered by the franchisor [or] . . . [c]an provide an independent and reliable report about the franchise or the experiences of any current or former franchise[;] (c) [d]isseminate any financial performance representations to prospective franchisees unless the franchisor has a reasonable basis and written substantiation for the representation at the time the representation is made;" [or] (h) [d]isclaim or require a prospective franchisee to waive reliance on any representation made in the disclosure document or in its exhibits or amendments." 16 C.F.R. § 436.9.

868.     Additionally, State statutes regulate the advertising, sale, renewal, modification, and termination of franchises. Defendants' conduct described herein violates provisions of these state statutes, including, for example, Cal. Corp. Code § 31000 *et seq.*, Fla. Stat. Ann. § 817.416 *et seq.*, Mich. Comp. Laws Ann. § 445.1501 *et seq.*, Minn. Stat. Ann. § 80C.17 *et seq.*, Neb. Rev. Stat. Ann. § 59-1701 *et seq.*, N.J. Stat. Ann. § 56:10-1 *et seq.*, N.C. Gen. Stat. Ann. § 66-94 *et seq.*, Ohio Rev. Code Ann. § 1334.01 *et seq.*, Okla. Stat. Ann. tit. 71, § 801 *et seq.*, Or. Rev. Stat. Ann. § 650.005 *et seq.*, S.C. Code Ann. § 39-57-20 *et seq.*, Tex. Bus. & Com. Code Ann. § 51.001 *et seq.*, Wash. Rev. Code Ann. § 19.100.080 *et seq.*, and Wis. Stat. Ann. § 553.41 *et seq.*

869.     These statutes and regulations are intended to protect the public and prospective franchisees, including Plaintiffs.

870.     Plaintiffs are within the class of persons intended to be protected by these statutes and regulations.

871.     Defendants' conduct as described herein violates each of the aforementioned statutes and regulations. For example, Defendants repeatedly made representations that were contradicted by the disclosure documents that Defendants provided to Plaintiffs as required by these statutes and regulations, such as that Plaintiffs could operate the Semi-Absentee Model by working no more than 10 hours per week, that Plaintiffs could operate the Semi-Absentee Model with one full-time and one part-time employee, that the Semi-Absentee Model would result in net profit in excess of 40% to 50%, and that Plaintiffs would be successful in operating the Semi-Absentee Model because the model was proven and effective and PMA and its agents, employees, and affiliates would supply services, training, and assistance.

184

872.    Defendants also represented that the Owner Validation Calls provided an independent and reliable report regarding the Semi-Absentee Model, when Defendants had instructed existing owners on these calls to lie about the Semi-Absentee Model.

873.    Defendants systematically disseminated financial information that Defendants knew was not representative of the Semi-Absentee Model and nonetheless represented that it was representative of the Semi-Absentee Model.

874.    Further, Defendants repeatedly attempted to fraudulently induce Plaintiffs to disclaim and waive reliance on the FDDs.

875.    As a direct and proximate cause of Defendants' actions, Plaintiffs have been damaged and are entitled to actual and punitive damages because Defendants' conduct was knowing, willful, intentional, and done with malice.

## COUNT X
## Negligent Misrepresentation

876.    Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

877.    In the course of their business and in transactions in which Defendants had a pecuniary interest, Defendants negligently supplied false information to the Plaintiffs as detailed above.

878.    Plaintiffs reasonably relied on statements made by and information provided by Defendants.

879.    Plaintiffs have been damaged as a result of Defendants' conduct.

## COUNT XI
## Promissory Fraud

880.     Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

881.     Defendants made promises to perform as described herein with no present intention of performing the promises in order to induce Plaintiffs to become and remain franchisees, including, but not limited to, the provisions in the Franchise Agreements detailed above.

882.     Defendants' conduct described herein was willful, knowing, intentional, and done with malice.

883.     As a direct and proximate cause of Defendants' actions, Plaintiffs have been damaged and are entitled to actual and punitive damages.

## COUNT XII
## Constructive Fraud

884.     Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

885.     Defendants had a duty to disclose the truth about the Semi-Absentee Model because Defendants represented to Plaintiffs that Defendants were providing accurate information about the Semi-Absentee Model, and Defendants' actions in providing false financials and arranging misleading Owner Validation Calls further constitute tricks and contrivances intended to defraud Plaintiffs.

886.     Defendants' conduct described herein was willful, knowing, intentional, and done with malice.

887.     As a direct and proximate cause of Defendants' actions, Plaintiffs have been damaged and are entitled to actual and punitive damages.

## COUNT XIII
## Civil Conspiracy

888.    Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

889.    Defendants conspired and agreed to commit the torts described herein with the intent of inducing Plaintiffs to become and remain franchisees in order to enrich themselves.

890.    Defendants' conduct described herein was willful, knowing, intentional, and done with malice.

891.    As a direct and proximate cause of Defendants' actions, Plaintiffs have been damaged and are entitled to actual and punitive damages.

892.    Defendants are jointly and severally liable to Plaintiffs for these damages.

## COUNT XIV
## Quantum Meruit/Unjust Enrichment

893.    Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

894.    As a result of the conduct described herein, Defendants have become enriched by inducing Plaintiffs to become and remain franchisees, and the circumstances described herein make Defendants' retention of these amounts unjust, as Defendants divided the franchise fees and other fees paid by Plaintiffs amongst themselves, each benefiting from inducing each Plaintiff to become a franchise, which resulted in each Plaintiff paying thousands of dollars in franchise fees, marketing fees, software fees, and other fees imposed by Defendants, amounting to millions of dollars in benefits to each Defendant.

895.    Plaintiffs are entitled to recover the amounts by which Defendants have been enriched as a result of Defendants' conduct as described herein.

## COUNT XV
## Violation of State Franchise Laws

896. Plaintiffs restate and incorporate the allegations set forth in the foregoing and following paragraphs.

897. Defendants' conduct described herein constitutes violations of State statutes regulating the advertising, sale, renewal, modification, and termination of franchises and entitles Plaintiffs to rescission of the agreements into which they entered with Defendants.

898. Defendants' conduct described herein violates provisions of Cal. Corp. Code § 31000 *et seq.*, Fla. Stat. Ann. § 817.416 *et seq.*, Mich. Comp. Laws Ann. § 445.1501 *et seq.*, Minn. Stat. Ann. § 80C.17 *et seq.*, Neb. Rev. Stat. Ann. § 59-1701 *et seq.*, N.J. Stat. Ann. § 56:10-1 *et seq.*, N.C. Gen. Stat. Ann. § 66-94 *et seq.*, Ohio Rev. Code Ann. § 1334.01 *et seq.*, Okla. Stat. Ann. tit. 71, § 801 *et seq.*, Or. Rev. Stat. Ann. § 650.005 *et seq.*, S.C. Code Ann. § 39-57-20 *et seq.*, Tex. Bus. & Com. Code Ann. § 51.001 *et seq.*, Wash. Rev. Code Ann. § 19.100.080 *et seq.*, and Wis. Stat. Ann. § 553.41 *et seq.*

899. For instance, Cal. Corp. Code § 31000 *et seq.*, Mich. Comp. Laws Ann. § 445.1501 *et seq.*, Minn. Stat. Ann. § 80C.17 *et seq.*, N.C. Gen. Stat. Ann. § 66-100, Neb. Rev. Stat. Ann. § 59-1701 *et seq.*, Ohio Rev. Code Ann. § 1334.03, Okla. Stat. Ann. tit. 71, § 801 *et seq.*, Or. Rev. Stat. Ann. § 650.020 *et seq.*, S.C. Code Ann. § 39-57-80, Wash. Rev. Code Ann. § 19.100.080 *et seq.*, and Wis. Stat. Ann. § 553.41 *et seq.* prohibit persons from offering to sell or selling a franchise by means of written or oral communications that include untrue statements of material facts, omit material facts necessary to make the statements not misleading under the circumstances, submitting false financial information to the various state agencies to which Defendants must submit FDDs, or directly or indirectly employ any device, scheme, or artifice to defraud, and/or

188

directly or indirectly engage in any practice, act, or course of business which operates or would operate as a fraud or deceit upon any person.

900.    By making the misrepresentations described herein, violating the provisions of the FTC Rule, failing to provide the services and products promised, forcing Plaintiffs to sign documents purporting to waive their rights, and otherwise executing their fraudulent scheme, Defendants have violated each of the aforementioned statutes.

901.    PMA, Van Over, Baker, FFL, Seebohm, and Brennan offered to sell franchises to Plaintiffs in each of the aforementioned States in violation of these statues because these Defendants made false and misleading statements as described herein.

902.    Defendants directed their misrepresentations, actions, and other conduct toward each Plaintiff in each Plaintiff's state or commonwealth of residence, Plaintiffs entered into the transactions in each Plaintiff's state or commonwealth of residence, and the economic and other harm caused by Defendants' conduct as described herein was directed at and has affected each Plaintiff in each Plaintiff's state or commonwealth of residence. Each Plaintiff brings this claim against all Defendants pursuant to the statutes applicable to each Plaintiff's state or commonwealth of residence and each Defendant's state or commonwealth of residence.

903.    Defendants' conduct has directly and proximately caused Plaintiffs harm.

904.    Pursuant to these statutes, PMA, Van Over, Baker, FFL, and Seebohm are jointly and severally liable to the Plaintiffs located in these States for damages, costs, and attorney's fees.

905.    Because Unleashed directly and/or indirectly controls PMA, Unleashed is jointly and severally liable for these damages and costs.

### <u>Jury Demand</u>

**PLAINTIFFS DEMAND THAT THIS CASE BE TRIED BY A JURY OF TWELVE.**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that:

1.      Plaintiffs be awarded compensatory damages, including, but not limited to, out-of-pocket losses, lost opportunity costs, interest, and any and all other compensatory damages under the law in an amount to be determined by a jury, but in any event not less than $75,000,000.00;

2.      Attorneys' fees as permitted by law;

3.      Treble, statutory, and/or punitive damages as permitted by law;

4.      The Court enter Declaratory Judgments as requested above;

5.      Pursuant to Tenn. Code Ann. § 29-14-101 and § 47-18-109, that the Court enter a permanent injunction enjoining Defendants from further engaging in the wrongful conduct detailed above;

6.      The Court rescind the agreements between Plaintiffs and Defendants;

7.      Plaintiffs be awarded pre-judgment and post-judgment interest as well as all discretionary costs and other relief to which they may be entitled; and

8.      Plaintiffs be awarded such other relief, both general and special, to which they may be entitled.

> Respectfully submitted,
>
> /s/ *John R. Jacobson*
> John R. Jacobson (BPR #14365)
> Stuart A. Burkhalter (BPR #29078)
> Riley & Jacobson, PLC
> 1906 West End Avenue
> Nashville, TN 37203
> Telephone:  (615) 320-3700
> Facsimile:  (615) 320-3737
> jjacobson@rjfirm.com
> sburkhalter@rjfirm.com
> *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the foregoing document was made upon the following via the Court's ECF filing system on this 16th day of December 2022:

Norman M. Leon (*Pro Hac Vice forthcoming*)
Bethany Appleby (*Pro Hac Vice forthcoming*)
DLA Piper LLP
444 West Lake Street, Suite 900
Chicago, IL 60606
Norman.leon@us.dlapiper.com
Bethany.appleby@us.dlapiper.com

John R. Tarpley
Lewis Thomason, P.C.
424 Church Street, Suite 2500
P.O. Box 198615
Nashville, TN 37219
jtarpley@lewisthomason.com

Janet Strevel Hayes
Lewis Thomason, P.C.
620 Market Street, 5th Floor
P.O. Box 2425
Knoxville, TN 37901
*Attorneys for Premier Franchising Group, LLC d/b/a Premier Martial Arts, Unleashed Brands, LLC, and Myles Baker*

And *via U.S. mail and email:*

Michael C. Keats
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
Michael.Keats@friedfrank.com
*Attorney for Franchise Fastlane, LLC and Brent Seebohm*

And *via U.S. mail*:

Barry Van Over
1351 Charlottesville Blvd
Knoxville, TN 37922

*/s/ Stuart A. Burkhalter*

191